1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NEW YORK
2

3    JERRY GRADL MOTORS, INC., et al)
     (Via Zoom for Government)      ) Case No. 1:21-CV-00409
4                                   )                    (CRR)
                    Plaintiff,      )
5                                   )
     vs.                            ) January 3rd, 2022
6                                   ) 10:00 a.m.
     ACV AUCTIONS, INC., et al      )
7    (Via Zoom for Government)      )
                                    )
8                   Defendant.      )

9
              TRANSCRIPT OF EVIDENTIARY HEARING
10         BEFORE THE HONORABLE CHRISTINA R. REISS
              SENIOR UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:   HOGANWILLIG
                          BY:  RYAN JOHNSEN, ESQ.
14                             EDWARD P. YANKELUNAS, ESQ.
                          2410 North Forest Road, Suite 301
15                        Getzville, NY 14068
                          (Via Zoom for Government)
16
     For the Defendant:   BECKAGE PLLC
17                        BY:  MYRIAH VALENTINA JAWORSKI, ESQ.
                          420 Main Street, Suite 1110
18                        Buffalo, NY 14202
                          (Via Zoom for Government)
19
                          ORRICK
20                        BY:  JONATHAN DIRENFELD, ESQ.
                               JOHN A. JURATA, JR., ESQ.
21                        Columbia Center 1152 15th St., N.W.
                          Washington, DC 20005-1706
22                        (Via Zoom for Government)

23   Court Reporter:      MEGAN E. PELKA, RPR
                          Robert H. Jackson US Courthouse
24                        2 Niagara Square
                          Buffalo, NY 14202
25                        (716) 364-6449
                          (Via Zoom for Government)

```
 1    APPEARANCES CONTINUED:

 2    For Mr. Taylor and Mr. Renzoni:

 3                      LAW OFFICES OF ROBERT R. RADEL
                        BY:  BRIAN MALCHAK, ESQ.
 4                           ROBERT R. RADEL, ESQ.
                        174 Franklin Street
 5                      Buffalo, NY 14202

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:46AM | 1 | THE CLERK:  This is case of Jerry Gradl Motors, Inc. |
| 10:00AM | 2 | and Lifetime Motor Cars, Inc. v. ACV Auctions, Inc., et al. |
| 10:00AM | 3 | 21-CV-409. |
| 10:00AM | 4 | MR. YANKELUNAS:  Good morning, Your Honor, Ed |
| 10:00AM | 5 | Yankelunas.  I've got Nate McMurray with me.  Mr. McMurray had |
| 10:00AM | 6 | an accident on Christmas Eve.  He broke some ribs.  We're |
| 10:00AM | 7 | going to -- it may impact his ability to speak now and then. |
| 10:00AM | 8 | He may have a coughing fit or two, but we'll get through it. |
| 10:00AM | 9 | I just wanted to let you know about that. |
| 10:00AM | 10 | MS. JAWORSKI:  Good morning, Your Honor.  Happy New |
| 10:00AM | 11 | Year.  This is Myriah Jaworski on behalf of defendant ACV |
| 10:00AM | 12 | Auctions.  I also have my co-counsel Jay Jurata and John |
| 10:00AM | 13 | Direnfeld with us this morning. |
| 10:00AM | 14 | Your Honor, Christopher Taylor and Tim Renzoni are here |
| 10:01AM | 15 | with their counsel, Mr. Robert Radel and I appreciate the |
| 10:01AM | 16 | introduction of Nate McMurray.  I do wonder if, given that |
| 10:01AM | 17 | this is an evidentiary hearing, we should ask the non- |
| 10:01AM | 18 | testifying witness to step out during the testimony of the |
| 10:01AM | 19 | other witnesses if Your Honor has a preference. |
| 10:01AM | 20 | THE COURT:  If you're asking for that, ask to |
| 10:01AM | 21 | sequester witnesses, it's mandatory that that happens, so I |
| 10:01AM | 22 | would grant that request if you're making it. |
| 10:01AM | 23 | MS. JAWORSKI:  I am making it, Your Honor. |
| 10:01AM | 24 | THE COURT:  All right.  So if it's not your turn to |
| 10:01AM | 25 | testify, you should not be listening in and let's figure out |

10:01AM    1    the term to testify.  This is defendant's motion so I will

10:01AM    2    allow you to go forward with whichever witness you choose

10:01AM    3    first and have the other witnesses excused.

10:01AM    4         MS. JAWORSKI:  Thank you, Your Honor.  We intend to

10:01AM    5    call Christopher Taylor first.

10:01AM    6         THE COURT:  Okay.  Christopher Taylor will come first

10:01AM    7    and then I want the other attorneys, plaintiffs' attorneys

10:02AM    8    to -- and as well as defendants, to have some method for

10:02AM    9    letting the witness know that they're up.  So, email, instant

10:02AM   10    messaging, however you want to do that, lets get that squared

10:02AM   11    away and I'll start with plaintiffs.  Are you all set for how

10:02AM   12    you're going to let Mr. McMurray know to come on?

10:02AM   13         MR. YANKELUNAS:  He's going to leave the room, Judge.

10:02AM   14    He's a couple second away.  I will go get him when it's his

10:02AM   15    turn.

10:02AM   16         THE COURT:  So you're doing it old school.

10:02AM   17         MR. YANKELUNAS:  Yeah.  Co-counsel is Ryan Johnsen.

10:02AM   18    He's with me.  He's on the screen now as well.

10:02AM   19         THE COURT:  All right.  And defendants, are you all

10:02AM   20    set as to how you're going to let your witness know, the next

10:02AM   21    witness, that they're up?

10:02AM   22         MS. JAWORSKI:  I think we'll be relying on Mr. Radel

10:02AM   23    for that.  Rob, could you ask Tim Renzoni to leave the room

10:02AM   24    and would you be responsible for calling him back in?

10:03AM   25         MR. RADEL:  Yes.  And Mr. Renzoni will be leaving the

| | | |
|---|---|---|
| 10:03AM | 1 | building that we are in and will be moving to another separate |
| 10:03AM | 2 | building.  With that knowledge, we would ask for a moment or |
| 10:03AM | 3 | two when we have to call him because we'll have to physically |
| 10:03AM | 4 | go into another building to call him into where we're giving |
| 10:03AM | 5 | testimony. |
| 10:03AM | 6 | THE COURT:  How far away is this other building? |
| 10:03AM | 7 | MR. RADEL:  About 100 feet, Your Honor. |
| 10:04AM | 8 | THE COURT:  That sounds good. |
| 10:04AM | 9 | MR. JOHNSEN:  I'm helping Mr. Yankelunas with the |
| 10:04AM | 10 | technology, so I have some exhibits I just want to make sure |
| 10:04AM | 11 | we're able to share our screens when it's time to have |
| 10:04AM | 12 | evidentiary pieces.  There's also an audio recording that I |
| 10:04AM | 13 | believe Myriah and Ed had talked about getting into evidence |
| 10:04AM | 14 | here and we've had discussion with counsel to stipulate to |
| 10:04AM | 15 | these things.  So if there is a technological blip of me |
| 10:04AM | 16 | running back and forth between my laptop and Ed's, just please |
| 10:04AM | 17 | forgive me in advance. |
| 10:04AM | 18 | THE COURT:  Okay.  The other thing I'm going to ask |
| 10:04AM | 19 | you to do is announce yourself before your speaking.  I don't |
| 10:04AM | 20 | know what's it's like to be a court reporter in the arena of |
| 10:04AM | 21 | Zoom but even for me looking at the Hollywood Squares and |
| 10:04AM | 22 | trying to figure out who is actually speaking is problematic. |
| 10:04AM | 23 | So go ahead and announce yourself each time you speak and I'll |
| 10:04AM | 24 | try to do the same.  Ms. Duque, I'm going to have the |
| 10:04AM | 25 | defendants call their first witness and I'm going to have you |

| | | |
|---|---|---|
| 10:04AM | 1 | swear that person in. |
| 10:05AM | 2 | THE CLERK:  Thank you. |
| 10:05AM | 3 | MS. JAWORSKI:  This is Myriah Jaworski on behalf of |
| 10:05AM | 4 | the ACV Auctions.  We call Christopher Taylor. |
| 10:05AM | 5 | (The witness was sworn at 10:05 a.m.) |
| 10:05AM | 6 | |
| 10:05AM | 7 | DIRECT EXAMINATION |
| 10:05AM | 8 | |
| 10:05AM | 9 | BY MS. JAWORSKI: |
| 10:05AM | 10 | Q.  Good morning.  As mentioned, my name is Myriah Jaworski. |
| 10:05AM | 11 | I'm counsel for defendant ACV Auctions.  Can you see and hear |
| 10:05AM | 12 | me all right? |
| 10:05AM | 13 | A.  Yes, I can. |
| 10:05AM | 14 | Q.  If you experience any technological glitches, frozen |
| 10:05AM | 15 | screens, et cetera, just let me know.  I can easily repeat |
| 10:05AM | 16 | the questions. |
| 10:05AM | 17 | A.  Will do. |
| 10:05AM | 18 | Q.  Mr. Taylor, please introduce yourself to the Court. |
| 10:05AM | 19 | A.  Hi.  My name is I'm Christopher Taylor.  I'm the owner or |
| 10:05AM | 20 | co-owner of Certified Auto Brokers here at 1693 Grand Island |
| 10:05AM | 21 | Boulevard in Grand Island, New York. |
| 10:06AM | 22 | Q.  And where do you live? |
| 10:06AM | 23 | A.  At 4025 West River Road also here in Grand Island, New |
| 10:06AM | 24 | York. |
| 10:06AM | 25 | Q.  And what do you do for a living? |

| | | |
|---|---|---|
| 10:06AM | 1 | A.  I am the owner of this car dealership. |
| 10:06AM | 2 | Q.  And how many years of experience do you have in the |
| 10:06AM | 3 | automobile sales industry? |
| 10:06AM | 4 | A.  Seventeen years. |
| 10:06AM | 5 | Q.  And what type of vehicles does Certified Auto Brokers |
| 10:06AM | 6 | sell? |
| 10:06AM | 7 | A.  Used vehicles. |
| 10:06AM | 8 | Q.  Does it sell new cars? |
| 10:06AM | 9 | A.  No. |
| 10:06AM | 10 | Q.  Does Certified Auto Brokers post its inventory online? |
| 10:06AM | 11 | A.  Most of it.  Yes. |
| 10:06AM | 12 | Q.  Does it post its hours of operation online? |
| 10:06AM | 13 | A.  Yes. |
| 10:06AM | 14 | Q.  When did Certified Auto Brokers open its doors and start |
| 10:06AM | 15 | operating? |
| 10:06AM | 16 | A.  In September 2010. |
| 10:06AM | 17 | Q.  Has Certified Auto Brokers ever expanded its facility? |
| 10:06AM | 18 | A.  Several times.  Yes. |
| 10:06AM | 19 | Q.  I would like to draw your attention to a ceremony, a |
| 10:07AM | 20 | ribbon cutting ceremony, in 2016.  If you recall, can you |
| 10:07AM | 21 | explain what occurred then? |
| 10:07AM | 22 | A.  That was well, to-date, our largest expansion.  We had |
| 10:07AM | 23 | expanded the footprint of our lot, the actual storage |
| 10:07AM | 24 | facility for the vehicles that are for sale as well as made a |
| 10:07AM | 25 | significant expansion to the service area, to the building as |

| | | |
|---|---|---|
| 10:07AM | 1 | a whole.  We added four bays of service to our store.  So |
| 10:07AM | 2 | that would have been the ribbon cutting ceremony for that. |
| 10:07AM | 3 | Q.  Do you recall the date of the ribbon cutting ceremony? |
| 10:07AM | 4 | A.  I do not. |
| 10:07AM | 5 | Q.  I'm going to share my screen.  One moment please.  Can |
| 10:07AM | 6 | you see my screen? |
| 10:07AM | 7 | A.  Yes, I can. |
| 10:07AM | 8 | Q.  This is what's already in the record as Exhibit A to the |
| 10:07AM | 9 | affidavit of Nathan McMurray.  It's on Docket 73 and the |
| 10:07AM | 10 | affidavit is dated September 27th, 2021.  Mr. Taylor, do you |
| 10:08AM | 11 | recognize this picture? |
| 10:08AM | 12 | A.  I do.  Yes. |
| 10:08AM | 13 | Q.  And what is it? |
| 10:08AM | 14 | A.  That would be a picture from the ribbon cutting ceremony |
| 10:08AM | 15 | that we were just speaking about.  That's Travis, my partner, |
| 10:08AM | 16 | next to me and myself cutting the ribbon with some of the |
| 10:08AM | 17 | town council, Mr. McMurray, and some of the Chamber of |
| 10:08AM | 18 | Commerce folks as well as a number of my employees there |
| 10:08AM | 19 | behind me. |
| 10:08AM | 20 | Q.  And it says in this picture that the event was held on |
| 10:08AM | 21 | July 6th.  Do you recall the year? |
| 10:08AM | 22 | A.  Five years ago so 2016. |
| 10:08AM | 23 | Q.  And again, could you identify any of the individuals in |
| 10:08AM | 24 | this picture? |
| 10:08AM | 25 | A.  I could identify them all if you want me to. |

| 10:08AM | 1 | Q.  Yes, please. |

10:08AM   1   Q.  Yes, please.

10:08AM   2   A.  Starting from the left is Jim Sharpe.  He's politician

10:08AM   3   from Grand Island.  I think he was maybe on the Chamber of

10:08AM   4   Commerce at the time.  Below him is Frank, I can't remember

10:08AM   5   his last name.  He was in detail and one of our employees.

10:09AM   6   Eric Finkelborn is then right next to him.  He is the

10:09AM   7   president of the Grand Island Chamber of Commerce.  Behind

10:09AM   8   me, off my left shoulder there, I'm forgetting his name.  He

10:09AM   9   was a -- I believe he was a councilman at the time.

10:09AM   10   Travis Smith, right next to me, my business partner.

10:09AM   11   Behind him Was another gentleman and now I'm forgetting his

10:09AM   12   name.  He was an employee here about five years ago.  Next to

10:09AM   13   him is Alec Metro.  He's currently our marketing director.

10:09AM   14   Next to him, the head above Mr. McMurray's shoulder is Joel

10:09AM   15   Finlasen.  He's our service manager.  And then, of course, Mr.

10:09AM   16   McMurray.  Next to him, I don't -- I can't identify who that

10:09AM   17   is in this picture.

10:09AM   18   And then next to Mr. McMurray, the woman, maybe it's Liz

10:10AM   19   Wilbur.  I think she was also a -- I don't know if -- she

10:10AM   20   wasn't on the town council.  I think she was on one of the

10:10AM   21   boards or something like that.  I can't recall her name off

10:10AM   22   the top of my head.

10:10AM   23   Q.  So you've identified Mr. McMurray and it sounds like

10:10AM   24   other representatives of town government were in attendance

10:10AM   25   at this ribbon cutting ceremony, correct?

TAYLOR -- BY MS. JAWORSKI -- 01/03/2022

8

| | | |
|---|---|---|
| 10:10AM | 1 | A.  Correct. |
| 10:10AM | 2 | Q.  And members of the Grand Island Chamber of Commerce, |
| 10:10AM | 3 | correct? |
| 10:10AM | 4 | A.  Correct. |
| 10:10AM | 5 | Q.  And in what capacity was Mr. McMurray invited to this |
| 10:10AM | 6 | ribbon cutting, if you know? |
| 10:10AM | 7 | A.  He was the town supervisor at the time.  I think |
| 10:10AM | 8 | typically when we do one of these things, you know, we're car |
| 10:10AM | 9 | salesmen, so we take as much publicity as we can, but we try |
| 10:10AM | 10 | to get everybody in the town.  I sent out an invite usually |
| 10:10AM | 11 | to all the -- almost to the entire town hall. |
| 10:10AM | 12 | Q.  He was invited as a local politician? |
| 10:10AM | 13 | A.  Yes.  He was -- I believe he was the town supervisor at |
| 10:10AM | 14 | the time. |
| 10:10AM | 15 | Q.  And again, you testified that I was in 2016 correct? |
| 10:10AM | 16 | A.  Correct to the best of my recollection. |
| 10:11AM | 17 | Q.  I'm going to stop sharing my screen.  Mr. Taylor, are you |
| 10:11AM | 18 | familiar with something known as the West Road Shoreline |
| 10:11AM | 19 | Trail? |
| 10:11AM | 20 | A.  Yes I am. |
| 10:11AM | 21 | Q.  And what is it? |
| 10:11AM | 22 | A.  It was -- there used to see a parkway a 55 mile-an-hour |
| 10:11AM | 23 | parkway that went along the shoreline of West River Road, |
| 10:11AM | 24 | which is where I live.  They eliminated that parkway and |
| 10:11AM | 25 | turned it into a bike path.  And I guess part -- it was |

10:11AM    1    always a park.  It was always part of the state parks, but

10:11AM    2    they eliminated the parkway and turned it into a bike path.

10:11AM    3    Q.  And what time period was this that they eliminated the

10:11AM    4    parkway and turned it into a trail or a bike path?

10:11AM    5    A.  I can only give you a ballpark, three to five years ago.

10:11AM    6    Q.  And at the time, did you have a position on the West Road

10:11AM    7    River Trail?

10:11AM    8    A.  I didn't take up too much of a position but I was kind of

10:12AM    9    for it.  My house is right at the beginning of the parkway

10:12AM   10    and was, in the summertime, often the location of many drag

10:12AM   11    races late at night.  So the parkway being gone was a

10:12AM   12    positive for my house I think, you know?  It just got a lot

10:12AM   13    quieter after the parkway was gone.

10:12AM   14    Q.  I'm going to share my screen to show you the affidavit of

10:12AM   15    Mr. McMurray.  One moment.  Can you see my screen?

10:12AM   16    A.  Yes.

10:12AM   17    Q.  I would like to direct you to paragraph 6 of the McMurray

10:12AM   18    affidavit which reads, I am proud of the West River Trail.

10:12AM   19    Today, the trail is quite beautiful and widely embraced, but

10:12AM   20    at the time, Mr. Taylor told me on numerous occasions that he

10:12AM   21    was against the trail.  On one occasion, he yelled at me,

10:12AM   22    saying that I was ruining his dream home.  You just testified

10:12AM   23    that you were generally in favor of the West Road Shoreline

10:12AM   24    Trail; is that correct?

10:12AM   25    A.  Yes, that's correct.

TAYLOR -- BY MS. JAWORSKI -- 01/03/2022

10

10:13AM 1 Q.  So is it incorrect for McMurray to say that you oppose

10:13AM 2 the trail?

10:13AM 3 A.  Completely.

10:13AM 4 Q.  Do you recall making any statements to Mr. McMurray about

10:13AM 5 the West River Road Shoreline Trail?

10:13AM 6 A.  I did not.

10:13AM 7 Q.  Did you communicate your displeasure about the trail or

10:13AM 8 anything associated with the trail to Mr. McMurray?

10:13AM 9 A.  Never.  I was for the trail.

10:13AM 10 Q.  Do you have any understanding of Mr. McMurray's

10:13AM 11 statements that on one occasion you yelled at him and said it

10:13AM 12 was ruining his dream home?

10:13AM 13 A.  I did not yell at Mr. McMurray and I do not recall that

10:13AM 14 conversation at all.  I can say probably that he probably --

10:13AM 15 there was a lot of opposition to it and I was a house in a

10:13AM 16 row of 30 homes with no, you know, keep the parkway signs in

10:13AM 17 their yards.  I was not a participant of that, so maybe he's

10:13AM 18 got me confused with somebody else.

10:13AM 19 Q.  Did you ever have cause to interact with Mr. McMurray

10:14AM 20 about any other town-oriented proposals?

10:14AM 21 A.  Only interactions we ever had were again, you know,

10:14AM 22 invites to things like the ribbon cutting.  He was

10:14AM 23 occasionally involved.  I was a committee member for the

10:14AM 24 DeGlopper Memorial Committee which was a memorial that we

10:14AM 25 worked to put together for the those that were killed in

10:14AM   1   action on the Town of Grand Island.  My uncle was one of them

10:14AM   2   memorialized there.  Mr. McMurray would occasionally come to

10:14AM   3   ceremonies for that and I think he attended a meeting or two.

10:14AM   4   So those are the only time I can ever remember, you know,

10:14AM   5   being in the same general vicinity as Mr. McMurray.

10:14AM   6   Q.  And do you use the trail today?

10:14AM   7   A.  Often.  I have a one-year-old and three-year-old, so --

10:14AM   8   Q.  Are you related to Mr. McMurray in any way?

10:14AM   9   A.  No.

10:14AM   10  Q.  Are you related to any HoganWillig attorney?

10:15AM   11  A.  No.

10:15AM   12  Q.  Do you have any personal animus against Mr. McMurray

10:15AM   13  based on any of your prior interactions with him in the

10:15AM   14  2016-2017 time period?

10:15AM   15  A.  Not at all.

10:15AM   16  Q.  Have you ever sought legal counsel for Mr. McMurray?

10:15AM   17  A.  I have not.

10:15AM   18  Q.  Have you ever sought legal counsel from anyone at the law

10:15AM   19  firm of HoganWillig?

10:15AM   20  A.  I have not.

10:15AM   21  Q.  Have you ever been a client of Mr. McMurray's?

10:15AM   22  A.  I have not.

10:15AM   23  Q.  Have you ever been a client of HoganWillig's?

10:15AM   24  A.  I have not.

10:15AM   25  Q.  I'd like to now draw your attention to the events of

10:15AM    1    July 22nd, 2021 which is the subject matter of today's

10:15AM    2    hearing.  Can you please describe what you recall about the

10:15AM    3    events of July 22nd, 2021?

10:15AM    4    A.   Yeah.  It was the end of business.  We were just kind of

10:15AM    5    wrapping up the day and I believe I was outside doing what we

10:16AM    6    call lot walk, which is just making sure vehicles were where

10:16AM    7    they needed to be, things were secured.  I came back in the

10:16AM    8    front door of the building and noticed that one of my sales

10:16AM    9    representatives, Tim Renzoni, was in his office with what I

10:16AM    10    believed to be a customer.  As I approached, I noticed I

10:16AM    11    recognized the customer and it was Mr. McMurray.

10:16AM    12    So, at that point, I walked in and said hello.  And he

10:16AM    13    remembered who I was.  And then Tim chimed in and just said,

10:16AM    14    Mr. McMurray was here looking at a truck.  So I obviously

10:16AM    15    jumped into that, asking him what he was looking for.  That

10:16AM    16    conversation lasted about a minute and then Mr. McMurray asked

10:16AM    17    me or said that he had actually something he'd like to talk to

10:16AM    18    me about and asked if we could speak in private.

10:17AM    19    Q.   And then what happened?

10:17AM    20    A.   I said, yes and it was a bit -- it was very awkward

10:17AM    21    because we're in a fairly small office with Tim.  I'm in

10:17AM    22    between the door.  Tim kind of gestured to leave but

10:17AM    23    Mr. McMurray jumped kind of right into the conversation.  I

10:17AM    24    recall looking at Tim with a, you know, what do we do now

10:17AM    25    look and Mr. McMurray just continued on with his pitch,

10:17AM 1  which -- he started in asking me if I did work with ACV.  I

10:17AM 2  wasn't real sure where the questioning was going, but then he

10:17AM 3  started to talk about the current lawsuit.  Then he asked me

10:17AM 4  if I was aware that he works for the firm that was

10:17AM 5  representing the -- so he explained to me that he worked for

10:18AM 6  HoganWillig and HoganWillig was the law firm representing a

10:18AM 7  couple of dealerships.  He mentioned their names, Sunshine

10:18AM 8  something-or-other and another local dealer.  He -- sorry.

10:18AM 9  Go ahead.

10:18AM 10 Q.  No.  Continue.

10:18AM 11 A.  He dove into the lawsuit, how he believed that ACV

10:18AM 12 Auctions and, very specifically, he referred to Mr. Nieman,

10:18AM 13 Joe Nieman, the founder, several times.  He asked them -- or

10:18AM 14 he asked -- he told me that they had been accused of shill

10:18AM 15 bidding and then got into some legal terms I didn't

10:18AM 16 understand, RICO, and things like that.  He then went on to

10:18AM 17 state that or he then went on to ask me -- this is where

10:19AM 18 things got weird.

10:19AM 19     He went on to ask me, you know, how I felt about Joe

10:19AM 20 Nieman personally, how I felt about his success.  I felt like

10:19AM 21 he was implying that Joe had become successful by the use of,

10:19AM 22 you know, maybe tactics that weren't truthful.  He then asked

10:19AM 23 how my relationship was with ACV Auctions as a working

10:19AM 24 relationship.  And then he, after I answered those questions,

10:19AM 25 he went on to say that they'd like to talk to me further.  He

10:19AM    1   implied that I would come onto the lawsuit -- if I came into

10:19AM    2   the lawsuit, there was a large lawsuit monetarily and if I

10:19AM    3   joined the lawsuit and they won, of course, then we could

10:19AM    4   financially benefit from that.  And then he asked me --

10:19AM    5   Q.  Excuse me.  So he asked you to join the lawsuit, is that

10:20AM    6   your testimony here today?

10:20AM    7   A.  Yeah.  He asked he to join the lawsuit.  I did tell him

10:20AM    8   that it was something I would consider then.  He asked me to

10:20AM    9   -- if I would be willing to meet with him and it sounded like

10:20AM   10   other attorneys or other representatives of HoganWillig at

10:20AM   11   their office.

10:20AM   12   Q.  When he asked you to join the lawsuit, who did he say

10:20AM   13   would you representing you in the lawsuit?

10:20AM   14   A.  HoganWillig.

10:20AM   15   Q.  And how long did this conversation last for?

10:20AM   16   A.  Ten to fifteen minutes.

10:20AM   17   Q.  And what portion of your communications with Mr. McMurray

10:20AM   18   were a discussion of the lawsuit?

10:20AM   19   A.  Everything but -- that was what was odd about the

10:20AM   20   conversation, was that it was one minute of a truck and the

10:20AM   21   rest of it was the lawsuit.

10:20AM   22   Q.  And to be clear, he initiated the discussion of the

10:20AM   23   lawsuit with you, correct?

10:20AM   24   A.  One hundred percent.  I was unaware that he worked -- at

10:20AM   25   that moment, I didn't know that he worked for HoganWillig.

| 10:21AM | 1 | MR. YANKELUNAS:  Object to the leading, Judge.  I |
| 10:21AM | 2 | should have objected earlier. |
| 10:21AM | 3 | THE COURT:  Yes.  So it was leading.  You objected |
| 10:21AM | 4 | too late.  Don't lead anymore. |
| 10:21AM | 5 | MS. JAWORSKI:  Understood. |
| 10:21AM | 6 | BY MS. JAWORSKI: |
| 10:21AM | 7 | Q.  Who else was present with you and Mr. McMurray? |
| 10:21AM | 8 | A.  Mr. Tim Renzoni. |
| 10:21AM | 9 | Q.  Did Mr. McMurray make any statements to you about money? |
| 10:21AM | 10 | A.  He just mentioned that the lawsuit was for a large sum or |
| 10:21AM | 11 | I can't recollect his exact words, but he made it known that |
| 10:21AM | 12 | the lawsuit, if they won the lawsuit, there would be a lot of |
| 10:21AM | 13 | money involved.  And he specifically stated that if we were a |
| 10:21AM | 14 | part of the lawsuit, then we would have a piece of that. |
| 10:21AM | 15 | Q.  How did the conversation with Mr. McMurray make you feel? |
| 10:22AM | 16 | A.  Very uncomfortable. |
| 10:22AM | 17 | Q.  And based on his statement to you, what did you perceive |
| 10:22AM | 18 | Mr. McMurray's purpose was in speaking with you? |
| 10:22AM | 19 | MR. YANKELUNAS:  Object to the form.  It's leading. |
| 10:22AM | 20 | THE COURT:  That is -- it's not so much that it's |
| 10:22AM | 21 | leading, it's asking him to look into the state of mind and |
| 10:22AM | 22 | intent of somebody else.  So you can ask the same question |
| 10:22AM | 23 | differently, but the stated purpose, as far as this witness is |
| 10:22AM | 24 | concerned, is what's said to him, unless there is some other |
| 10:22AM | 25 | information that he's gathering. |

| | | |
|---|---|---|
| 10:22AM | 1 | BY MS. JAWORSKI: |
| 10:22AM | 2 | Q.  Did Mr. McMurray state the purpose of his communications |
| 10:22AM | 3 | with you? |
| 10:22AM | 4 | A.  Yes. |
| 10:22AM | 5 | Q.  What was the purpose as stated to you? |
| 10:22AM | 6 | A.  The first minute was looking into buying a truck and the |
| 10:22AM | 7 | next 15 minutes were to join the lawsuit. |
| 10:23AM | 8 | Q.  I'd like to, again, share the McMurray affidavit by share |
| 10:23AM | 9 | screen with you.  One moment.  I'd like to draw your |
| 10:23AM | 10 | attention to paragraph 11 and specifically, the third |
| 10:23AM | 11 | sentence which states, he, meaning you Christopher Taylor, |
| 10:23AM | 12 | gave me a business card.  Did you give Mr. McMurray your |
| 10:23AM | 13 | business card? |
| 10:23AM | 14 | A.  No. |
| 10:23AM | 15 | Q.  Do you have a business card? |
| 10:23AM | 16 | A.  I do not. |
| 10:23AM | 17 | Q.  So would you agree that it's incorrect for Mr. McMurray |
| 10:23AM | 18 | to state that you gave him a business card? |
| 10:23AM | 19 | A.  Yes.  I had not had business cards for years. |
| 10:23AM | 20 | MR. YANKELUNAS:  Objection.  That's not what the |
| 10:23AM | 21 | affidavit says. |
| 10:23AM | 22 | MS. JAWORSKI:  Mr. Taylor -- |
| 10:23AM | 23 | THE COURT:  So the question is asking him whether |
| 10:23AM | 24 | it's incorrect.  You have to actually be verbatim about what's |
| 10:23AM | 25 | said in the affidavit.  You can't paraphrase it and them ask |

10:24AM   1   him if it's correct.

10:24AM   2          MS. JAWORSKI:  I apologize my screen just froze.  Was

10:24AM   3   there an objection to my question?

10:24AM   4          MR. YANKELUNAS:  Yes.

10:24AM   5   BY MS. JAWORSKI:

10:24AM   6   Q.  Mr. Taylor, did you see paragraph 11, sentence 3, of the

10:24AM   7   McMurray affidavit?

10:24AM   8   A.  Yes, I did.

10:24AM   9   Q.  Did you give Mr. McMurray your business card?

10:24AM  10   A.  No I did not.

10:24AM  11   Q.  Do you have a business cord?

10:24AM  12   A.  No I do not.

10:24AM  13   Q.  Following Mr. McMurray's visit to Certified Auto Brokers,

10:24AM  14   did you ever call Mr. McMurray?

10:24AM  15   A.  No I did not.

10:24AM  16   Q.  Did you take Mr. McMurray up on his officer to meet with

10:24AM  17   him at HoganWillig's office?

10:24AM  18   A.  No I did not.

10:24AM  19   Q.  Did Mr. McMurray ever contact you?

10:24AM  20   A.  I believe so.

10:24AM  21   Q.  Can you explain?

10:24AM  22   A.  I received a call a day or two later from a phone number,

10:24AM  23   a local number.  This might seem odd, but I Google searched

10:24AM  24   it because it didn't leave a voicemail, it's something I

10:25AM  25   commonly do, and that number came back to HoganWillig.

TAYLOR -- BY MS. JAWORSKI -- 01/03/2022

18

| | | |
|---|---|---|
| 10:25AM | 1 | Q.  And is that a standard practice of yours to Google |
| 10:25AM | 2 | numbers that you don't recognize. |
| 10:25AM | 3 | A.  Yeah.  Again, it seems maybe odd but sometimes I need to |
| 10:25AM | 4 | call somebody back.  They might lot leave a voicemail for one |
| 10:25AM | 5 | reason or the other.  If they're important, then I want to |
| 10:25AM | 6 | call them back or honestly, I might want to avoid talking to |
| 10:25AM | 7 | them, so I like to know who I'm calling first. |
| 10:25AM | 8 | Q.  And in the days following Mr. McMurray's visit and offer |
| 10:25AM | 9 | to represent CAB in a lawsuit, what, if anything, did you do? |
| 10:25AM | 10 | A.  Can you repeat the question? |
| 10:25AM | 11 | Q.  In the days following McMurray's visit to CAB? |
| 10:25AM | 12 | A.  Right.  Sure. |
| 10:25AM | 13 | Q.  What, if anything, did you do? |
| 10:25AM | 14 | A.  As I stated before, I was really uncomfortable with the |
| 10:25AM | 15 | conversation.  I didn't know that, obvious, this would come |
| 10:25AM | 16 | of it, but I was very uncomfortable with the conversation.  I |
| 10:25AM | 17 | didn't like his line of questioning and I felt that it was |
| 10:26AM | 18 | important that somebody from ACV was at least aware of this. |
| 10:26AM | 19 | I didn't really think a whole lot of it, but I reached |
| 10:26AM | 20 | out to my sales manager who has a close relationship with one |
| 10:26AM | 21 | of the managers there at ACV Auctions and I told my sales |
| 10:26AM | 22 | manager that I think he should reach out to his contact at |
| 10:26AM | 23 | ACV and just simply let him know that there was an attorney |
| 10:26AM | 24 | out there soliciting dealers for this lawsuit.  And so, |
| 10:26AM | 25 | that's what he did.  He reached out to a contact at ACV. |

10:26AM   1   That contact, about a day later, I think, reached out to me

10:26AM   2   and asked me if I'd be willing to speak with their legal

10:26AM   3   counsel.

10:26AM   4   Q.   Returning to the communication that you had with

10:26AM   5   Mr. McMurray on July 22nd, 2021, you indicated just now that

10:27AM   6   there was an attorney soliciting other dealers.  Did

10:27AM   7   Mr. McMurray say anything to you about other dealerships?

10:27AM   8   A.   Yes.

10:27AM   9         MR. YANKELUNAS:  Objection, Judge.  It's a multiple

10:27AM  10   question and it's also leading.

10:27AM  11         THE COURT:  It's not necessarily leading because she

10:27AM  12   is building off of what the witness said and it's proper

10:27AM  13   question and if you can answer it, you may answer it.

10:27AM  14         THE WITNESS:  Yes.  He had mentioned that he had

10:27AM  15   spoken with other dealers and was looking to speak with other

10:27AM  16   dealers.  He also, at one point, asked me if I knew any other

10:27AM  17   dealers that may be interested in this.

10:27AM  18   BY MS. JAWORSKI:

10:27AM  19   Q.   And that's dealers plural or singular?

10:27AM  20   A.   That's plural.

10:27AM  21   Q.   Thank you.  Returning to your decision to contact an ACV

10:27AM  22   representative, as you just testified to, what happened next?

10:27AM  23   A.   That ACVA representative reached out to me and asked if

10:27AM  24   I'd be willing to meet with their legal counsel.

10:28AM  25   Q.   And did you meet with their legal counsel?

10:28AM   1    A.   Yes I did.

10:28AM   2    Q.   And what happened next?

10:28AM   3    A.   They just -- he just asked me a series of questions

10:28AM   4    similar to these, as to what occurred during our brief

10:28AM   5    meeting at the dealership and I told him what I recalled.

10:28AM   6    Q.   Did you prepare an affidavit?

10:28AM   7    A.   Yes I did.  Yeah.  They asked me to sign a legal -- an

10:28AM   8    affidavit.  Yeah.  Go on record.

10:28AM   9    Q.   And did you review and authorize the affidavit prior to

10:28AM   10   its filing?

10:28AM   11   A.   Yes I did.

10:28AM   12   Q.   Did you review the affidavit for accuracy and

10:28AM   13   truthfulness?

10:28AM   14   A.   Yes I did.

10:28AM   15   Q.   Did anyone pressure you or require you to submit the

10:28AM   16   affidavit?

10:28AM   17   A.   Not at all.

10:28AM   18   Q.   Are you being compensated for your time here today?

10:28AM   19   A.   No.

10:28AM   20   Q.   Has ACV made any promises to you in exchange for your

10:28AM   21   testimony?

10:29AM   22   A.   None.

10:29AM   23   Q.   Has anyone made any promises to you in exchange for your

10:29AM   24   testimony?

10:29AM   25   A.   No.

10:29AM  1    Q.  You have counsel representing you today, correct?

10:29AM  2    A.  Yes I do.

10:29AM  3    Q.  And you are here pursuant to a court-ordered subpoena

10:29AM  4    issued by HoganWillig; is that right?

10:29AM  5    A.  That's correct.

10:29AM  6         MS. JAWORSKI:  We have no further questions at this

10:29AM  7    time but reserve the opportunity for redirect.

10:29AM  8         THE COURT:  Any cross?

10:29AM  9         MR. YANKELUNAS:  Yes, Your Honor.

10:29AM 10

10:29AM 11                          CROSS-EXAMINATION

10:29AM 12

10:29AM 13    MR. YANKELUNAS:

10:29AM 14    Q.  Mr. Taylor, you indicated that you were contacted by

10:29AM 15    someone at ACV, but you didn't identify who that was.  Who

10:29AM 16    contacted you?

10:29AM 17    A.  James.  We call him Jamie.  I'm not sure what his full

10:29AM 18    legal name is, but Jamie Rayman.

10:29AM 19    Q.  Okay.  Did you speak to Joe Nieman about your

10:29AM 20    conversation with Mr. McMurray?

10:29AM 21    A.  No I did not.

10:29AM 22    Q.  Okay.  Now you testified about your ribbon cutting

10:29AM 23    ceremony in 2017 I believe it was; is that right?

10:30AM 24    A.  I thought it was '16, but it could be '17.  I'm not the

10:30AM 25    best.

TAYLOR -- BY MR. YANKELUNAS -- 01/03/2022

22

| 10:30AM | 1 | Q.  Now Mr. McMurray was there? |
| 10:30AM | 2 | A.  Yes. |
| 10:30AM | 3 | Q.  He was there because you asked him to be there? |
| 10:30AM | 4 | A.  Yes. |
| 10:30AM | 5 | Q.  Okay.  Were there other occasions when you asked for |
| 10:30AM | 6 | Mr. McMurray's support in his capacity as a town supervisor? |
| 10:30AM | 7 | A.  Directly, not that I recall. |
| 10:30AM | 8 | Q.  Indirectly? |
| 10:30AM | 9 | A.  Again I worked on the DeGlopper Memorial Committee so, |
| 10:30AM | 10 | you know, possibly. |
| 10:30AM | 11 | Q.  Okay.  Well, you were active in town politics; is that |
| 10:30AM | 12 | true? |
| 10:30AM | 13 | A.  No.  Not at all. |
| 10:30AM | 14 | Q.  You didn't consider Mr. McMurray to be someone you had a |
| 10:30AM | 15 | political association with, either for or against? |
| 10:30AM | 16 | A.  No.  Not at all. |
| 10:30AM | 17 | Q.  Now you certainly knew Mr. McMurray before July 22nd, |
| 10:30AM | 18 | 2021, correct? |
| 10:30AM | 19 | A.  Correct.  Yes. |
| 10:30AM | 20 | Q.  All right.  Why isn't that in your affidavit? |
| 10:31AM | 21 | A.  I don't know.  Maybe somebody didn't -- I don't know. |
| 10:31AM | 22 | Q.  You don't know.  Now when you spoke to ACV, did you |
| 10:31AM | 23 | indicate to Mr. ACV that you knew Mr. Taylor? |
| 10:31AM | 24 | A.  I am Mr. Taylor. |
| 10:31AM | 25 | Q.  Sorry.  Mr. McMurray? |

TAYLOR -- BY MR. YANKELUNAS -- 01/03/2022

10:31AM    1    A.  I don't recall.

10:31AM    2    Q.  Okay.  Well you read your affidavit for accuracy.  You

10:31AM    3    just testified to that?

10:31AM    4    A.  Yes.

10:31AM    5    Q.  And you noticed, I assume, that there was no reference to

10:31AM    6    you knowing Mr. McMurray?

10:31AM    7    A.  I did not notice until you just brought it up.

10:31AM    8    Q.  Never occurred to you that that might be some important

10:31AM    9    you should disclose?

10:31AM   10    A.  No.  I thought, you know, no.

10:31AM   11    Q.  Do you have your affidavit handy sir?

10:31AM   12    A.  I do.  Yeah.

10:31AM   13    Q.  Paragraph 4.  When I walked in, I saw Nate McMurray, who

10:31AM   14    I now know to be an attorney at HoganWillig, speaking with

10:31AM   15    one of the salespeople.  Now you knew when you walked in he

10:32AM   16    was the former town supervisor, correct?

10:32AM   17    A.  I said that in the beginning of this testimony.

10:32AM   18    Q.  Yeah, but you didn't say that in the affidavit.  That's

10:32AM   19    my point sir.  Next one, 29?

10:32AM   20    A.  I'm sorry.  Say again.

10:32AM   21    Q.  Paragraph 29 of your affidavit?

10:32AM   22    A.  Yeah.

10:32AM   23    Q.  I had never heard of HoganWillig before Mr. McMurray

10:32AM   24    walked into my dealership.

10:32AM   25    A.  Correct.

| | | |
|---|---|---|
| 10:32AM | 1 | Q.  Did I read that correctly? |
| 10:32AM | 2 | A.  Yes. |
| 10:32AM | 3 | Q.  Again, once -- you certainly knew who Mr. McMurray was in |
| 10:32AM | 4 | his capacity as town supervisor? |
| 10:32AM | 5 | A.  One hundred percent. |
| 10:32AM | 6 | Q.  Yeah.  You sure did. |
| 10:32AM | 7 | THE COURT:  So, let's not do that. |
| 10:32AM | 8 | MR. YANKELUNAS:  I'm sorry, Judge. |
| 10:32AM | 9 | THE COURT:  If you want an answer -- when I, the |
| 10:32AM | 10 | Judge is talking, nobody else is talking.  You don't answer |
| 10:32AM | 11 | back and let's make sure the questions are not purely |
| 10:32AM | 12 | argumentative. |
| 10:33AM | 13 | MR. YANKELUNAS:  All right. |
| 10:33AM | 14 | BY MR. YANKELUNAS: |
| 10:33AM | 15 | Q.  But let's make sure we're clear on this, Judge -- I'm |
| 10:33AM | 16 | sorry, Mr. Taylor -- you didn't disclose that you knew |
| 10:33AM | 17 | Mr. McMurray. |
| 10:33AM | 18 | A.  Yes, but let's also be clear since you're obviously |
| 10:33AM | 19 | taking this is in a direction, I didn't do that deliberately. |
| 10:33AM | 20 | There was -- |
| 10:33AM | 21 | Q.  Yeah because -- |
| 10:33AM | 22 | A.  You know -- |
| 10:33AM | 23 | Q.  Well -- |
| 10:33AM | 24 | A.  I -- honestly, in my head, it's implied.  I own a |
| 10:33AM | 25 | business in the town that he was the town supervisor.  So I |

10:33AM   1   apologize.  I didn't -- you know, I'm not an attorney.  I

10:33AM   2   don't get nitty-gritty with the details and I understand that

10:33AM   3   those are important.

10:33AM   4   Q.  But you read the affidavit and you understand that it

10:33AM   5   creates the impression that Mr. McMurray was a stranger?

10:33AM   6   A.  I did not understand that at all.  That's not --

10:33AM   7   Q.  Isn't that a fair reading of the affidavit, that he was a

10:33AM   8   stranger?

10:33AM   9   A.  No.  That is not fair.

10:33AM  10   Q.  How do you read the affidavit to say you knew him?

10:33AM  11   A.  I read the affidavit and I know that I knew him.

10:33AM  12   Q.  Well but -- because --

10:33AM  13        THE COURT:  This is not productive and it's also

10:33AM  14   improper.  So it says what it says.  The Court will draw its

10:34AM  15   own conclusions.  Let's have a real question.

10:34AM  16   BY MR. YANKELUNAS:

10:34AM  17   Q.  Now when you spoke with Mr. McMurray about ACV, was that

10:34AM  18   in response to a question from you about what are you up to,

10:34AM  19   something like that?

10:34AM  20   A.  No.  No.  It was directly in response -- his conversation

10:34AM  21   about ACV was completely engaged on its own.  He had asked

10:34AM  22   me, as I stated in my affidavit, if I had a moment to speak

10:34AM  23   privately because there was something else that I wanted to

10:34AM  24   talk to you about, at which point, oddly, he just continued

10:34AM  25   in the conversation about the lawsuit against ACV.

10:34AM    1    Q.  Now somebody drafted the affidavit for you; is that

10:34AM    2    correct sir?

10:34AM    3    A.  Yes.

10:34AM    4    Q.  One of ACV's attorneys?

10:34AM    5    A.  Yeah.  I guess.  I guess.  I don't recall.

10:34AM    6    Q.  Was it Myriah Jaworski?

10:34AM    7    A.  I don't recall for sure.

10:34AM    8    Q.  But one of the attorneys for ACV?

10:34AM    9    A.  I can't say for sure that it was an attorney, but it was

10:35AM   10    a representative at least to some degree of ACV.

10:35AM   11    Q.  Were you -- did you have the opportunity to tell that

10:35AM   12    person that you knew Mr. McMurray?

10:35AM   13    A.  I don't recall.

10:35AM   14    Q.  But you chose not to, correct?

10:35AM   15    A.  I chose not to what?

10:35AM   16    Q.  You either chose not to or you didn't disclose it.  Which

10:35AM   17    was it?

10:35AM   18    A.  I don't know.

10:35AM   19    Q.  Okay.

10:35AM   20         MR. YANKELUNAS:  Judge, we have stipulated certain

10:35AM   21    items into evidence.  One of them is going to be a business

10:35AM   22    card Exhibit 1?

10:35AM   23         THE COURT:  Okay.

10:35AM   24         MR. YANKELUNAS:  On the screen now.

10:35AM   25         THE COURT:  Exhibit 1 is admitted.

| | | |
|---|---|---|
| 10:35AM | 1 | (Exhibit 1 was received in evidence.) |
| 10:35AM | 2 | |
| 10:35AM | 3 | MR. YANKELUNAS:  Yeah.  We've stipulated them in, |
| 10:35AM | 4 | Judge. |
| 10:35AM | 5 | THE COURT:  So keep in mind that you can stipulate. |
| 10:35AM | 6 | I still have to admit it, right? |
| 10:35AM | 7 | MR. YANKELUNAS:  I'm sorry, Your Honor.  We |
| 10:35AM | 8 | stipulated to what we stipulated to.  I understand it has been |
| 10:36AM | 9 | admitted to, Your Honor.  That's it. |
| 10:36AM | 10 | THE COURT:  Okay. |
| 10:36AM | 11 | MR. YANKELUNAS:  We'll get them on the screen now |
| 10:36AM | 12 | Judge. |
| 10:36AM | 13 | MR. JOHNSEN:  This Ryan Johnsen from HoganWillig. |
| 10:36AM | 14 | MR. YANKELUNAS:  There's a second page that's a |
| 10:36AM | 15 | little bit bigger.  There we go.  There's another page too, I |
| 10:36AM | 16 | think. |
| 10:36AM | 17 | MR. JOHNSEN:  This is page 1, Bates 1.  This page 2 |
| 10:36AM | 18 | just marked as Bates 2, and this is page 3, which is Bates 3. |
| 10:36AM | 19 | BY MR. YANKELUNAS: |
| 10:37AM | 20 | Q.  Mr. Taylor, can you identify this exhibit? |
| 10:37AM | 21 | A.  Yes.  That is a business card from my office of Tim |
| 10:37AM | 22 | Renzoni's that is my name and my cell phone number in the |
| 10:37AM | 23 | middle there. |
| 10:37AM | 24 | Q.  Okay.  That's a card that your firm issues in regular |
| 10:37AM | 25 | course of business; is that right? |

TAYLOR -- BY MR. YANKELUNAS -- 01/03/2022

28

| 10:37AM | 1 | A.  That's correct. |
| 10:37AM | 2 | Q.  Is that your handwriting on the card, sir? |
| 10:37AM | 3 | A.  I can't say for sure.  It could be.  I can't say for |
| 10:37AM | 4 | sure. |
| 10:37AM | 5 | Q.  Is that your phone number? |
| 10:37AM | 6 | A.  Yes. |
| 10:37AM | 7 | Q.  Do you recall Mr. McMurray being given this card during |
| 10:37AM | 8 | your meeting with Mr. Renzoni? |
| 10:37AM | 9 | A.  I do not recall. |
| 10:38AM | 10 | Q.  But that is your phone number? |
| 10:38AM | 11 | A.  Yes. |
| 10:38AM | 12 | Q.  You don't have a business card of your own? |
| 10:38AM | 13 | A.  I know that's odd, but I do not. |
| 10:38AM | 14 | Q.  Did you discussion with Mr. McMurray -- strike that. |
| 10:38AM | 15 | I can offer this later, but I'm offering it right now, |
| 10:38AM | 16 | Your Honor. |
| 10:38AM | 17 | THE COURT:  And I admitted it.  So remember you told |
| 10:38AM | 18 | me that Exhibit 1 was stipulated to, I reminded you that the |
| 10:38AM | 19 | Judge admits the evidence, I admitted it, so it's in. |
| 10:38AM | 20 | MR. YANKELUNAS:  Okay.  I'm sorry, Judge. |
| 10:38AM | 21 | BY MR. YANKELUNAS: |
| 10:38AM | 22 | Q.  Do you see the reference to back lot? |
| 10:38AM | 23 | A.  Okay. |
| 10:38AM | 24 | Q.  Do you see it? |
| 10:38AM | 25 | A.  I can't read it, but if you say it's back lot, I can see |

| | | |
|---|---|---|
| 10:38AM | 1 | how that could be back lot. |
| 10:38AM | 2 | Q.  Now, I'll get to that in a second, but do you recall how |
| 10:38AM | 3 | this card had gotten to Mr. McMurray's possession? |
| 10:38AM | 4 | A.  No.  I've already told you I do not. |
| 10:38AM | 5 | Q.  You don't recall whether Mr. Renzoni gave it to him? |
| 10:39AM | 6 | A.  No. |
| 10:39AM | 7 | Q.  Do you recall writing your name and phone number on this |
| 10:39AM | 8 | car during your meeting with Mr. McMurray? |
| 10:39AM | 9 | A.  I do not recall. |
| 10:39AM | 10 | Q.  Do you have any question, reservation, do you doubt for a |
| 10:39AM | 11 | minute that that's your handwriting where it says Christopher |
| 10:39AM | 12 | Taylor? |
| 10:39AM | 13 | A.  It certainly looks like it could be.  I don't doubt it. |
| 10:39AM | 14 | Q.  Well can we agree that it is your handwriting and that's |
| 10:39AM | 15 | your phone number? |
| 10:39AM | 16 | A.  No, we cannot agree to that. |
| 10:39AM | 17 | Q.  That is your phone number? |
| 10:39AM | 18 | A.  Yes.  That's my phone number.  Yes.  That we can agree to |
| 10:39AM | 19 | and have agreed to. |
| 10:39AM | 20 | Q.  But you're telling me you can't recognize your own |
| 10:39AM | 21 | handwriting?  That's not your signature?  You didn't write |
| 10:39AM | 22 | that? |
| 10:39AM | 23 | THE COURT:  How is this not asked and answered |
| 10:39AM | 24 | several times? |
| 10:39AM | 25 | MR. YANKELUNAS:  I'm sorry, Judge.  Sorry. |

| | | |
|---|---|---|
| 10:39AM | 1 | BY MR. YANKELUNAS: |
| 10:39AM | 2 | Q.  You don't know what back lot refers to? |
| 10:39AM | 3 | A.  I'm assuming the back lot refers to one of ACV's |
| 10:39AM | 4 | competitors but I'm not positive.  I don't know. |
| 10:39AM | 5 | Q.  Do you know how it got there? |
| 10:39AM | 6 | A.  I do not. |
| 10:39AM | 7 | Q.  Did either you or Mister -- do you know whether either |
| 10:40AM | 8 | you or Mr. Renzoni mentioned back lot to Mr. McMurray? |
| 10:40AM | 9 | A.  I don't recall that. |
| 10:40AM | 10 | Q.  Do you recall shill bidding being discussed during that |
| 10:40AM | 11 | meeting with Mr. McMurray and Mr. Renzoni? |
| 10:40AM | 12 | A.  Yes, several times. |
| 10:40AM | 13 | Q.  Do you know what shill bidding is? |
| 10:40AM | 14 | A.  No.  Up until recently, thought it was actually called |
| 10:40AM | 15 | shell bidding, but -- |
| 10:40AM | 16 | Q.  Up until when? |
| 10:40AM | 17 | A.  You know after this whole thing came to be, I learned |
| 10:40AM | 18 | that it was shill and I was saying it wrong.  I know what it |
| 10:40AM | 19 | is now and I am aware of the practice in the past in the car |
| 10:40AM | 20 | industry.  We didn't call it shill bidding. |
| 10:40AM | 21 | Q.  You ever heard of shill bidding being mentioned in |
| 10:40AM | 22 | relation to ACV before your meeting with Mr. McMurray? |
| 10:40AM | 23 | A.  No. |
| 10:40AM | 24 | Q.  Now is back lot in any way related to ACV? |
| 10:41AM | 25 | A.  Not to the best of my knowledge besides being in the |

10:41AM   1   same --

10:41AM   2   Q.  Is that something that would have been noted during a

10:41AM   3   conversation about cars?

10:41AM   4   A.  I don't know.  I can't tell you.  I don't recall.

10:41AM   5   Q.  But it's -- back lot is a dealership that sells used

10:41AM   6   cars, isn't it?

10:41AM   7   A.  No.  No they're not.  Back lot is a wholesale platform,

10:41AM   8   an online wholesale platform, very similar to ACV Auctions.

10:41AM   9   Q.  Which sells cars, correct?

10:41AM  10   A.  Correct, but they're not a dealership.

10:41AM  11   Q.  Now did you agree to meet with Mr. McMurray at a later

10:41AM  12   time?

10:41AM  13   A.  I said I would consider it.

10:41AM  14   Q.  Okay.  Consider it for any particular purpose?

10:41AM  15   A.  To discuss the lawsuit.

10:41AM  16   Q.  As a potential --

10:41AM  17   A.  Potentially coming on as a -- I don't know what you call

10:42AM  18   it; plaintiff, client, or something of that nature.

10:42AM  19   Q.  You just discussed becoming a witness in the case?

10:42AM  20   A.  I don't think it was becoming a witness.  It was

10:42AM  21   discussing becoming a client of HoganWillig's.

10:42AM  22   Q.  Did your company have a back lot where it keeps cars?

10:42AM  23   A.  Yes.

10:42AM  24   Q.  Could that be one of the reasons that that reference to

10:42AM  25   back lot is on that card?

10:42AM   1    A.  It could be.  Again, I have absolutely no recollection of

10:42AM   2    anything in regards to back lot.  I just don't recall.

10:42AM   3    Q.  Now is there any discussion about attorneys fees in your

10:42AM   4    meeting with Mr. McMurray?

10:42AM   5    A.  Not that I recall.

10:42AM   6    Q.  You had to sign a retainer agreement?

10:42AM   7    A.  No.

10:42AM   8    Q.  Were you asked to testify?

10:42AM   9    A.  No.

10:42AM  10    Q.  Now did you know that Mr. Renzoni and other people were

10:43AM  11    making phone calls to Mr. McMurray after this July 22

10:43AM  12    meeting?

10:43AM  13    A.  I would hope so.  As a customer, we have a pretty

10:43AM  14    stringent follow-up process to someone that comes in the

10:43AM  15    store and doesn't buy a vehicle.

10:43AM  16    Q.  Were contacts with Mr. McMurray discussed with you after

10:43AM  17    the July 22nd meeting?

10:43AM  18    A.  I don't recall.

10:43AM  19    Q.  But you wouldn't be surprised if there were followed --

10:43AM  20    A.  Definitely wouldn't be surprised.

10:43AM  21    Q.  Because that's what would in happen if someone's in your

10:43AM  22    office looking for a car, right?

10:43AM  23    A.  Correct, 100 percent.

10:43AM  24    Q.  Now other than you calling ACV, did you do anything in

10:43AM  25    response to this meeting with Mr. McMurray?  In other words,

| | | |
|---|---|---|
| 10:43AM | 1 | did you join, do anything in reference to the lawsuit? |
| 10:44AM | 2 | A.  Not that I recall. |
| 10:44AM | 3 | Q.  All right.  Didn't agree to become a plaintiff in the |
| 10:44AM | 4 | lawsuit? |
| 10:44AM | 5 | A.  No, sir. |
| 10:44AM | 6 | THE COURT:  Can we take down this exhibit now? |
| 10:44AM | 7 | MR. YANKELUNAS:  Yes.  Thank you. |
| 10:44AM | 8 | BY MR. YANKELUNAS: |
| 10:44AM | 9 | Q.  You were shaking after your meeting with Mr. McMurray; is |
| 10:44AM | 10 | that correct? |
| 10:44AM | 11 | A.  I was.  I was very nervous. |
| 10:44AM | 12 | Q.  So -- but you didn't have any trouble writing on a |
| 10:44AM | 13 | business card? |
| 10:44AM | 14 | A.  No, I can actually pull myself together. |
| 10:44AM | 15 | Q.  All right.  You're pretty used to having contentious |
| 10:44AM | 16 | conversations with customers, aren't you? |
| 10:44AM | 17 | MS. JAWORSKI:  Objection.  Argumentative. |
| 10:44AM | 18 | THE COURT:  I'll allow it. |
| 10:44AM | 19 | THE WITNESS:  I guess.  I think we have a different |
| 10:44AM | 20 | kind of dealership here and a different kind of sales process, |
| 10:44AM | 21 | so it's not very common or as common as you'd think in the |
| 10:45AM | 22 | sales -- |
| 10:45AM | 23 | Q.  How -- I'm sorry.  How long have you been in business, |
| 10:45AM | 24 | sir? |
| 10:45AM | 25 | A.  For 11 years. |

10:45AM   1   Q.  And I assume that there have been some tough

10:45AM   2   conversations from time to time, right?

10:45AM   3   A.  Sure, from time to time, absolutely.

10:45AM   4   Q.  Do you shake every time you have a tough conversation

10:45AM   5   with somebody?

10:45AM   6   A.  I'm literally shaking right now.  It's just something

10:45AM   7   that I do when I have a little bit of nerves.

10:45AM   8   Q.  Oh, I see.

10:45AM   9          MR. YANKELUNAS:  One more second, Judge, I'm almost

10:45AM   10   done.

10:45AM   11   BY MR. YANKELUNAS:

10:45AM   12   Q.  Did you refer to Joe Nieman in your conversation with

10:45AM   13   Mr. McMurray?

10:45AM   14   A.  Only to respond to his questions.  He had an odd number

10:45AM   15   series of questions in regards to Joe Nieman and our

10:46AM   16   relationship.

10:46AM   17   Q.  Is Joe Nieman a friend of yours?

10:46AM   18   A.  No, he's not.

10:46AM   19   Q.  Is he a business associate of your's?

10:46AM   20   A.  Only to the degree that we do business with ACV.

10:46AM   21   Q.  Do you buy cars off the ACV online platform?

10:46AM   22   A.  We do now.  We just started here in the last probably 60

10:46AM   23   days at a normal rate.  Back then, actually, we did not buy

10:46AM   24   cars from ACV.

10:46AM   25   Q.  On July 22nd, 2021, you weren't buying cars from ACV at

10:46AM   1   all?

10:46AM   2   A.   No.  In the years that we had been signed up with them,

10:46AM   3   we may have bought a handful, but it wasn't a regular

10:46AM   4   occurrence.  We just couldn't find the inventory we were

10:46AM   5   looking for.  We didn't really like the sales platform side

10:46AM   6   of it.

10:46AM   7   Q.   Did you have any objections to their sales tactics on

10:46AM   8   July 22, 2021?

10:46AM   9   A.   No.  My only objection is that you can't tell who you're

10:46AM  10   buying from.  That always drove me nuts.  I understand the

10:46AM  11   reasoning behind it but that's why I didn't buy from the

10:46AM  12   platform.

10:46AM  13   Q.   Did you tell Mr. McMurray that you started with Joe

10:47AM  14   Nieman?

10:47AM  15   A.   Yeah.  We started the same year.  Our companies were

10:47AM  16   founded the same year and Joe Nieman actually -- this is my

10:47AM  17   degree of relationship, he and some other person physically

10:47AM  18   signed us up at our office.  So, yeah.  So he -- we were

10:47AM  19   like, I forget, number 14 which I'm proud of.  They're a

10:47AM  20   supersuccessful company here locally and we were one of the

10:47AM  21   very early dealers to sign on with them.

10:47AM  22   Q.   Did you speak to Mr. Nieman about the ACV class-action

10:47AM  23   lawsuit?

10:47AM  24   A.   I have not spoken with Mr. Nieman ever since that day

10:47AM  25   11 years ago or 10 years ago, however long ago it was.  That

| | | |
|---|---|---|
| 10:47AM | 1 | was the last time I ever spoke with him. |
| 10:47AM | 2 | MR. YANKELUNAS:  Nothing further, Judge. |
| 10:47AM | 3 | THE COURT:  Any redirect? |
| 10:48AM | 4 | MS. JAWORSKI:  Yes, Your Honor. |
| 10:48AM | 5 | |
| 10:48AM | 6 | REDIRECT EXAMINATION |
| 10:48AM | 7 | |
| 10:48AM | 8 | BY MS. JAWORSKI: |
| 10:48AM | 9 | Q.  Mr. Taylor, you testified that in the 2016-2017 time |
| 10:48AM | 10 | period, you knew Mr. McMurray in his capacity as a town |
| 10:48AM | 11 | government official; is that correct? |
| 10:48AM | 12 | A.  Town supervisor.  Yes. |
| 10:48AM | 13 | Q.  And when he walked into Certified Auto Brokers on |
| 10:48AM | 14 | July 22nd, 2021, did you know that he was a practicing |
| 10:48AM | 15 | attorney at the time? |
| 10:48AM | 16 | A.  I can't say that I did.  No. |
| 10:48AM | 17 | Q.  Did you -- until he disclosed this to you, did you know |
| 10:48AM | 18 | that he was an attorney with HoganWillig? |
| 10:48AM | 19 | A.  No I did not. |
| 10:48AM | 20 | Q.  So is it accurate to say that until he disclosed that to |
| 10:48AM | 21 | you on July 22nd, 2021, you did not know him to be an |
| 10:48AM | 22 | attorney at HoganWillig? |
| 10:48AM | 23 | A.  That is correct. |
| 10:48AM | 24 | Q.  How did the conversation with Mr. McMurray conclude? |
| 10:48AM | 25 | A.  Awkwardly as it began.  Everybody kind of stood up and |

10:48AM   1   Mr. McMurray said, you know, we'll reach out to you and thank

10:48AM   2   you for your time and then Tim, being a good car salesman was

10:49AM   3   trying to get as much information from Mr. McMurray as

10:49AM   4   possible as far as contact information so that he could

10:49AM   5   appropriately follow up with him as well as we really tried

10:49AM   6   to redirect the conversation back to the sale of the vehicle,

10:49AM   7   trying to identify what exactly he was looking for.

10:49AM   8       We didn't spend much time talking about it.  I explained

10:49AM   9   to him that we have 150 cars on the lot and whatever he

10:49AM  10   wanted, if we didn't have it, we could get, but all this

10:49AM  11   happened very, very quickly and then he kind of shuffled out

10:49AM  12   the door after giving us some of that information.

10:49AM  13   Q.   Did you offer to show him cars on the lot?

10:49AM  14   A.   Absolutely.  Yeah.  Again -- so it was just a little odd

10:49AM  15   because he never looked at any vehicles and again, we have a

10:49AM  16   lot of vehicles.  Somebody had asked me during this testimony

10:49AM  17   do I -- are all my vehicles online?  We have a lot of

10:49AM  18   vehicles.  We turn them very fast.

10:49AM  19       We sell 120 cars a month.  We probably have 150 cars on

10:50AM  20   the ground at any one given time, so getting them all, what we

10:50AM  21   call, retail-ready and online for people to view sometimes can

10:50AM  22   be difficult.  So I explained to that Mr. McMurray and offered

10:50AM  23   to show him vehicles that I thought might suit was he was

10:50AM  24   looking for, but I think he had said that we could do that at

10:50AM  25   a later date.

10:50AM  1   Q.  And finally, with respect to your affidavit, aside from

10:50AM  2   the interactions you had with Mr. McMurray some four to

10:50AM  3   five years ago in his capacity as a town government official,

10:50AM  4   did you intend to deceive the Court or anyone with respect to

10:50AM  5   statements in your affidavit?

10:50AM  6   A.  Not at all.  That's what I want to make clear.  No.

10:50AM  7   Q.  And again, you reviewed the affidavit for truthfulness

10:50AM  8   and accuracy, correct?

10:50AM  9   A.  Yes, I did.

10:50AM  10          MS. JAWORSKI:  Thank you.  No further questions.

10:50AM  11          THE COURT:  Any recross?

10:51AM  12          MR. YANKELUNAS:  No, Judge.

10:51AM  13          THE COURT:  Thank you.  You -- Mr. Taylor, you are

10:51AM  14  done and we'll have the next witness called by the defendants.

10:51AM  15          MR. RADEL:  Your Honor, Robert Radel speaking.  I'll

10:51AM  16  just need a moment to get Mr. Renzoni.

10:53AM  17  (The witness was excused at 10:53 a.m.)

10:53AM  18          THE COURT:  This is Judge Reiss.  The deputy clerk is

10:53AM  19  going to swear your after you're called as a witness.

10:53AM  20          MR. RADEL:  Your Honor, a housekeeping matter first.

10:53AM  21  I just wanted to make sure that we were done with Mr. Taylor.

10:54AM  22  I had cut him loose unless this Court wants him to be kept

10:54AM  23  available.  He does have other business matters that he would

10:54AM  24  like to attend to.

10:54AM  25          THE COURT:  I was not -- I can't imagine him being

| 10:54AM | 1 | called on rebuttal and Mr. Marcus, have you completed your |

10:54AM   1   called on rebuttal and Mr. Marcus, have you completed your

10:54AM   2   examination of him?

10:54AM   3          MR. YANKELUNAS:  I am.  This is Ed Yankelunas and

10:54AM   4   Mr. Marcus is incorrect.

10:54AM   5          THE COURT:  Okay.

10:54AM   6          MR. YANKELUNAS:  I'm done with him, Judge.

10:54AM   7          MR. RADEL:  Thank you, Your Honor.

10:54AM   8          MS. JAWORSKI:  Defendant ACV Auctions calls Tim

10:54AM   9   Renzoni.

10:54AM  10   (The witness was sworn at 10:54 a.m.)

10:54AM  11          THE CLERK:  Please state your full name and spell it

10:54AM  12   for the record.

10:54AM  13          THE WITNESS:  Yes.  My name Timothy Renzoni, spelled

10:55AM  14   R-E-N-Z-O-N-I.

10:55AM  15

10:55AM  16                    DIRECT EXAMINATION

10:55AM  17

10:55AM  18   BY MS. JAWORSKI:

10:55AM  19   Q.  Good morning, Mr. Renzoni.

10:55AM  20   A.  Good morning.

10:55AM  21   Q.  My name is Myriah Jaworski.  I'm counsel for defendant

10:55AM  22   ACV Auctions.  Can you hear and see me all right?

10:55AM  23   A.  I can.  Thank you.

10:55AM  24   Q.  Okay.  If we have any glitches or technology issues, just

10:55AM  25   raise your hand and I can repeat my questions.

RENZONI -- BY MS. JAWORSKI -- 01/03/2022

40

| 10:55AM | 1 | A.  Thank you. |
| 10:55AM | 2 | Q.  Mr. Renzoni, can you please introduce yourself to the |
| 10:55AM | 3 | Court? |
| 10:55AM | 4 | A.  Yes.  My name is Timothy Renzoni.  I'm a sales person |
| 10:55AM | 5 | here at Certified Auto Brokers. |
| 10:55AM | 6 | Q.  And where do you live? |
| 10:55AM | 7 | A.  I live in North Buffalo. |
| 10:55AM | 8 | Q.  And how long have you been a car salesman with Certified |
| 10:55AM | 9 | Auto Brokers? |
| 10:55AM | 10 | A.  Slightly over three years. |
| 10:55AM | 11 | Q.  And what was your job experience before that? |
| 10:55AM | 12 | A.  Car sales. |
| 10:55AM | 13 | Q.  For how long have you been in the car sales industry? |
| 10:55AM | 14 | A.  Total of somewhere in between 13 and 15 years, best |
| 10:55AM | 15 | recall. |
| 10:55AM | 16 | Q.  What type of vehicles does Certified Auto Brokers sell? |
| 10:56AM | 17 | A.  That's the neat thing.  We sell a little bit of |
| 10:56AM | 18 | everything from the college kid car to the BMW to the $50,000 |
| 10:56AM | 19 | pick-up truck and everything in between. |
| 10:56AM | 20 | Q.  Does Certified Auto Brokers sell new cars? |
| 10:56AM | 21 | A.  No, we do not. |
| 10:56AM | 22 | Q.  So it only sells used cars; is that fair to say? |
| 10:56AM | 23 | A.  That's correct. |
| 10:56AM | 24 | Q.  Is Certified Auto's inventory posted on its website? |
| 10:56AM | 25 | A.  It is.  Yeah. |

10:56AM   1   Q.  And based on your 13 plus years of experience in the

10:56AM   2   industry, when people come into a car dealership for the

10:56AM   3   purpose of purchasing a car, what are some steps that they

10:56AM   4   ordinarily take?

10:56AM   5   A.  Everybody is a little bit different but at the end of the

10:56AM   6   day, people are people, and they all act -- it depends on how

10:56AM   7   they come in, the situation, you know?  Usually when somebody

10:57AM   8   comes in, regardless of whether it's truck buyer or somebody

10:57AM   9   buying a more economy car, they come in.  We learn about what

10:57AM  10   they're looking to accomplish and help them determine the

10:57AM  11   steps going from there, figure out what the process is going

10:57AM  12   to be figure out what our end game is.

10:57AM  13   Q.  Did they walk the lot and observe cars?

10:57AM  14   A.  They have the opportunity to.  We have an open lot and I

10:57AM  15   would say a vast majority of our customers like to get a look

10:57AM  16   around especially with our construction we got going on now.

10:57AM  17   Q.  Do they look at particular cars in which they're

10:57AM  18   interested?

10:57AM  19       MS. JAWORSKI:  Objection.  Are these questions

10:57AM  20   related to Mr. McMurray or just --

10:57AM  21       THE COURT:  So I'm going to sustain the objection on

10:57AM  22   relevance.  There isn't need to identify the typical car

10:57AM  23   buyer.  That would be well within the cannon of any common

10:58AM  24   person how somebody buys a car, so let's move along to the

10:58AM  25   questions that we're here --

10:58AM    1         MS. JAWORSKI:  All right.

10:58AM    2    BY MS. JAWORSKI:

10:58AM    3    Q.  I'd like to draw your attention to the evening of the

10:58AM    4    July 22nd, 2021 which is the subject matter of today's

10:58AM    5    hearing.  Prior to that date, had you ever met an individual

10:58AM    6    by the name of Nathan McMurray?

10:58AM    7    A.  No.

10:58AM    8    Q.  And can you explain what occurred on July 22nd, 2021?

10:58AM    9    A.  Yes.  That evening, a gentleman walked through the front

10:58AM   10    door.  We were just about to close up, but it's summertime

10:58AM   11    and days are long, so customer walks in at 7 o'clock, I'm

10:58AM   12    certainly going to help them out.  And he came in, sat down,

10:58AM   13    mentioned that he was looking for a pick-up truck so he and

10:58AM   14    his brother could build out a project in Niagara County.  We

10:58AM   15    discussed trucks a little bit and like you said, just the

10:59AM   16    start of the sales process.

10:59AM   17    Q.  And at the time, did Certified Auto Brokers have trucks

10:59AM   18    in stock?

10:59AM   19    A.  Yes.  Oh yeah.  We always have trucks.

10:59AM   20    Q.  And did Nathan McMurray walk the lot to observe any of

10:59AM   21    the trucks?

10:59AM   22    A.  He did not.

10:59AM   23    Q.  Did you offer to have him walk the lot to observe the

10:59AM   24    trucks?

10:59AM   25    A.  Yes.  I offered to show him some trucks.  So once we

10:59AM   1   started talking about it a little bit trying to figure out

10:59AM   2   which way he was going for his pick-up truck.

10:59AM   3   Q.  Did Mr. McMurray ask to see any trucks?

10:59AM   4   A.  He did not.

10:59AM   5   Q.  Did he ask to test drive any trucks?

10:59AM   6   A.  He did not.

10:59AM   7   Q.  And did he, in fact, see or test drive any trucks?

10:59AM   8   A.  No.

10:59AM   9   Q.  And then what happened?

10:59AM  10   A.  So about five or so minutes into the conversation, he had

10:59AM  11   asked if Chris Taylor was in and I didn't know where Chris

10:59AM  12   was at that point, being the end of the day, and Chris

11:00AM  13   happened to walk through the showroom and stopped in to greet

11:00AM  14   Mr. McMurray as he would just about any customer.  It's my

11:00AM  15   office, frankly.

11:00AM  16   Q.  And then what happened?

11:00AM  17   A.  Then the conversation turned a little bit from talking

11:00AM  18   about pick-up trucks and Mr. McMurray made a comment about

11:00AM  19   asking if Chris uses ACV, if he was familiar with them.  I

11:00AM  20   kind of -- at that point, I like -- we were talking about

11:00AM  21   business things that was kind of withdrawn from the

11:00AM  22   conversation a little bit at that point, but Chris and

11:00AM  23   Mr. McMurray were in my office talking about this subject

11:00AM  24   matter.

11:00AM  25   Q.  And what did Mr. McMurray say about ACV Auctions?

11:00AM  1   A.  He -- what I heard them mention was that he offered --

11:01AM  2   made -- sounded like he made Chris an offer.  I know he made

11:01AM  3   Chris an offer and in his vague terms, he said, it could very

11:01AM  4   well stand to help him.

11:01AM  5   Q.  And what was the offer that Mr. McMurray made to

11:01AM  6   Mr. Taylor?

11:01AM  7   A.  I imagine it had to do with being involved with suing ACV

11:01AM  8   but, again, you know, he wasn't specific.  It was like, if

11:01AM  9   you get on board with this, this could really help you and

11:01AM  10  like, I didn't want to be -- frankly, I didn't want to be in

11:01AM  11  the office for that.  I looked at Chris and kind of give him

11:01AM  12  a glare like I was feeling a little bit awkward and then the

11:01AM  13  conversation kind of continued as Mr. McMurray asked Chris

11:02AM  14  these questions.

11:02AM  15  Q.  Did Mr. McMurray say anything about a lawsuit?

11:02AM  16  A.  Yes.

11:02AM  17  Q.  And what was that about the lawsuit?

11:02AM  18  A.  All I remember was that he mentioned that there was

11:02AM  19  something happening against ACV.

11:02AM  20  Q.  Did Mr. McMurray ask Mr. Taylor any questions?

11:02AM  21  A.  Specifically, I don't recall.

11:02AM  22  Q.  How long would you approximate that the conversation

11:02AM  23  between Mr. McMurray and Mr. Taylor lasted for?

11:02AM  24  A.  I would say somewhere between 5 and 15 minutes if I'm

11:02AM  25  recalling right.

11:02AM  1   Q.  And you testified that Mr. McMurray implied that the

11:02AM  2   lawsuit could help Certified Auto Brokers out or help

11:02AM  3   Mr. Taylor out?

11:03AM  4   A.  Right.

11:03AM  5          MR. YANKELUNAS:  Attorney/client -- objection, Judge.

11:03AM  6          THE COURT:  Objection sustained.

11:03AM  7   BY MS. JAWORSKI:

11:03AM  8   Q.  Is it your testimony today that you heard Mr. McMurray

11:03AM  9   state that the lawsuit could help Mr. Taylor out?

11:03AM  10         MR. YANKELUNAS:  Objection.  Asked and answered.

11:03AM  11         THE COURT:  Well it's not asked and answered.  That

11:03AM  12  wasn't the testimony.  So -- at least I'm taking notes

11:03AM  13  verbatim.  It's harder for me to do that when you're asking

11:03AM  14  questions.  Why don't you just ask him what, if anything, he

11:03AM  15  recalls about that subject matter.

11:03AM  16  BY MS. JAWORSKI:

11:03AM  17  Q.  What, if anything, do you recall Mr. McMurray saying

11:03AM  18  about the lawsuit?

11:03AM  19  A.  Like I said, that he -- there was something that if Chris

11:03AM  20  was to get involved with, that he stood to gain; like, it

11:03AM  21  would be very good for him.  Like, you could tell there was

11:03AM  22  an offer being made.

11:03AM  23  Q.  And did Mr. McMurray offer any insight into how Chris

11:04AM  24  could get involved in the lawsuit?

11:04AM  25  A.  No, not that I recall.

11:04AM    1    Q.   And what was your impression of Mr. McMurray's offer?

11:04AM    2    A.   That it's --

11:04AM    3             MR. YANKELUNAS:   Objection, Your Honor.   Impression.

11:04AM    4             THE COURT:   I'll allow it because it's this

11:04AM    5    witness's.   I'm not so sure the relevance, but go ahead.

11:04AM    6             THE WITNESS:   My impression was what I was hearing

11:04AM    7    seemed unethical.   And it went from, you know, coming into

11:04AM    8    look at a pick-up truck to taking this right turn onto a

11:04AM    9    subject that has nothing to do with purchasing a pick-up

11:04AM   10    truck.

11:04AM   11    BY MS. JAWORSKI:

11:04AM   12    Q.   Did Mr. McMurray make any other statements about car

11:04AM   13    dealerships?

11:04AM   14    A.   That I can recall, he might have.   I think he mentioned a

11:05AM   15    few.   I don't remember specifically which ones.

11:05AM   16    Q.   How did the conversation with Mr. McMurray and Mr. Taylor

11:05AM   17    end, if you recall?

11:05AM   18    A.   Cordially, you know?   Chris is a professional he shook

11:05AM   19    hands and they parted ways and -- oh.   Go ahead.

11:05AM   20    Q.   Do you recall Mr. McMurray mentioned his law firm

11:05AM   21    HoganWillig?

11:05AM   22    A.   I don't recall.

11:05AM   23    Q.   And how did you feel witnessing this conversation?

11:05AM   24             MR. YANKELUNAS:   Objection, Judge.

11:05AM   25             THE COURT:   Sustained.

| | | |
|---|---|---|
| 11:05AM | 1 | BY MS. JAWORSKI: |
| 11:05AM | 2 | Q.  How did this conversation make you feel? |
| 11:05AM | 3 | A.  Uncomfortable. |
| 11:05AM | 4 | MR. YANKELUNAS:  Same objection, Judge. |
| 11:05AM | 5 | THE COURT:  Sustained.  So remember this isn't an |
| 11:05AM | 6 | intention infliction of emotional distress.  How he felt about |
| 11:05AM | 7 | it, he already asked and answered that.  Let move to the next |
| 11:05AM | 8 | question. |
| 11:05AM | 9 | BY MS. JAWORSKI: |
| 11:05AM | 10 | Q.  At the end of that discussion, did the conversation turn |
| 11:06AM | 11 | back to a discussion of trucks? |
| 11:06AM | 12 | A.  I tried to turn the discussion back to a pick-up truck |
| 11:06AM | 13 | and I had to hastily write down Mr. McMurray's contact info |
| 11:06AM | 14 | because, like I said, it seemed a lot less like it was about |
| 11:06AM | 15 | the pick-up truck at that point than his -- again, it was |
| 11:06AM | 16 | less about the truck at that point. |
| 11:06AM | 17 | Q.  And after the conversation concluded, did Mr. McMurray |
| 11:06AM | 18 | look at any of the trucks? |
| 11:06AM | 19 | A.  He did not. |
| 11:06AM | 20 | Q.  Did he, at that time, walk the lot? |
| 11:06AM | 21 | A.  No.  I followed up with him quite a bit and didn't get |
| 11:06AM | 22 | any contact back. |
| 11:06AM | 23 | Q.  Can you explain some of the follow up that you had with |
| 11:06AM | 24 | Mr. McMurray? |
| 11:06AM | 25 | A.  Phone calls, text messages, emails. |

| | | |
|---|---|---|
| 11:06AM | 1 | Q.  And did Mr. McMurray return any of your calls? |
| 11:06AM | 2 | A.  No. |
| 11:06AM | 3 | Q.  And based on your interaction with him on the night of |
| 11:07AM | 4 | July 22nd, why do you think that attorney McMurray came into |
| 11:07AM | 5 | Certified Auto Brokers? |
| 11:07AM | 6 | MR. YANKELUNAS:  Objection, Judge. |
| 11:07AM | 7 | THE COURT:  I think it's been asked and answered. |
| 11:07AM | 8 | I'll allow him to answer it because he has answered it to the' |
| 11:07AM | 9 | Courts satisfaction. |
| 11:07AM | 10 | THE WITNESS:  So my impression was that the looking |
| 11:07AM | 11 | at a truck was not the primary purpose.  The primary purpose |
| 11:07AM | 12 | was getting some facetime with Chris and asking him about, you |
| 11:07AM | 13 | know, what we're talking about today. |
| 11:07AM | 14 | BY MS. JAWORSKI: |
| 11:07AM | 15 | Q.  And at the time of McMurray's visit on July 22nd, 2021, |
| 11:07AM | 16 | did Certified Auto Brokers have used Dodge Rams for sale, if |
| 11:07AM | 17 | you recall? |
| 11:07AM | 18 | A.  Yeah.  We always have a good mix of all kinds of pick-up |
| 11:08AM | 19 | trucks. |
| 11:08AM | 20 | Q.  So, if McMurray was interested in purchasing -- |
| 11:08AM | 21 | A.  He mentioned he wasn't really brand specific -- |
| 11:08AM | 22 | Q.  Oh I'm sorry.  Did I speak over you? |
| 11:08AM | 23 | A.  He mentioned that he wasn't really brand specific in the |
| 11:08AM | 24 | beginning and that he was looking for more like a work truck. |
| 11:08AM | 25 | So I wasn't thinking something in like a late model. |

11:08AM   1   Q.  And if Mr. McMurray had a brand and mileage in mind that

11:08AM   2   Certified Auto Brokers did not have in stock, could you

11:08AM   3   obtain it for him some way?

11:08AM   4   A.  Oh yeah.  Absolutely.  We do that all the time.

11:08AM   5   Q.  And again, Certified Auto Brokers only sells used cars,

11:08AM   6   correct?

11:08AM   7   A.  Everything that we sell is preowned, but we had a 2021

11:08AM   8   recently with 497 miles on it.  So we're not like a dirt lot.

11:08AM   9   Q.  Are you being compensated for your time here today,

11:08AM  10   Mr. Renzoni?

11:08AM  11   A.  No.  I'm actually losing money because I'm off the floor.

11:08AM  12   Pardon my candor.

11:08AM  13   Q.  Has ACV made any promises to you in exchange for your

11:09AM  14   testimony today?

11:09AM  15   A.  No.

11:09AM  16   Q.  Has anyone made any promises to you in exchange for your

11:09AM  17   testimony?

11:09AM  18   A.  No.

11:09AM  19   Q.  You have counsel representing you today, correct?

11:09AM  20   A.  Yes.

11:09AM  21   Q.  And you're here pursuant to a court-ordered subpoena

11:09AM  22   issued by HoganWillig, correct?

11:09AM  23   A.  Correct.

11:09AM  24        MS. JAWORSKI:  No further questions.

11:09AM  25        THE COURT:  Any cross-examination?

11:09AM   1          MR. YANKELUNAS:  Yes, Your Honor.

11:09AM   2

11:09AM   3                    CROSS-EXAMINATION

11:09AM   4

11:09AM   5   BY MR. YANKELUNAS:

11:09AM   6   Q.  Can you identify this exhibit?

11:09AM   7   A.  Yes.  It looks like one of my business cards.

11:09AM   8   Q.  Mr. Renzoni, can you identify that?

11:09AM   9   A.  Yes.  It's one of my business cards.

11:09AM  10   Q.  Okay.  Did you give your business card to Mr. McMurray

11:09AM  11   during your meeting?

11:09AM  12   A.  I can't recall.

11:09AM  13   Q.  Well that's your business card, correct?

11:10AM  14   A.  It is.

11:10AM  15   Q.  Okay.  Do you recognize the handwriting, the phone number

11:10AM  16   and the name?

11:10AM  17   A.  I recognize the name on it.  The handwriting, I can't.  I

11:10AM  18   don't know whose it is.

11:10AM  19   Q.  Do you recall seeing Mr. Taylor write his name and phone

11:10AM  20   number on this card?

11:10AM  21   A.  I don't recall.

11:10AM  22   Q.  Okay.  But you do recall giving this card to Mr.

11:10AM  23   McMurray?  It's your card.

11:10AM  24   A.  I give every one of my customers a card.

11:10AM  25   Q.  Do you give them a card when they come in looking for a

11:10AM   1   truck or a vehicle?

11:10AM   2   A.  Of course.

11:10AM   3   Q.  And the reference to the back lot, do you know what that

11:10AM   4   means?

11:10AM   5   A.  As a reference to what?

11:10AM   6   Q.  Back lot, you see that toward the left-hand side of the

11:10AM   7   exhibit?

11:10AM   8   A.  Oh okay.  Yes.  That could refer to our holding lot, I

11:10AM   9   would imagine.  It's just a --

11:11AM  10   Q.  Okay.  That's fine.  Do you also recall discussing a back

11:11AM  11   lot wholesaler with Mr. McMurray?

11:11AM  12   A.  No.

11:11AM  13   Q.  You don't know if you did or you didn't?

11:11AM  14   A.  No.  I don't recall having a conversation about that.

11:11AM  15   Q.  Now, the conversation between Mr. McMurray and

11:11AM  16   Mr. Taylor, you were there for the duration of it, the entire

11:11AM  17   conversation?

11:11AM  18   A.  That's correct.

11:11AM  19   Q.  Okay.  Do you recall Mr. Taylor writing his name on this

11:11AM  20   card at the conclusion of the conversation?

11:11AM  21   A.  I don't recall.

11:11AM  22   Q.  Do you have any question, doubt, that he did that?

11:11AM  23   A.  I wouldn't know.

11:11AM  24   Q.  All right.  Did they discuss talking in the future at

11:11AM  25   some point, Mr. McMurray and Mr. Taylor?

| | | |
|---|---|---|
| 11:11AM | 1 | A.  If they did, I can't recall.  It would have been more |
| 11:11AM | 2 | about buying a truck based on, you know, where we left off. |
| 11:11AM | 3 | I think it was more like Chris saying yeah, Tim will help you |
| 11:12AM | 4 | any way he can. |
| 11:12AM | 5 | Q.  I believe you indicated if your direct that you don't |
| 11:12AM | 6 | have any specific recollection of what was discussed between |
| 11:12AM | 7 | Mr. McMurray and Mr. Taylor; is that fair? |
| 11:12AM | 8 | A.  That's fair. |
| 11:12AM | 9 | Q.  So you can't recall whether or not Mr. McMurray asked to |
| 11:12AM | 10 | represent Mr. Taylor; is that right? |
| 11:12AM | 11 | A.  I don't recall. |
| 11:12AM | 12 | Q.  All right.  Let's play Exhibit 5. |
| 11:12AM | 13 | MR. YANKELUNAS:  Judge, we're now going to play a |
| 11:12AM | 14 | video or a phone message.  Just take us a second to get it set |
| 11:12AM | 15 | up. |
| 11:12AM | 16 | THE COURT:  And this is Exhibit 5? |
| 11:12AM | 17 | MR. YANKELUNAS:  Exhibit 5. |
| 11:12AM | 18 | THE COURT:  Exhibit 5 is admitted. |
| 11:12AM | 19 | (Exhibit 5 was received in evidence.) |
| 11:12AM | 20 | |
| 11:12AM | 21 | (The recording was played.) |
| 11:13AM | 22 | MR. YANKELUNAS:  Judge should we play that again? |
| 11:13AM | 23 | The volume didn't sound great. |
| 11:13AM | 24 | THE COURT:  Let's try it again. |
| 11:13AM | 25 | MR. YANKELUNAS:  Let's try it again. |

| 11:13AM | 1 | (The recording was played.) |
| 11:13AM | 2 | MR. YANKELUNAS:  Is that better, Judge? |
| 11:13AM | 3 | THE COURT:  Yes. |
| 11:13AM | 4 | MS. JAWORSKI:  Okay. |
| 11:13AM | 5 | BY MR. YANKELUNAS: |
| 11:13AM | 6 | Q.  Mr. Renzoni, was that your voice on that recording? |
| 11:14AM | 7 | MR. RADEL:  Your Honor, we could not hear at this |
| 11:14AM | 8 | end anything on the recording.  We've tried to turn up our |
| 11:14AM | 9 | volume at this end.  If we could replay it one more time, |
| 11:14AM | 10 | were tried to get -- we've got our volume at 100 percent now. |
| 11:14AM | 11 | THE COURT:  So we'll try it one more time.  What I |
| 11:14AM | 12 | heard didn't have much in the way of the substance about it, |
| 11:14AM | 13 | so let's try it one more time. |
| 11:14AM | 14 | MR. RADEL:  Thank you, Your Honor. |
| 11:15AM | 15 | MR. JOHNSEN:  Trying to turn up the volume here, |
| 11:15AM | 16 | everyone.  I apologize. |
| 11:15AM | 17 | (The recording was played.) |
| 11:15AM | 18 | MR. YANKELUNAS:  Was that any better I hope? |
| 11:15AM | 19 | MR. RADEL:  We were able to hear something.  I'll let |
| 11:16AM | 20 | the witness describe what it is that he heard. |
| 11:16AM | 21 | BY MR. YANKELUNAS: |
| 11:16AM | 22 | Q.  Mr. Renzoni, did you -- I'm sorry about the volume.  I |
| 11:16AM | 23 | tried.  Was that your voice? |
| 11:16AM | 24 | A.  It sounded like me leaving a follow-up call. |
| 11:16AM | 25 | Q.  Okay.  A follow-up call with Mr. McMurray? |

11:16AM  1    A.  Right.

11:16AM  2    Q.  Did you make more than one follow-up call with

11:16AM  3    Mr. McMurray?

11:16AM  4    A.  I believe I did.

11:16AM  5    Q.  Did you send some texts to Mr. McMurray?

11:16AM  6    A.  Yes.

11:16AM  7    Q.  Because is it correct, sir, that you did that because you

11:16AM  8    understood Mr. McMurray to be in your firm -- in your

11:16AM  9    dealership looking for a pick-up truck?

11:16AM  10   A.  Yeah.  I followed the steps that I would with any

11:16AM  11   customer.

11:16AM  12   Q.  You wouldn't have done it if you didn't think they was

11:16AM  13   there to buy a pick-up truck, would you?

11:16AM  14   A.  No.  If somebody came in for some air in their tires, I

11:16AM  15   would put some air in their tires.

11:16AM  16   Q.  Or if he came for some other purpose other than to buy a

11:16AM  17   truck you would not have done that if that's what you

11:16AM  18   believed, correct?

11:16AM  19   A.  I think sometimes people can come in for more than one

11:16AM  20   reason.

11:16AM  21   Q.  But you made quite an effort to follow up, right; several

11:17AM  22   attempts?

11:17AM  23   A.  Yes.

11:17AM  24   Q.  Okay.

11:17AM  25        MR. YANKELUNAS:  Nothing further for this witness,

11:17AM  1   Judge.

11:17AM  2          THE COURT:  Any redirect?

11:17AM  3          MS. JAWORSKI:  Yes, Your Honor.

11:17AM  4

11:17AM  5                   REDIRECT EXAMINATION

11:17AM  6

11:17AM  7   BY MS. JAWORSKI:

11:17AM  8   Q.  Mr. Renzoni, do you recall formalizing an affidavit for

11:17AM  9   this case?

11:17AM  10  A.  I do.  Yeah.

11:17AM  11  Q.  I'm going to share my screen to show you that affidavit.

11:17AM  12  And can you tell me the date that your affidavit was

11:17AM  13  executed?

11:17AM  14  A.  The 9th of September.

11:17AM  15  Q.  And you'd agree that that is some six weeks after the

11:17AM  16  July 22nd visit by Mr. McMurray into Certified Auto Brokers,

11:17AM  17  correct?

11:17AM  18  A.  Sounds right.

11:17AM  19  Q.  At the time that you submitted this affidavit, do you

11:17AM  20  have the opportunity to review it for accuracy?

11:17AM  21  A.  I did.

11:17AM  22  Q.  And review it for truthfulness?

11:17AM  23  A.  Yes.

11:17AM  24  Q.  And would you agree that generally the events of that

11:18AM  25  evening may have been more fresh in your mind at the time

| 11:18AM | 1 | that you filed out this affidavit? |
| 11:18AM | 2 | MR. YANKELUNAS:  Objection. |
| 11:18AM | 3 | THE COURT:  Basis? |
| 11:18AM | 4 | MR. YANKELUNAS:  Objection. |
| 11:18AM | 5 | THE COURT:  Basis for your objection? |
| 11:18AM | 6 | MR. YANKELUNAS:  Judge, it's to relevance also and |
| 11:18AM | 7 | what was subjectively -- what was in this person's mind to |
| 11:18AM | 8 | what he recollected is not accurate -- or not relevant. |
| 11:18AM | 9 | Relevance, Judge. |
| 11:18AM | 10 | THE COURT:  Well it's outside the scope of cross and |
| 11:18AM | 11 | I'm going to sustain the objection on that ground.  It could |
| 11:18AM | 12 | have been asked in direct in the first place.  You didn't |
| 11:18AM | 13 | address the affidavit.  It doesn't seem to be a prior |
| 11:18AM | 14 | consistent statement.  It seems to be something else. |
| 11:18AM | 15 | BY MS. JAWORSKI: |
| 11:18AM | 16 | Q.  Do you agree that you submitted an affidavit six weeks |
| 11:18AM | 17 | after Mr. McMurray's visit? |
| 11:18AM | 18 | MR. YANKELUNAS:  Objection, Judge. |
| 11:18AM | 19 | THE COURT:  Sustained. |
| 11:18AM | 20 | BY MS. JAWORSKI: |
| 11:18AM | 21 | Q.  Mr. Renzoni, did you submit an affidavit in this case? |
| 11:19AM | 22 | A.  Yes. |
| 11:19AM | 23 | MR. YANKELUNAS:  Objection.  Objection. |
| 11:19AM | 24 | THE COURT:  So you -- the cross-examination didn't |
| 11:19AM | 25 | have anything to do with the affidavit.  These are all |

11:19AM   1    questions you could have asked on direct.  If you are trying

11:19AM   2    to rehabilitate the witness, you may point to a portion of the

11:19AM   3    affidavit that you want to focus on, but asking the questions

11:19AM   4    now when it wasn't covered in cross isn't proper.

11:19AM   5              MS. JAWORSKI:  All right.

11:19AM   6    BY MS. JAWORSKI:

11:19AM   7    Q.  I'm going to share my screen and ask you some questions

11:19AM   8    about specific statements in your affidavit, Mr. Renzoni.

11:19AM   9    Let me know if you can see my screen.

11:19AM  10    A.  Yes.  I can see it.

11:19AM  11    Q.  I am directing your attention to paragraphs 13 through

11:19AM  12    17.

11:19AM  13    A.  Yes.

11:19AM  14    Q.  Did you have an opportunity to review those statements?

11:19AM  15    A.  Yes.  I have reviewed them.

11:20AM  16    Q.  And to turn back to the conversation that you had with

11:20AM  17    Mister -- that you observed between Mr. McMurray and

11:20AM  18    Mr. Taylor, does this refresh your recollection at all as to

11:20AM  19    the specifics of that conversation?

11:20AM  20    A.  It does quite a bit.

11:20AM  21    Q.  And would you agree that the affidavit is accurate?

11:20AM  22    A.  Yes.

11:20AM  23    Q.  And truthful?

11:20AM  24    A.  Yes.

11:20AM  25              MR. YANKELUNAS:  Objection, Judge.

| 11:20AM | 1 | MS. JAWORSKI:  No further questions. |
| 11:20AM | 2 | THE COURT:  Basis for objection? |
| 11:20AM | 3 | MS. JAWORSKI:  If she's going to ask the witness if |
| 11:20AM | 4 | the affidavit refreshes your recollection, I believe she |
| 11:20AM | 5 | should identify what she's -- the witness is not remembering |
| 11:20AM | 6 | from the testimony. |
| 11:20AM | 7 | THE COURT:  So you asked the witness about the |
| 11:20AM | 8 | specifics of the conversation and he repeatedly said, I didn't |
| 11:20AM | 9 | recall.  I didn't recall.  So it's proper refreshing of |
| 11:21AM | 10 | recollection. |
| 11:21AM | 11 | MS. JAWORSKI:  No further questions. |
| 11:21AM | 12 | THE COURT:  Any recross? |
| 11:21AM | 13 | MR. YANKELUNAS:  No thanks, Judge. |
| 11:21AM | 14 | THE COURT:  All right.  You may excuse the witness |
| 11:21AM | 15 | and any further witnesses for the defendant? |
| 11:21AM | 16 | MS. JAWORSKI:  No, Your Honor. |
| 11:21AM | 17 | THE COURT:  Any witnesses for the plaintiffs? |
| 11:21AM | 18 | MR. YANKELUNAS:  Yes.  We're going to call |
| 11:21AM | 19 | Mr. McMurray, Judge. |
| 11:21AM | 20 | MR. RADEL:  Your Honor, Robert Radel on behalf of the |
| 11:21AM | 21 | two witnesses.  Are we now complete?  May I dismiss this |
| 11:21AM | 22 | second witness and drop from this Zoom meeting? |
| 11:21AM | 23 | THE COURT:  We are and you may.  Thank you. |
| 11:21AM | 24 | MR. RADEL:  Thank you, Your Honor. |
| 11:21AM | 25 | (The witness was excused at 11:21 a.m.) |

| | | |
|---|---|---|
| 11:21AM | 1 | MR. DIRENFELD:  Your Honor, this is John Direnfeld on |
| 11:21AM | 2 | behalf of ACV.  I just want to let the Court know I'll be |
| 11:21AM | 3 | handling Mr. McMurray and handling any objections as well, |
| 11:21AM | 4 | just so you know in terms of who is speaking. |
| 11:21AM | 5 | THE COURT:  All right.  Thank you. |
| 11:21AM | 6 | MR. JOHNSEN:  Your Honor, just for purposes of |
| 11:21AM | 7 | feedback, Mr. McMurray will have his own camera, but we're |
| 11:21AM | 8 | just going to use one microphone on Mr. Yankelunas's computer |
| 11:22AM | 9 | so we don't have all that feedback and reverb.  So if there's |
| 11:22AM | 10 | an issue, please let me know. |
| 11:22AM | 11 | THE COURT:  All right.  Thank you.  Plaintiffs may |
| 11:22AM | 12 | call the witness and we'll have the witness sworn in. |
| 11:22AM | 13 | MR. YANKELUNAS:  Thank you Judge.  Nate McMurray for |
| 11:22AM | 14 | the plaintiff.  Hopefully you can see him.  There he is.  I |
| 11:22AM | 15 | believe we have called him. |
| 11:22AM | 16 | THE COURT:  You have called him.  You are all under |
| 11:22AM | 17 | different peoples's name, so I think this is coming up under |
| 11:23AM | 18 | Mr. Johnsen.  You are Mr. McMurray. |
| 11:23AM | 19 | (The witness was sworn at 11:23 a.m.) |
| 11:23AM | 20 | THE CLERK:  Please state your name and spell your |
| 11:23AM | 21 | last name for the record. |
| 11:23AM | 22 | THE WITNESS:  My name is Nathan McMurray, last name |
| 11:23AM | 23 | M-C-M-U-R-R-A-Y. |
| 11:23AM | 24 | |
| 11:23AM | 25 | |

11:23AM    1                     DIRECT EXAMINATION

11:23AM    2

11:23AM    3    BY MR. YANKELUNAS:

11:23AM    4    Q.   Mr. McMurray, are you an attorney?

11:23AM    5    A.   Yes I am.

11:24AM    6    Q.   Admitted in what state?

11:24AM    7    A.   New York State.

11:24AM    8    Q.   What year were you admitted?

11:24AM    9    A.   2008.

11:24AM   10    Q.   Tell us a little bit your educational background.

11:24AM   11    A.   I graduated public schools locally.  Went to the

11:24AM   12    University of Buffalo undergraduate.  I was a full bright

11:24AM   13    scholar in South Korea.  Went to lawsuit at the University of

11:24AM   14    California, Hastings College of the Law.  I received a

11:24AM   15    scholarship to study at Tsinghua University in Beijing.  I

11:24AM   16    practiced overseas for a long time, came back around

11:24AM   17    eight years ago and work in Western New York at that time.

11:24AM   18    Q.   Did you run for Congress, Mr. McMurray?

11:24AM   19    A.   I did.

11:24AM   20    Q.   What year was that?

11:24AM   21    A.   I ran twice; first in 2018 and I ran 2019.

11:24AM   22    Q.   Did you have any endorsements that you were proud of?

11:25AM   23    A.   I was endorsed by the President of the United States,

11:25AM   24    every major local union and national union; not every, but

11:25AM   25    most, many non-profit organizations, almost too numerous to

11:25AM   1   list.

11:25AM   2   Q.  And you were -- did you hold a position of authority in

11:25AM   3   the Town of Grand Island at any point?

11:25AM   4   A.  Yes.  I am proud to have served as the Grand Island Town

11:25AM   5   Supervisor.

11:25AM   6   Q.  What years?

11:25AM   7   A.  I was elected in 2015.  I served for four years.

11:25AM   8   Q.  At what point, you worked at HoganWillig law firm?

11:25AM   9   A.  I did.

11:25AM  10   Q.  Okay.  And where are you now?

11:25AM  11   A.  I work for Advocates For Justice chartered attorneys.

11:25AM  12   It's a civil rights firm.

11:25AM  13   Q.  Now do you know Christopher Taylor?

11:25AM  14   A.  I do.

11:25AM  15   Q.  How do you know him?

11:25AM  16   A.  When I become town supervisor, he was a businessperson on

11:25AM  17   the island.  I try to support local business as much as

11:26AM  18   possible.  He reached out to me.  He was also involved in an

11:26AM  19   organization that I was working with to develop a memorial

11:26AM  20   for a Medal of Honor winner that was from Grand Island.  We

11:26AM  21   had some disputes regarding various different issues.  He was

11:26AM  22   very active in the town.  He appeared, at least a few times,

11:26AM  23   before me at the town hall advocating for various positions,

11:26AM  24   so yes.  I know him.

11:26AM  25   Q.  Now at some point, did he ask you to assist him with his

| 11:26AM | 1 | business opportunities? |

11:26AM  1    business opportunities?

11:26AM  2    A.  He did.  Yes he did.

11:26AM  3    Q.  And you appeared at a ribbon cutting ceremony?

11:26AM  4    A.  I did.  I was proud to be there.  It was fun.  He did the

11:26AM  5    ribbon cutting for his new wing of his facility.

11:26AM  6    Q.  How did you get there?

11:26AM  7    A.  He invited me.

11:26AM  8    Q.  Okay.  Were there other events that he participated in,

11:26AM  9    political events?

11:27AM  10   A.  I saw him all the time.

11:27AM  11   Q.  Now, eventually, you had a falling out.  Would that be a

11:27AM  12   fair characterization?

11:27AM  13         MR. DIRENFELD:  Object -- Your Honor, I'm just going

11:27AM  14   to object that there's a lot of leading going on here, so I'll

11:27AM  15   object to leading now that we're getting to substance.

11:27AM  16         THE COURT:  Sustained.

11:27AM  17   BY MR. YANKELUNAS:

11:27AM  18   Q.  Did you have a falling out?

11:27AM  19   A.  I mean, we -- I think on national issues were very

11:27AM  20   different and I think, you know, I said in my affidavit he

11:27AM  21   was supporting the -- I was support the West River Trail

11:27AM  22   which was very controversial in Grand Island.  I received a

11:27AM  23   lot of pushback.  He lives on West River.  At one moment, we

11:27AM  24   did have a confrontation about it.  He was very upset.  I

11:27AM  25   know he was working with several of the council members that

11:27AM   1   were also against the trail, so yes.  We stopped talking.

11:27AM   2   Q.  Let me direct your attention to July 22nd, 2021.  Did you

11:28AM   3   visit this -- I'll call it CAB.  Did you visit the CAB

11:28AM   4   business facilities on that date?

11:28AM   5   A.  Yes.  I pass it every day literally.  It's right by my

11:28AM   6   home and I dropped in to look at cars.

11:28AM   7   Q.  Okay.  Were you looking for cars during this time period?

11:28AM   8   A.  Yes.  I was going to self dealership looking for a truck

11:28AM   9   and I actually bought a truck right around that time.

11:28AM  10   Q.  Okay.  Can you give me an estimate as to how many

11:28AM  11   dealerships you visited while you were looking for a truck?

11:28AM  12   A.  I can only estimate.  I would guess four.

11:28AM  13   Q.  Okay.  That's fair.  Now when you first got to these --

11:28AM  14   dealership on July 22nd, who did you speak with?

11:28AM  15   A.  I may be saying his name wrong, Renzoni, I think.  I

11:28AM  16   can't remember his first name.  I'm sorry.

11:28AM  17   Q.  And how long did you speak to Mr. Renzoni?

11:28AM  18   A.  Maybe 5, 10 minutes.

11:28AM  19   Q.  And what were you talking about?

11:29AM  20   A.  Cars.  And he was -- I told him exactly what I wanted.  I

11:29AM  21   don't have a lot of time.  My schedule is busy.  And I said,

11:29AM  22   this is what I want and this is the price I got from other

11:29AM  23   places and he told me he couldn't give me those prices and it

11:29AM  24   was a short conversation.

11:29AM  25   Q.  At some point, did Mr. Taylor become a participant in

| 11:29AM | 1 | that conversation? |
| 11:29AM | 2 | A.  He came out. |
| 11:29AM | 3 | Q.  Just answer the question. |
| 11:29AM | 4 | A.  Yes. |
| 11:29AM | 5 | Q.  Okay.  And how did that happen? |
| 11:29AM | 6 | A.  He came out and we saw each other and it was fun because |
| 11:29AM | 7 | it was -- I was excited.  The reason why I went in there was |
| 11:29AM | 8 | because I remember Chris.  I didn't have any hard feelings |
| 11:29AM | 9 | and I hoped maybe it would, in some small way, would help the |
| 11:29AM | 10 | island and help Chris if I were to get a truck from him and |
| 11:29AM | 11 | work it out.  He was excited to see me and I was excited to |
| 11:29AM | 12 | see him. |
| 11:29AM | 13 | Q.  Okay.  How long would you say you spoke to Mr. Taylor? |
| 11:29AM | 14 | A.  It was a short conversation, maybe 10 minutes. |
| 11:30AM | 15 | Q.  Okay.  Did the ACV lawsuit come up? |
| 11:30AM | 16 | A.  Yes. |
| 11:30AM | 17 | Q.  How? |
| 11:30AM | 18 | A.  He said, remember when you were here for the first wing |
| 11:30AM | 19 | and I said yes.  And he said, we're putting in a new wing. |
| 11:30AM | 20 | What have you been up to?  And I said, I'm working at this |
| 11:30AM | 21 | law firm and I'm working on a case.  And I said, listen, do |
| 11:30AM | 22 | you know about ACV because at that time, I was consumed with |
| 11:30AM | 23 | the case and learning about it and understanding the |
| 11:30AM | 24 | industry. |
| 11:30AM | 25 | Q.  And what did he say? |

11:30AM  1   A.  Yes.  He said he knew about it and he had started to talk

11:30AM  2   about it with me and tell me his concerns with ACV and it

11:30AM  3   seemed like we had some, I don't know, like we had like,

11:30AM  4   common ground.

11:30AM  5   Q.  Where were his concerns?

11:30AM  6   A.  He said that he started with Joe Nieman and his

11:30AM  7   reputation for aggressive tactics an lavish sales tactics and

11:31AM  8   I said, you know, I said, I heard the same thing.  It was a

11:31AM  9   high level conversation regarding what I had heard and what

11:31AM  10  he had heard.

11:31AM  11  Q.  Did a reference to shill bidding come up?

11:31AM  12  A.  Yes.

11:31AM  13  Q.  Did he know what that was?

11:31AM  14  A.  Yes.

11:31AM  15  Q.  And what did he say?

11:31AM  16  A.  He said he knew about it.  He said he heard about it.  He

11:31AM  17  said there were rumors in the industry and people talk and we

11:31AM  18  started to talk and I was animated because I was very

11:31AM  19  interested in what was -- I mean, obviously, I was committed

11:31AM  20  to the case and to the facts I heard about the case.

11:31AM  21  Q.  When you say heard about it, in reference to ACV?

11:31AM  22  A.  He told me he knew Joe well and knew all about the

11:31AM  23  company.

11:31AM  24  Q.  What about shill bidding?

11:31AM  25  A.  He says he heard about it, but he knew more about lavish

| | | |
|---|---|---|
| 11:31AM | 1 | gifts and other activities and he acted like he was sort of |
| 11:31AM | 2 | an -- inside knowledge of ACV because obviously I would have |
| 11:32AM | 3 | been interested in it. |
| 11:32AM | 4 | Q.  Okay.  Did you discuss meeting again? |
| 11:32AM | 5 | A.  Yes.  He wanted to meet as well.  He gave me his card. |
| 11:32AM | 6 | He put his number on the card and he said contact me.  Let's |
| 11:32AM | 7 | talk. |
| 11:32AM | 8 | MR. YANKELUNAS:  Okay.  Let's put Exhibit 1 up. |
| 11:32AM | 9 | MR. JOHNSEN:  Your Honor, if permissible by you, |
| 11:32AM | 10 | could I give Mr. McMurray the same piece of paper that's on |
| 11:32AM | 11 | the screen?  This is Ryan Johnsen.  I apologize. |
| 11:32AM | 12 | THE COURT:  Yes.  You may do that. |
| 11:32AM | 13 | BY MR. YANKELUNAS: |
| 11:32AM | 14 | Q.  Now Mr. McMurray, can you identify Exhibit 1 please? |
| 11:32AM | 15 | A.  Yes.  That's the card that he gave me. |
| 11:33AM | 16 | Q.  Now who is the -- what's the pointed name on the card? |
| 11:33AM | 17 | A.  Chris Taylor. |
| 11:33AM | 18 | Q.  Printed name on the card? |
| 11:33AM | 19 | A.  Oh, Tim Renzoni. |
| 11:33AM | 20 | Q.  Okay.  Is Tim Renzoni the person who gave you the card? |
| 11:33AM | 21 | A.  He gave me the card and then -- |
| 11:33AM | 22 | Q.  Okay.  We'll get to that. |
| 11:33AM | 23 | THE REPORTER:  I'm sorry Mr. McMurray.  Who gave you |
| 11:33AM | 24 | the card? |
| 11:33AM | 25 | THE WITNESS:  Tim Renzoni. |

11:33AM      1    BY MR. YANKELUNAS:

11:33AM      2    Q.  Okay.  When?

11:33AM      3    A.  While we were -- this was a conversation in the hallway

11:33AM      4    of Certified Auto.  It's like we weren't in some office or

11:33AM      5    something.  I was in Renzoni's office, he gave me the card,

11:33AM      6    then Chris came out and talked to all of us in the hallway.

11:33AM      7    Q.  Okay.  Now do you see the handwriting, Chris Taylor, and

11:33AM      8    a phone number?

11:33AM      9    A.  Yes.

11:33AM     10    Q.  Okay.  Done how that got there?

11:33AM     11    A.  Chris wrote it on there.

11:33AM     12    Q.  Did you see him write on on there?

11:33AM     13    A.  Yes.

11:33AM     14    Q.  Was he saying something to you while he was going that or

11:33AM     15    how did this come about?

11:33AM     16    A.  He said contact me.  Yeah.  Call.  Let's talk.

11:33AM     17    Q.  There's a reference to back lot.  Do you see that on the

11:34AM     18    left-hand side of the exhibit?

11:34AM     19    A.  Yes.

11:34AM     20    Q.  Whose handwriting is that, do you know?

11:34AM     21    A.  That's my handwriting.

11:34AM     22    Q.  What does that refer to?

11:34AM     23    A.  That refers to the competitor of ACV, back lot.

11:34AM     24    Q.  How did you know to write that down?

11:34AM     25    A.  He told me back lot may have some problems with ACV.  I

11:34AM    1    made a note of it on the card.

11:34AM    2    Q.   Who is he?

11:34AM    3    A.   Christopher Taylor.

11:34AM    4    Q.   Thank you.  Now did you discuss meeting again when you

11:34AM    5    were -- had this conversation with Mr. Taylor?

11:34AM    6    A.   Yes, but I told -- I'm sorry.

11:34AM    7    Q.   That's fine.

11:34AM    8    A.   I'm a little belabored by breath because of the -- sorry.

11:34AM    9    Q.   Are you okay?

11:34AM   10    A.   I'm fine.  I don't hurt.  I just seemed belabored.

11:34AM   11    Q.   That's fine.

11:34AM   12    A.   So the -- yes.  I said, call me.  And he -- I said -- or

11:34AM   13    he told me to call him and I did not call him.

11:35AM   14    Q.   All right.

11:35AM   15    A.   I did not give him a card or anything.  I gave

11:35AM   16    Mr. Renzoni my contact information.

11:35AM   17    Q.   Did you ever discuss attorney's fees with Mr. Taylor?

11:35AM   18    A.   Never.

11:35AM   19    Q.   Discuss retainer agreements?

11:35AM   20    A.   Never.

11:35AM   21    Q.   Did you ask him to sign a retainer agreement?

11:35AM   22    A.   Never.

11:35AM   23         THE COURT:  Mr. Yankelunas, can we take down the card

11:35AM   24    now so I can see?

11:35AM   25         MR. YANKELUNAS:  Yes.  Sorry.  Can we go to

| | | |
|---|---|---|
| 11:35AM | 1 | Exhibit 2?  That's it.  Can you give Mr. McMurray a hard copy? |
| 11:35AM | 2 | BY MR. YANKELUNAS: |
| 11:35AM | 3 | Q.  Can you identify this exhibit? |
| 11:35AM | 4 | A.  Yes, the email confirming my purchase of my car that's |
| 11:35AM | 5 | parked outside. |
| 11:35AM | 6 | MR. YANKELUNAS:  Okay.  We're offering this exhibit, |
| 11:35AM | 7 | Judge. |
| 11:35AM | 8 | THE COURT:  Any objection? |
| 11:36AM | 9 | MR. DIRENFELD:  No objection, Your Honor. |
| 11:36AM | 10 | THE COURT:  Plaintiff's 2 is admitted. |
| 11:36AM | 11 | (Plaintiff's Exhibit 2 was received in evidence.) |
| 11:36AM | 12 | |
| 11:36AM | 13 | BY MR. YANKELUNAS: |
| 11:36AM | 14 | Q.  Is that referring to the purchase of a vehicle at the |
| 11:36AM | 15 | same time period of July -- |
| 11:36AM | 16 | A.  I bought a 2021 Ram. |
| 11:36AM | 17 | Q.  Is there a date on this exhibit? |
| 11:36AM | 18 | A.  It's the 23rd, I think, right? |
| 11:36AM | 19 | Q.  Read the exhibit.  It's right there. |
| 11:36AM | 20 | A.  Friday, July 23rd, yeah. |
| 11:36AM | 21 | Q.  Okay.  So, in other words, you bought a car the next day, |
| 11:36AM | 22 | correct? |
| 11:36AM | 23 | A.  Yes. |
| 11:36AM | 24 | Q.  Why didn't you buy a car or pick-up at CAB? |
| 11:36AM | 25 | A.  I don't want to disparage the guy, but his sales tactics |

11:36AM    1    were hard and heavy.  And I didn't like the pricing he was

11:36AM    2    giving me.  I mean, we -- to be totally honest, I went into

11:36AM    3    Certified because I live right there.  Again, I thought, what

11:36AM    4    the heck, let's see what Christ can offer and I was already

11:36AM    5    kind of set on what I was going to do.

11:36AM    6    Q.  Why did you visit a used car dealership if you were

11:36AM    7    looking for a new car?

11:36AM    8    A.  Because I know Chris and I pass this location every

11:37AM    9    single day.  I'll pass it when I leave here.  I pass it every

11:37AM   10    single day.  And they have cars parked up and down the

11:37AM   11    street, truck.  So I thought what's the harm in going to talk

11:37AM   12    with them?

11:37AM   13            MR. YANKELUNAS:  Let's try Exhibit 5 again.

11:37AM   14            MR. JOHNSEN:  This is Ryan JOHNSEN.  Mr. Yankelunas

11:37AM   15    would like me to play Plaintiff's 5 which has already been

11:37AM   16    marked and introduced into evidence.

11:37AM   17    (The recording was played.)

11:38AM   18    BY MR. YANKELUNAS:

11:38AM   19    Q.  Was everybody able to hear that?  Mr. McMurray, you

11:38AM   20    recognize the voice on that tape?

11:38AM   21    A.  I do not.

11:38AM   22    Q.  Okay.  Do you know what that tape is asking you to do?

11:38AM   23    A.  I -- it's -- I received -- it feels like dozens, I'm not

11:38AM   24    sure the exact number of calls and messages from Certified

11:38AM   25    after I went in, which confirmed my original impression of

11:38AM  1    the sales tactics and they called all the time.

11:38AM  2    Q.  In reference to buying a pick-up truck?

11:38AM  3    A.  Yes.

11:38AM  4    Q.  Because that's why you went in there?

11:38AM  5    A.  Yes.

11:38AM  6    Q.  Now did you have any other interests and discussions with

11:38AM  7    anyone about the ACV lawsuit?

11:38AM  8    A.  Yes.

11:38AM  9    Q.  Okay.  Can you describe that for the Court?

11:38AM  10   A.  Any other persons?

11:38AM  11   Q.  Any in-person discussions with anyone else?

11:38AM  12   A.  Well we met with people that were witnesses in the case

11:39AM  13   or people that wanted to be potential witnesses.  Yes.  We

11:39AM  14   met, in our law offices, with several people.

11:39AM  15   Q.  Okay.  I'm talking about in-person discussions with

11:39AM  16   people with counsel present?

11:39AM  17   A.  Yes.

11:39AM  18   Q.  All right.

11:39AM  19   A.  We -- it was -- there was substantial evidence of

11:39AM  20   wrongdoing and we did everything we could to understand it

11:39AM  21   and find people that are --

11:39AM  22        MR. YANKELUNAS:  Okay.  Now the subject of redirect,

11:39AM  23   Judge, I have nothing further for Mr. McMurray.

11:39AM  24        THE COURT:  Any cross?

11:39AM  25        MR. DIRENFELD:  Yes, Your Honor.

| | | |
|---|---|---|
| 11:39AM | 1 | CROSS-EXAMINATION |
| 11:39AM | 2 | |
| 11:39AM | 3 | BY MR. DIRENFELD: |
| 11:39AM | 4 | Q.  So Mr. McMurray I think I just want to start with where |
| 11:39AM | 5 | you just ended there and then we can trace back.  You said |
| 11:39AM | 6 | you had dozens of other conversations with other people about |
| 11:39AM | 7 | the lawsuit? |
| 11:39AM | 8 | MR. YANKELUNAS:  Objection.  That wasn't the |
| 11:39AM | 9 | testimony.  He didn't say dozens. |
| 11:39AM | 10 | THE COURT:  So, don't do that until the question is |
| 11:40AM | 11 | finished.  And dozens may be an exaggeration.  You had a |
| 11:40AM | 12 | conversation with other people about the lawsuit.  Go ahead |
| 11:40AM | 13 | and finish your question. |
| 11:40AM | 14 | MR. DIRENFELD:  Thank you, Your Honor. |
| 11:40AM | 15 | BY MR. DIRENFELD: |
| 11:40AM | 16 | Q.  Could you tell us who those other people -- that you had |
| 11:40AM | 17 | conversations with about the lawsuit? |
| 11:40AM | 18 | MR. YANKELUNAS:  Objection, Judge.  I think that's |
| 11:40AM | 19 | work product. |
| 11:40AM | 20 | THE COURT:  It appears to be work product.  So if -- |
| 11:40AM | 21 | and the testimony was, these were potential witnesses.  So |
| 11:40AM | 22 | let's hear why we would overcome the work product privilege. |
| 11:40AM | 23 | MR. DIRENFELD:  Well Your Honor, I believe that |
| 11:40AM | 24 | counsel opened the door to that by asking the witness in terms |
| 11:40AM | 25 | of whether he had conversations with other people about the |

11:40AM   1   case.  So I think we're entitled to explore those

11:40AM   2   conversations he's put on the record.

11:40AM   3        THE COURT:  He hasn't discussed the content of those

11:40AM   4   conversations and the witness testified they were with

11:40AM   5   witnesses in the law firm.  I will allow you to ask him if he

11:40AM   6   had any contact with any dealerships outside of the law firm

11:41AM   7   similar to the conversations that's at issue here.  That's a

11:41AM   8   permissible question.

11:41AM   9        MR. DIRENFELD:  Thank you, Your Honor.

11:41AM  10   BY MR. DIRENFELD:

11:41AM  11   Q.  Mr. McMurray, did you have any conversations with other

11:41AM  12   dealers outside the confines of the HoganWillig law firm?

11:41AM  13   A.  No.

11:41AM  14   Q.  All right.  So Mr. McMurray you testified that you are

11:41AM  15   licensed in New York State as an attorney; is that correct?

11:41AM  16   A.  Correct.

11:41AM  17   Q.  All right.  And as a member of the New York bar, are you

11:41AM  18   familiar with the New York Rules of Professional Conduct?

11:41AM  19   A.  Yes.

11:41AM  20   Q.  And that would include the rules relating to solicitation

11:41AM  21   of clients?

11:41AM  22   A.  Yes.

11:41AM  23   Q.  All right.  Now I think you testified earlier that you

11:41AM  24   are no longer employed at HoganWillig; is that correct?

11:41AM  25   A.  That's correct.

11:42AM    1    Q.  When did you leave HoganWillig?

11:42AM    2            MR. YANKELUNAS:  Objection.  Relevance.

11:42AM    3            THE COURT:  I'll allow it.

11:42AM    4            THE WITNESS:  Approximately two months ago.  I'm not

11:42AM    5    sure the exact date.

11:42AM    6    BY MR. DIRENFELD:

11:42AM    7    Q.  And up until your departure two months ago, you were

11:42AM    8    working on the lawsuit against ACV that HoganWillig was

11:42AM    9    representing plaintiffs in; is that correct?

11:42AM   10    A.  I was.

11:42AM   11    Q.  So you testified, I believe, also earlier as to kind of

11:42AM   12    your relationship or previous relationship with Mr. Taylor.

11:42AM   13    Have you had -- was your relationship with Mr. Taylor limited

11:42AM   14    to your role as town supervisor?

11:42AM   15    A.  No.  We were engaged in things that were, I mean, he is

11:42AM   16    an active member of the community as was I -- as am I.  It's

11:43AM   17    a small town.  You're part of the committee to build the

11:43AM   18    DeGlopper Memorial.  We're both working on that together or

11:43AM   19    adjacent to it.  So it wasn't simply as the town supervisor.

11:43AM   20    We know each other to the point where I walked in and he saw

11:43AM   21    me.  We were -- it was -- excited to see each other.

11:43AM   22    Q.  When was that memorial that you referenced?  When was

11:43AM   23    that?  When was that completed or when was that worked on?

11:43AM   24    A.  It's still work in progress, but it's substantially

11:43AM   25    completed as of last year.

11:43AM   1   Q.   Okay.  And you testified earlier as to a falling out that

11:43AM   2   you had with Mr. Taylor relating to the West River Trail?

11:43AM   3   A.   Right.

11:43AM   4   Q.   When did that falling out occur?

11:43AM   5   A.   Approximately 2016.  But we still are in the same small

11:43AM   6   town and, you know, you got to get along with people when you

11:44AM   7   see people.

11:44AM   8   Q.   Prior to July, prior to you going to Certified Auto on

11:44AM   9   July 22nd, 2021, when was the last time you had seen

11:44AM  10   Mr. Taylor?

11:44AM  11   A.   I cannot remember exactly.

11:44AM  12   Q.   Had you seen him in 2020?

11:44AM  13         MR. YANKELUNAS:  Objection asked and answered.

11:44AM  14         THE COURT:  Sustained.

11:44AM  15   BY MR. DIRENFELD:

11:44AM  16   Q.   Now you are not related to Mr. Taylor; is that correct?

11:44AM  17   A.   I do not believe I am.  No.

11:44AM  18   Q.   Right.  And Mr. Taylor has never been your client before?

11:44AM  19   A.   No.

11:44AM  20   Q.   As an attorney?

11:44AM  21   A.   No.

11:44AM  22   Q.   Has he ever been a client of HoganWillig?

11:44AM  23   A.   I don't know.

11:44AM  24   Q.   Has Certified Auto Brokers ever been a client of

11:44AM  25   HoganWillig?

11:44AM   1   A.  I don't know.

11:44AM   2   Q.  Has Certified Auto Brokers ever been a client of yours in

11:45AM   3   your capacity as an attorney?

11:45AM   4   A.  No.

11:45AM   5   Q.  So I want to turn to the events of July 22nd that you

11:45AM   6   testified to.  I believe you testified that you stopped off

11:45AM   7   at Certified Auto Brokers on your way home from work.

11:45AM   8   Approximately what time was that at?

11:45AM   9   A.  I don't remember exactly.  It was in the afternoon some

11:45AM  10   time.

11:45AM  11   Q.  Was it close to the time that Certified Auto Brokers was

11:45AM  12   closing?

11:45AM  13   A.  I don't remember.  It was -- honestly, if we weren't

11:45AM  14   having this discussion --

11:45AM  15           MR. YANKELUNAS:  Just answer the question, Nate.

11:45AM  16           THE WITNESS:  I would never remember most of this.

11:45AM  17   It was a brief encounter.

11:45AM  18   BY MR. DIRENFELD:

11:45AM  19   Q.  Now you say that you -- one of your issues when you were

11:45AM  20   talking with Mr. Renzoni, as it related to the trucks was

11:45AM  21   that you didn't like the price that he was giving to you; is

11:45AM  22   that correct?

11:45AM  23   A.  The -- I told him exactly how much I wanted to pay.  And

11:46AM  24   he said, how about we do this?  And I said, that doesn't make

11:46AM  25   sense from what I'm hearing at other dealerships.

11:46AM  1    Q.  How much did you want to pay?

11:46AM  2    A.  I said I wanted to keep my payment to $500 a month and I

11:46AM  3    wanted a car that was within, you know, three to five years

11:46AM  4    old and he said, how about this much?  And I was like no.

11:46AM  5    Q.  Did he offer to show you any cars on the lot?

11:46AM  6    A.  Yeah.  He also said he didn't have the car I wanted,

11:46AM  7    which was a Dodge Ram.

11:46AM  8    Q.  So you testified he didn't have any Dodge Rams in stock?

11:46AM  9    A.  He said not of the color I wanted.  I wanted black.

11:46AM  10   Q.  I believe you testified earlier that you don't have a lot

11:46AM  11   of time and therefore, it was important for you to make a

11:46AM  12   very efficient trip.  Is that correct?  Is that fair to say?

11:46AM  13   A.  Yes, that's fair to say.

11:46AM  14   Q.  Did you do any research prior to going to Certified Auto

11:46AM  15   Brokers as to what cars they may have in stock?

11:46AM  16   A.  Again, I pass it all the time.  Lots of cars.  And I know

11:47AM  17   from talking to Chris in the past he has the ability to get

11:47AM  18   cars fast.  So I thought, why don't I give it a shot?

11:47AM  19   Q.  But did you do any research in terms of what inventory

11:47AM  20   they had on the lot prior to going?

11:47AM  21          MR. YANKELUNAS:  Objection.

11:47AM  22          THE WITNESS:  I don't have -- go ahead.

11:47AM  23          THE COURT:  So, stop.  There's an objection.  Basis?

11:47AM  24          MR. YANKELUNAS:  Asked and answered.

11:47AM  25          THE COURT:  I do not believe it has been.  Did you do

| | | |
|---|---|---|
| 11:47AM | 1 | any research before you went on the lot? |
| 11:47AM | 2 | THE WITNESS:  Other than driving by, no.  I don't |
| 11:47AM | 3 | have a personal, first-hand knowledge of the lot or the |
| 11:47AM | 4 | dealership or -- beyond my interaction with Chris in the past. |
| 11:47AM | 5 | So, no.  I was going to go and look later. |
| 11:47AM | 6 | BY MR. DIRENFELD: |
| 11:47AM | 7 | Q.  Okay.  What dealership did you ultimately purchase your |
| 11:47AM | 8 | car from? |
| 11:47AM | 9 | A.  What's it called again?  I think it's called Northtown |
| 11:47AM | 10 | Dodge Ram. |
| 11:47AM | 11 | Q.  Okay.  And how did you decide to go to that dealership? |
| 11:47AM | 12 | A.  The same way, I pass it on the way home and it's near |
| 11:48AM | 13 | where I was working. |
| 11:48AM | 14 | Q.  So just -- you did not end up actually looking at any |
| 11:48AM | 15 | vehicles while you were on the Certified Auto Brokers lot; is |
| 11:48AM | 16 | that correct? |
| 11:48AM | 17 | MR. YANKELUNAS:  Objection.  Asked and answered. |
| 11:48AM | 18 | THE COURT:  It is. |
| 11:48AM | 19 | MR. DIRENFELD:  Okay. |
| 11:48AM | 20 | BY MR. DIRENFELD: |
| 11:48AM | 21 | Q.  Now in talking with Mr. Taylor, you brought up the |
| 11:48AM | 22 | lawsuit with ACV; is that correct? |
| 11:48AM | 23 | A.  Yes. |
| 11:48AM | 24 | Q.  All right.  And you invited Mr. Taylor to talk more with |
| 11:48AM | 25 | you about the lawsuit; is that correct? |

| 11:48AM | 1 | A.  Yes, because he seemed to know lots about ACV. |
|---|---|---|
| 11:48AM | 2 | Q.  Did you offer Mr. Taylor to come to HoganWillig to |
| 11:49AM | 3 | discuss the lawsuit? |
| 11:49AM | 4 | A.  Yes.  I said, do you want to?  Let's -- maybe we can talk |
| 11:49AM | 5 | later and, you know, I said, reach out to me. |
| 11:49AM | 6 | Q.  Did you offer Certified Auto Brokers that HoganWillig |
| 11:49AM | 7 | could represent ACV in a lawsuit? |
| 11:49AM | 8 | A.  No.  I didn't -- I said we should talk more.  More than |
| 11:49AM | 9 | anyone, I wanted to get his inside knowledge of the industry. |
| 11:49AM | 10 | I'm not from the industry.  He's lived in it -- okay.  Sorry. |
| 11:49AM | 11 | Q.  So after your discussion with Mr. Taylor regarding ACV |
| 11:49AM | 12 | Auctions, did you leave the dealership after that |
| 11:49AM | 13 | conversation? |
| 11:49AM | 14 | A.  Right away.  Yes. |
| 11:49AM | 15 | Q.  Did Mr. Taylor offer to show you cars on the lot as part |
| 11:49AM | 16 | of your conversation? |
| 11:49AM | 17 | A.  I don't recall. |
| 11:49AM | 18 | Q.  You testified earlier regarding voice messages that you |
| 11:50AM | 19 | received from Mr. Renzoni.  You didn't return any of those |
| 11:50AM | 20 | voice messages, did you, about purchasing a pick-up truck? |
| 11:50AM | 21 | A.  I did not. |
| 11:50AM | 22 | Q.  What is your payment on the car that you did end up |
| 11:50AM | 23 | purchasing? |
| 11:50AM | 24 | MR. YANKELUNAS:  Objection.  Relevance. |
| 11:50AM | 25 | THE COURT:  I'm going to sustain the objection. |

11:50AM    1            MR. DIRENFELD:  I have no further questions, Your

11:50AM    2    Honor.

11:50AM    3            THE COURT:  Any redirect?

11:50AM    4            MR. YANKELUNAS:  No, Judge.

11:50AM    5            THE COURT:  Any further witnesses for plaintiffs?

11:50AM    6            MR. YANKELUNAS:  No, Your Honor.

11:50AM    7            THE COURT:  Any rebuttal witnesses for defendants?

11:51AM    8            MS. JAWORSKI:  No, Your Honor.

11:51AM    9            THE COURT:  I'm going to close the evidence

11:51AM   10    alternative this point in time.  I believe both sides

11:51AM   11    adequately briefed the issues.  I know what they are.  If you

11:51AM   12    feel there is something you need to supplement, I would give

11:51AM   13    you two weeks to do it.  I don't necessarily share that

11:51AM   14    opinion, but I wouldn't be opposed to it.  Any thoughts about

11:51AM   15    that?

11:51AM   16            MR. YANKELUNAS:  That sounds adequate, Judge.  Thank

11:51AM   17    you.

11:51AM   18            MS. JAWORSKI:  Agreed, Your Honor.  Thank you.

11:51AM   19            THE COURT:  All right.  I want you to make sure that

11:51AM   20    the court clerk gets a hard copy of your exhibits, including

11:51AM   21    the recording.  I'll close the evidence at this time.  I'll

11:51AM   22    take the matter under advisement 14 days from today, starting

11:51AM   23    tomorrow and do the 14-day count.  If you didn't file

11:51AM   24    anything, it just goes under advisement based on what's been

11:51AM   25    filed so far.  All right?  Anything further in this matter?

11:52AM    1            MR. YANKELUNAS:  Not for the plaintiff, Your Honor.

11:52AM    2    Thank you very much.

11:52AM    3            MS. JAWORSKI:  No, Your Honor.  Thank you.

11:52AM    4            THE COURT:  All right.  Thank you.  Thank you, madam

11:52AM    5    clerk.  You may leave the Zoom call.

           6    (Proceedings concluded at 11:52 a.m.)

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                  *    *    *    *    *    *    *

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                            s/ Megan E. Pelka, RPR

10                           Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25