```
                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF NEW YORK


JERRY GRADL MOTORS, INC.,              Docket Number:
LIFETIME MOTOR CARS, INC.,       1-21-CV-00409-CCR
Individually and on Behalf of
All Others Similarly
Situated,                  *
                           *
Plaintiffs,                *
                           *
                           *          Buffalo, New York
            v.             *          January 11, 2022
                           *
                           *          12:52 p.m.
                           *
ACV AUCTIONS, INC.,                    ORAL ARGUMENT
BRIAN M. MALCHAK,
SUN CHEVROLET, INC.,
WHOLESALE CARS ONLINE.COM,
L.L.C.,
JOHN NEIMAN,
GEORGE CHAMOUN,
DANIEL MAGNUSZEWSKI,
TODD J. CAPUTO,            *
                           *
Defendants.                *
                           *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE CHRISTINA REISS
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:          HOGANWILLIG, PLLC,
                             By EDWARD P. YANKELUNAS, ESQ.,
                             2410 North Forest Road,
                             Suite 301,
                             Getzville, New York  14068.

```
 1   For Defendant ACV Auctions:

 2                             ORRICK,
                               By JOHN A. JURATA, JR., ESQ.,
 3                             Columbia Center 1152,
                               15th Street N.W.,
 4                             Washington, DC  20005.
                               And
 5                             BECKAGE PLLC,
                               By MYRIAH VALENTINA JAWORSKI, ESQ.,
 6                             420 Main Street,
                               Suite 1110,
 7                             Buffalo, New York  14202.

 8   For Defendant Brian M. Malchak:

 9                             BARCLAY DAMON, LLP,
                               By JON P. DEVENDORF, ESQ.,
10                             Barclay Damon Tower,
                               125 East Jefferson Street,
11                             Syracuse, New York  13202.

12
     For Defendant Sun Chevrolet, Inc.,
13   Wholesale Cars Online.Com
     Todd Jacob Caputo:
14
                               HOOVER & DURLAND, LLP,
15                             By TIMOTHY W. HOOVER, ESQ.,
                               561 Franklin Street,
16                             Buffalo, New York  14202.

17
     Court Reporter/FTR transcriber:
18
                               BONNIE S. WEBER,
19                             Notary Public,
                               Robert H. Jackson Courthouse,
20                             2 Niagara Square,
                               Buffalo, New York  14202.
21                             Bonnie_Weber@nywd.uscourts.gov.

22
                 Proceedings recorded by mechanical stenography,
23                    transcript produced by computer.

24

25
```

1          (Proceedings commenced at 12:52 p.m.)

2

3          **THE CLERK:**  The United States District Court for the

4   Western District of New York is now in session.

5          This is the case of Jerry Gradl Motors, Inc. versus

6   ACV Auctions, et al.  21-CV-409, before the Honorable Christina

7   Reiss.

8          And if the attorneys could state their appearances for

9   the record, please.

10         **MR. YANKELUNAS:**  Good afternoon.  Ed Yankelunas for

11  the plaintiffs.

12         **MR. JURATA:**  Good afternoon, Your Honor.  Myriah

13  Jaworski with Beckage on behalf of defendant ACV Auctions.

14         I also have my co-counsel, Mr. John Jurata with

15  Orrick, on behalf of defendant ACV Auctions.

16         **MR. DEVENDORF:**  Good afternoon, Your Honor.  Jon

17  Devendorf of Barclay Damon for defendant Malchak.

18         **MR. HOOVER:**  Your Honor, Tim Hoover, Hoover & Durland,

19  LLP for Sun Chevrolet, Inc., Wholesale Cars Online.Com and Todd

20  Jacob Caputo, defendants.

21         Good afternoon, Judge.

22         **THE COURT:**  Good afternoon to all of you.  I'm going

23  to ask that you announce yourself before you speak.  We have a

24  fair amount of people showing up on the squares and it's easier

25  for the record and for the court reporter if it's transcribed

1    later.

2          My understanding, Ms. Duke, is that you don't use a

3    court reporter.  It gets transcribed from a tape thereafter?

4          **THE CLERK:**  Yes.

5          **THE COURT:**  Okay.  So I have just two things to bring

6    to your attention before we get started on the arguments.

7          And, obviously, the focus is whether this is a Federal

8    Court case or those counts should be dismissed, and the Court

9    should not exercise supplemental jurisdiction.

10         With regard to the anti-trust case claim, the U.S.

11   Supreme Court in Leegin Creative Leather Products versus PSKS,

12   551 U.S. 877 907, which is a 2007 case, held, and I quote, that

13   vertical price restraints are to be judged by the rule of

14   reason.

15         So I'm going to want to hear why this is a horizontal

16   price restraint between competitors.

17         And if it is not a horizontal and it's a vertical,

18   then you need a product market and you need a geographic market

19   and neither is alleged in the complaint.

20         With regard to the RICO claim, in Riverwoods Chappaqua

21   Corp versus Marine Midland Bank, 30 F.3d 339, it's a 1994 case

22   for the Second Circuit, but it appears that all the circuits are

23   in agreement, the Court held that corporations and its officers

24   are not distinct from the corporation that allegedly

25   participated in the RICO enterprise.

1          So you can't kind of conspire or engage in

2    racketeering with yourself.  And if the sole basis for your

3    being in the RICO claim is because you are a corporate officer,

4    I want to hear what a -- why that's sufficient.

5          In the case, to have a distinction between the

6    corporation and the corporate officers to -- one of the things

7    that the Second Circuit says:  We have made clear that by virtue

8    of the distinctness requirement, a corporate entity may not be

9    both the RICO person and the RICO enterprise under Section 1962.

10         This does not foreclose the possibility of a corporate

11   entity being held liable as a defendant under Section 1962,

12   where it associates with others to form an enterprise that is

13   sufficiently distinct from itself.

14         In this regard, we have noted that a Section 1962C

15   claim may be sustained, where there is only a partial overlap

16   between the RICO person and the RICO enterprise.

17         And the defendant may be a RICO person or one of a

18   number of the members of the RICO enterprise, because a

19   corporation can only function through its employees and agents.

20         Any act of the corporation can be viewed as an act of

21   such an enterprise and the enterprise in -- in reality, no more

22   than the defendant itself.

23         Thus, where employees of a corporation associate

24   together to commit a pattern of product predicate acts in the

25   course of their employment and on behalf of the corporation, the

 1   employees in association with the corporation do not form an

 2   enterprise distinct from the corporation itself.

 3        So those are kind of two fundamental questions I have,

 4   in addition to your ample briefing on this case, and I'm going

 5   to start with defendants as the moving party.

 6        **MR. JURATA:**  Thank you.  Thank you, Your Honor.

 7   Again, this is Jay Jurata on behalf of ACV, also individual

 8   defendants Chamoun, Neiman and Magnuszewski.

 9        And by agreement of the co-defendants today, Your

10   Honor, I will be presenting the argument on behalf of all

11   defendants.

12        Your Honor.  The second amended complaint attempts to

13   manufacturer a conspiracy that does not exist either factually

14   or legally.

15        The alleged conspiracy is vertical in nature, as you

16   referred to.  Based on your question on Legan, it involves a

17   single seller, a single buyer on top of an online platform;

18   three distinct entities, all within a vertical relationship from

19   each other.

20        The complaint does not allege facts sufficient to show

21   an agreement, let alone one, involving all three of those

22   entities.

23        And even if the complaint did cobble together an

24   agreement, there is no allegations to demonstrate harm because

25   the case is pled as a per se violation, which does not apply to

1   vertical restraints on trade, as held by the Supreme Court in

2   Legan.

3          **THE COURT:**  So let me give you --

4          **MR. JURATA:**  Now, Your Honor.

5          **THE COURT:**  Let me give you my try on the agreement.

6   It is online platform.  The biggest customer and an investor in

7   it gets tipped off by the platform operator what the low bid is

8   and is allowed to bid on its own vehicles and then not complete

9   the sales.

10          And the reason why that works out for the online

11   platform is it raises the price of cars, so people are paying

12   more as in whatever fee the platform obtains and -- and they may

13   have some other agreement as between the two of them as to why

14   this is allowed.

15          And it's ultimately the consumer that pays more for a

16   vehicle than it might otherwise pay.

17          So why -- at least at the pleading stage, isn't that

18   sufficient for an agreement?

19          In an anti-trust, we actually look at criminal law for

20   the conspiracy elements and it's an agreement between one or

21   more persons or two or more persons -- excuse me -- to engage in

22   illegal activity.

23          It's not a lot more complicated than that, so why is

24   that not sufficient?

25          **MR. JURATA:**  So, Your Honor, there is a couple reasons

1   why the factual -- why the complaint does not satisfy an

2   agreement.

3        And I will first note that the factual scenario that

4   you just gave in which the platform operator is tipping off

5   users of the platform regarding something is not the factual

6   allegations being made here in this case.

7        So maybe it would be helpful to start with what the

8   core allegations are of the conspiracy, if I may, Your Honor.

9        So ACV operates an online platform, upon which used

10  car dealers buy and sell cars via auction.  That's contained in

11  paragraphs 16 of the complaint.

12       Paragraph 17 of the complaint notes that for every

13  auction, the seller designates a minimum for price that is not

14  disclosed to potential buyers.

15       That paragraph also notes that if the auction results

16  in a bid above that floor place, the car is automatically sold

17  to the highest bider.

18       Now, the other scenario, Your Honor, is the auction

19  results in a situation where the highest bid is below the floor

20  price.

21       The seller can either accept that bid, at which point

22  there is a sale.  The seller can decline that bid, at which

23  point there is no sale.

24       And you see, you -- you can see examples of that in

25  the exhibits that are attached to the complaint or the

1    counteroffer or the seller can make a counteroffer to the

2    highest bider, which may or may not be accepted.

3            And, again, you can see examples of that in Exhibit C

4    to the pleading.

5            Now, with that factual framework --

6            **THE COURT:**  Well, let me stop you, because that's part

7    of the factual framework.

8            But in paragraph 25, upon information and belief by

9    prior agreement with ACV and Sun Auto, the Sun Auto floor price

10   of the vehicle being offered for sale by Sun Auto, using the

11   ACV -- ACV online platform was disclosed to Malchak.

12           And with knowledge of that information, Malchak

13   presented a phantom proxy bid at a price below the floor price,

14   for the purpose of causing competing bids to increase it, shill

15   it up, with no intention of purchasing the motor vehicle being

16   offered for sale by Sun Auto.

17           **MR. JURATA:**  Yes, Your Honor.  I was just about to

18   turn to that.

19           So there is a fundamental problem with that allegation

20   and then I do want to address the factual scenario that you

21   gave.

22           The fundamental problem with that allegation is that

23   during in an anti-case -- in an anti-trust conspiracy, that

24   there is an agreement that is a legal conclusion that is not a

25   factual allegation.

 1              The Supreme Court has said in the Twombly decision and

 2     multiple -- multiple cases in the Second Circuit have said that

 3     the word agreement is a legal conclusion and you actually have

 4     to look to see if there are facts that adequately allege that

 5     there is an agreement, as opposed to independent business

 6     conduct.

 7              And we will talk about that and why the facts don't

 8     show that there is an agreement --

 9          **THE COURT:**  So let me stop you there.  And the

10     complaint goes on to say:  Ordinarily, this would be something

11     that ACV would not like at all.

12              Why are you doing this on our platform?  And the

13     allegation is ACV not only knew about it, but facilitated it.

14              And when somebody complained about it, who allegedly

15     works for ACV, or some insider, they were told to stay out of

16     it.  This is not something that you should be pursuing.

17              So it's not that there is just a naked allegation that

18     there was an agreement.  The argument or the allegation is this

19     would not make sense to ACV.  They would be policing that

20     platform and they are not policing that platform because it

21     works for their advantage.

22              And as kind of an additional thing, in fact, somebody

23     who was running ACV wanted a private app, so that they could

24     kind of get into the action.

25          **MR. JURATA:**  So, Your Honor, the basic core of the

1    agreement here or the alleged agreement here is contained in

2    paragraph 29 of the second amended complaint.

3            And paragraph 29 makes clear that the floor price is

4    supposedly exposed not through ACV, but through an alleged

5    agreement between Sun Auto and Mr. Malchak.

6            That is based on some undisclosed prior relationship

7    between individuals at Sun Auto and Mr. Malchak.  There is no

8    allegation in the second amended complaint that ACV is involved

9    in any way of sharing the floor price with Mr. Malchak.

10           The only allegation --

11       **THE COURT:**  Well, let me ask you about that, because

12   that I see in paragraph 25.  And I understand your argument is

13   that's can conclusory, how else does the -- Mr. Malchak get the

14   floor price?

15           So if it's not coming from ACV, he's getting it from

16   Sun Auto?

17       **MR. JURATA:**  So, Your Honor, the conclusory nature of

18   this complaint makes us have to infer a little bit as to how

19   Mr. Malchak is getting it.

20           But paragraph 29 makes clear that the -- the floor

21   price is being -- if there is a floor price that is being

22   shared, it is being shared by Sun Auto directly with

23   Mr. Malchak.

24           There is nothing in paragraph 29 that ties ACV's

25   involvement at all to the sharing of the floor price.

1          The allegation that ACV is somehow part of this

2     conspiracy is based on claims, as you've already noted, Your

3     Honor, that they were supposedly made aware of it and they did

4     nothing.

5          They -- but there is no allegation in the complaint

6     other than a conclusory reference to an agreement in paragraph

7     24 and 25 that puts ACV in the mix as to how the floor price

8     goes from Sun Auto to Mr. Malchak.

9          ACV's involvement is, based on the complaint, the fact

10    that this happens on ACV's platform.  There is nothing in any of

11    the allegations regarding Mr. Neiman or Mr. Magnuszewski, which

12    talks about bidding on cars that are sold by Sun Auto.

13         And the complaint is very clear that the alleged

14    conspiracy involves only cars involving Sun Auto that

15    Mr. Malchak bid on.

16         So everything about ACV, the allegation about an

17    application, the allegation about -- about engaging in bidding,

18    none of that in the complaint is tied to Sun Auto.

19         These are just generic allegations that don't go to

20    the specific alleged conspiracy here, which is an agreement

21    between ACV, Sun Auto and Mr. Malchak, which does not meet the

22    pleading requirements set by the Supreme Court in the Twombly

23    decision.

24         And there's a reason -- there is a reason for that,

25    Your Honor, which is that companies engage very often in

1    independent business behavior.

2         And the Supreme Court has recognized that companies

3    can engage in ways which may look like there is a price fixing

4    agreement, when there is actually not.

5         And, instead, you just have parallel business behavior

6    or even in some cases that the Supreme Court has said is

7    completely legal, a company becomes aware of an arrangement and

8    does independent business conduct that follows it.

9         But unless there is a requisite meeting of the minds

10   or as the Supreme Court sets forth in the Montesanto decision,

11   what is called a conscious commitment to a common scheme, there

12   is no agreement.

13        That is why an agreement in anti-trust law is a legal

14   conclusion, not a factual allegation.

15        And so, Your Honor, you noted --

16        **THE COURT:**  But -- but at the pleading stage, the --

17   there is also an abundance of case law that says in an

18   anti-trust case, the hand -- the evidence is in the hands of the

19   alleged co-conspirators.

20        And we don't need to have a document -- a written

21   document that says, this is an agreement to conspire to increase

22   the prices for Sun Auto cars.

23        It is definitely something that can be inferred.  And

24   one of the things the courts look at is how would this make

25   sense.

1          So if something is happening on your platform that

2    sticks out as a sore thumb -- and this is the allegation of the

3    complaint; here's the number of transactions; here's the ones he

4    bid on; here's the ones he actually bought, the Court isn't in

5    the position to -- I mean, if it's implausible, that's one

6    thing, but short of plausibility, accepting those facts are

7    true, could you reasonably infer that this was by agreement

8    between the party who has the authority to stop this and is not

9    doing anything about it?

10          And then there is an allegation in the complaint that

11   there was a complaint made about it to a person in authority and

12   they said, don't touch it.

13          **MR. JURATA:**  You know, I'm happy to address that --

14   happy to address that question.

15          And the answer to that question is, again, in the

16   Supreme Court's decision in the -- with the Twombly case -- and

17   you are correct, Your Honor.  There are multiple anti-trust

18   cases that say evidence of a direct agreement is rare.

19          And the second amend complaint does not allege

20   knowledge of a direct agreement.  Instead, they are attempting

21   to infer agreement.

22          Now, the Supreme Court said in Twombly that in order

23   to infer an agreement, you look at something called plus

24   factors.

25          And in the Second Circuit, there are three plus

1  factors which are of relevance.  One, is a high level of inter

2  firm communications; the second is parallel actions that are

3  against the apparent independent economic interest of the actors

4  and the third is a common motive to conspire.

5        And when you look at the allegations in the complaint,

6  there is simply not allegations in support of certain plus

7  factors.

8        There is nothing in the complaint that talks about any

9  details of any meetings between Mr. Malchak and Sun Auto or

10  Mr. Malchak and representatives of Sun Auto.

11       There is a -- just a -- there is just a very vague

12  reference to a relationship.  There is zero in the complaint.

13       Your Honor that talks about any inter firm

14  communications between Mr. Malchak between Sun Auto and between

15  ACV --

16       **THE COURT:**  So --

17       **MR. JURATA:**  -- in --

18       **THE COURT:**  -- let me ask you about that, as that

19  would not be a plus factor, because there is no requirement in

20  the Second Circuit or elsewhere that there be inter firm

21  communications and how would you have those prior to discovery.

22       **MR. JURATA:**  So the -- in many anti-trust cases, they

23  refer to actual meetings.  Your Honor, the reason the Supreme

24  Court made the bar so high in Twombly and anti-trust cases is

25  because of the massive cost of discovery, the massive effect on

1  judicial resources in managing a case, and, again, the fact that

2  you can have parallel conduct that is completely independent and

3  not the result of an agreement.

4      **THE COURT:**  So, but what's the parallel conduct?

5  Because I don't see this as a parallel conduct case.

6      **MR. JURATA:**  So the reason it's difficult to talk

7  about it as a parallel conduct case is, Your Honor, again, this

8  does not involve horizontal competitors.  And your normal

9  conspiracy would be horizontal competitors agreeing not to

10 compete on price.

11      And when they talk about parallel conduct, it is when

12 companies may be observing what their competitors are doing.

13 Companies might be copying what their competitors are doing and

14 as a result there is not price competition between them.

15      But see -- but because there is not an actual

16 agreement not to compete on price, it is not deemed to be an

17 illegal agreement under anti-trust law.

18      So when I'm referring to parallel behavior now, how

19 does parallel behavior work in the vertical context?

20      It goes exactly to the question that you asked, Your

21 Honor, why didn't ACV do something?  That was your question to

22 me.

23      **THE COURT:**  Right.

24      **MR. JURATA:**  And there are a variety of reasons as to

25 why ACV may or may not have done something, just like even with

1    Mr. Malchak and Mr. Sun Auto and Sun Auto.

2         All the complaint alleges is that Mr. Malchak made a

3    variety of bids below the floor price.  All the complaint

4    alleges is that Sun Auto received bids from Mr. Malchak below

5    the floor price and did not exercise its legal option.

6         And I will stress their, Your Honor, option in order

7    to accept -- in order to have a sale.  So you look -- if you

8    look at the actual facts in the complaint, all you get is that

9    Mr. Malchak was only willing to pay up to a certain amount for

10   906 transactions.

11        Sun Auto, for the vast majority of those did not

12   accept that offer.  On a couple transactions, Mr. Malchak's bid

13   went above the floor price and there was an automatic sale or

14   some of those, Sun Auto gave a counteroffer that Mr. Malchak

15   accepted.  And that for some reason, once ACV was told about

16   this bidding activity, ACV didn't do anything.

17        And that is exactly the type of parallel business

18   behavior that the Supreme Court has said does not infer an

19   agreement.

20        You need something more.  You need to look at inter

21   firm communications.  And in many anti-trust cases, there are

22   references about people meeting at meetings, where they are

23   conspiring.

24        In fact, that was one of the central allegations in

25   the London Banking price fixing case that plaintiffs cite in

1    their option, that that case involved daily phone calls in which

2    the alleged conspirators, they had daily phone calls at noon

3    every day and that's where the alleged agreements were made, but

4    the Supreme Court says that you are inferring -- you have to

5    look to see.

6         And it's not saying that you have to have all of

7    these -- these three things, but you're looking for those extra

8    things that make it -- that would make you comfortable, Your

9    Honor, in inferring an agreement.

10        So are there a level of high level communications

11   between the parties?  Are they acting against their economic

12   self interest --

13        **THE COURT:**  Now, let me stop at acting against their

14   economic self interests.

15        So you are saying okay, this was brought to ACV's

16   attention and ACV did nothing.

17        And in paragraphs 39 and 40, the plaintiffs go a bit

18   further than that and they say a high level ACV executive was

19   told about this and responded, leave that issue alone and drop

20   it for your own good.

21        And then ACV's own employees were being damaged by

22   this, because they lost the benefit of sales transactions if

23   bids on those sales did not meet the improper show price.

24        And ACV vigorously discouraged any complaints by ACV

25   employees about the ongoing shill bidding practices.

1          So I have a platform.  I want people to trade on my

2    platform.  I think it's a great platform.  The more volume, the

3    better it is for me and for my employees.

4          I allegedly find out that somebody is shill bidding on

5    it and they are not consummating those deals, so the sales are

6    not going through.

7          And my employees say, hey, this is hurting us.  We're

8    not making money on this and I tell them none of your business.

9    Drop it for your own good.  I don't want to hear any complaints

10   about that, so that that would be against economic interests,

11   would it not?

12         **MR. JURATA:**  Maybe -- Your Honor, maybe we would have

13   to assess things that are not within the four corners of the

14   complaint, such as how many transactions actually occur on the

15   platform; what is the percentage of sales involving Mr. Malchak;

16   on the overall platform, what would be the reaction on customer

17   behavior if it became aware that ACV was -- to use your words,

18   Your Honor, not policing its platform?

19         Those are all -- those are all things that that are

20   out -- unfortunately, they are outside of the four corners of

21   the complaint in order to answer.

22         **THE COURT:**  Are we hearing in the complaint, though,

23   that Sun Auto is the biggest customer and an investor in ACV?  I

24   thought I read that is.

25         **UNIDENTIFIED MALE SPEAKER:**  Its in there, Judge.

1         **MR. JURATA:**  So up -- Your Honor, there is an

2    allegation that of the thousands or customers or the thousands

3    of used car dealerships that use the ACV platform, that Sun Auto

4    is the largest.

5         And, yes.  I can represent that the complaint is

6    accurate in stating that in stating that Mr. Caputo has a minor

7    investment in the ACV -- in the ACV platform.

8         But, Your Honor, a common -- just a mere investment in

9    a company does not make a motive to conspire.

10         In fact, in that regard, the allegations are very

11    similar to the Allen versus Dairy Farmers case that you decided,

12    in which the Dairy Farmers Association owned a 15 percent

13    interest in defendant Hood.

14         In that case -- and when -- when you went through the

15    various allegations and the various clutch factors in that

16    decision, the 15 percent ownership was one of the things that

17    you looked at before deciding that the defendant Hood -- that it

18    wasn't alleged that defendant Hood was actually part of the

19    conspiracy that you did find involving -- involving the other

20    defendants in that case.

21         So, again, what the Supreme Court teaches in Twombly

22    is you have to look at all of these -- all these factors

23    together.

24         And, again, the mere knowledge -- the allegations that

25    merely demonstrate that ACV had knowledge and may not have done

1 anything to address that, does not make them an active

2 participant in the conspiracy.

3       In fact, Your Honor in the in re brand drug case, that

4 cited -- that's cited in our brief from the Northern District of

5 Illinois, in that situation, Your Honor, the defendant was aware

6 of the price fixing conspiracy and did actions to benefit from

7 it.

8       And what the Court said in that case was that -- that

9 they could not be liable.  Because, again, merely going along

10 with something that they never came to a conscious commitment to

11 a common scheme with the other defendants, does not

12 automatically bring them into the conspiracy.

13       And the same scenario is here.  ACV being informed,

14 supposedly, of this at that point after the fact, and not doing

15 anything, allegedly, to stop it, does not pool ACV into the

16 actual conspiracy.

17       So it -- there the problems with the agreement is that

18 when you look at the allegations in the complaint, there are no

19 facts that are sufficient to infer an agreement between

20 Mr. Caputo, Sun Auto and ACV.

21       And by the complaint's own language in paragraph 29,

22 again, the passing of the floor price is not done through ACV.

23 ACV is -- the only facts that tie ACV to this alleged conspiracy

24 is the fact that it found out that -- it was informed about it

25 at some point and didn't take any action.

1          And that is not enough to pull ACV into an alleged

2     agreement between Sun Auto and Mr. Malchak, which is already

3     deficient because that alleged agreement does not -- does not

4     satisfy Twombly.

5          But the lack of an agreement, Your Honor, is only one

6     reason why the anti-trust claim fails.

7          And the second reason why it fails is the point that

8     you noted in the beginning of our -- of our argument today,

9     which is that this is not a per se liability -- excuse me -- per

10    se liability is inappropriate for the alleged vertical scheme

11    here.

12         And, again, we're talking about participants at

13    different levels of the platform.  There is no allegation of any

14    agreement between horizontal competitors.

15         And Leegin (phonetic) is directly on point that says:

16    Vertical price restraints are evaluated by the rule of reason.

17         Except, Your Honor, the complaint never does the

18    necessary pleading, which is necessary in order to determine

19    whether or not there is an unreasonable restraint of trade.

20         Instead, they routinely refer to this as just a per

21    se -- as just a per se conspiracy.  There is no alleged product

22    market.

23         I know in their opposition that they -- that they

24    allege that one of the -- one of the paragraphs in the complaint

25    demonstrates what the product market is, but, unfortunately,

1   that does not match with their class action allegations, which

2   make it clear that the conspiracy is limited.

3          The alleged conspiracy is limited to only sales

4   involving Sun Auto on the platform, but there -- there is no

5   attempt to define a group of products to do exactly what you did

6   in the dairy farmers case, Your Honor, and look at what is the

7   interchangeability between the group of products; what are

8   substitutes; what are not substitutes.

9          The -- there is -- there is none of that analysis.

10  And the complaint is clear that ACV is only an online platform.

11  The complaint does not say that ACV is the only online platform

12  to wholesale cars.

13         The -- the complaint does not say that online

14  platforms are the only way to wholesale used cars at auction.

15  There is none of that analysis in the complaint.

16         And that's just the product market.  The complaint is

17  silent as to the geographic market.

18         So the only thing --

19         **THE COURT:**  Well, it says -- it says something about a

20  New York sub class, but if we are in the rule of reason, we do

21  need a product market.

22         I could guesstimate what it would be and -- but we

23  don't have anything that would help the Court define a

24  geographic market.

25         **MR. JURATA:**  That is -- that is correct, Your Honor.

1   And so for that -- for that reason, there is no way to conclude

2   that there is an unreasonable restraint of trade, based on the

3   pleadings.

4          These aren't new arguments the defendants are making.

5   Defendants raised this exact points in the motions to dismiss

6   the defendants filed in a response to the first amend complaint.

7          Plaintiffs were on notice as to defendants' arguments

8   regarding the applicability of per se liability.  They were on

9   notice of defendants' arguments regarding the lack of agreement.

10  They were on notices to the arguments on the lack of any -- on

11  the lack of injury.

12         But when they when they submitted their second amended

13  complaint, they chose not to address any of those arguments in

14  serious detail and instead added a civil RICO claim.

15         So this is not the first time that the plaintiffs are

16  aware that they were -- that it was necessary for them to allege

17  both a product market and a geographic market, because this is

18  not a case which is -- which warrants per se treatment.

19         Do you have any further questions on unreasonable

20  restraint?

21         So, Your Honor, then I'll move to standing.  And, you

22  know, as you know -- as you know, Your Honor, in anti-trust

23  cases in addition to having to allege the normal standing that

24  you have for a Federal Court case, you have to also satisfy

25  anti-trust standing, and how that is -- how there is a nexus

1    there between that and the alleged allegations.  So what is the

2    harm?

3          And there is -- there is only -- there is -- there, in

4    the complaint itself, Your Honor, there is only a conclusory

5    allegation of harm.

6          And it's the -- it's the -- it's the fact scenario

7    that you gave earlier in my argument, Your Honor, where you

8    were -- where you said that there could be a scenario in which

9    the bidding causes other -- other -- other bidders to bid higher

10   than they otherwise would and end up purchasing a vehicle at a

11   higher price than they would.

12         And that may or may not be a viable theory, Your

13   Honor.  It's certainly not what is pled in the second amended

14   complaint.

15         What's pled in the second amended complaint is other

16   than -- other than the conclusory allegation that sellers --

17   that the plaintiffs paid more than they otherwise would, all of

18   the detail -- all of the detail facts in the second amended

19   complaint are regarding the transactions that are attached in

20   Exhibit A, B and C.

21         And, Your Honor, those are all transactions that do

22   not -- that did not result in the plaintiff's purchasing a

23   vehicle.

24         There is not any factual allegation in the complaint

25   that plaintiffs purchased -- there are no details that

1   plaintiffs purchased vehicles from Sun Auto, let alone that they

2   that -- they purchased vehicles from Sun Auto that Mr. Malchak

3   bid on.

4        And the 906 transactions that are talked about so much

5   in the opposition are scenarios that resulted in either a sale

6   to Mr. Malchak or no sale whatsoever.

7        And, Your Honor, to the extent that the argument might

8   be that maybe plaintiffs would have been the highest bider below

9   the floor price in those 906 transactions, were it not for

10  Mr. Malchak -- and I think that's a very generous reading of the

11  complaint, but if that would be the argument, they have no legal

12  right to those vehicles because, again, the seller, as alleged

13  in paragraph, I believe, 20, of the complaint -- the seller has

14  the sole option as to whether or not to accept a bid that is

15  below the floor price.

16       And so there is -- given that the 906 transactions

17  involved either -- either transactions where Mr. Malchak

18  purchased the vehicle or transactions in which there was no

19  purchase whatsoever, there are -- there is no detailed fact or

20  pleading going to the scenario that you raised, Your Honor,

21  which is, well, maybe someone purchased a car at a price higher

22  than they otherwise would have paid.

23       There is just -- there is just nothing to -- nothing

24  to -- to get us there.  We are -- we're --

25       **THE COURT:**  Well, let's --

1    **MR. JURATA:**  -- we're -- we're just --

2    **THE COURT:**  -- let's look at paragraph 28.

3         In order to outbid the Malchak shill bids and purchase

4    the vehicles being offered for sale by Sun Auto on the ACV

5    online platform, bidders had to bid at prices higher than they

6    would have otherwise bid and purchasers of the vehicles would

7    have to pay a price higher than they would otherwise pay without

8    the Malchak shill bids.

9         So the allegation is because Mr. Malchak knows what --

10   what the -- what these -- what the floor bid is -- he's been

11   tipped off as to the floor bid, he can alter the marketplace, so

12   as not only to harm a competitor, plaintiffs, but also to drive

13   up the cost of what other people are paying for his vehicles and

14   that's the harm to competition.

15        Why is that not sufficient at the pleading stage?

16   **MR. JURATA:**  Because, Your Honor, there is no actual

17   evidence that suggests that people had to pay higher prices for

18   cars than they otherwise would.

19        All of the evidence is in situations where Mr. Malchak

20   supposedly gave false bids and no bidder valued the car.

21   Because, again, let's -- let's understand what's going on here.

22        These are used car dealers.  These are used car

23   companies that understand what a car may or may not be worth and

24   are going to decide what they are going to pay or not.

25        Just because an individual supposedly makes bids at

1   the price, does not mean that any of these are going to bid more

2   than they are willing to pay.

3        You would have to show that ACV is the only way to

4   purchase used cars at auction, for wholesalers, in order for

5   that to be that kind of market power.

6        But it's a competitive --

7        **THE COURT:**  So let me ask you about that.  So let's

8   say the geographic market is Buffalo or something like that and

9   this is the biggest platform.

10       And they can allege that people tend to purchase a

11  vehicle within a 60 mile proximity of where they live.  And I

12  agree, some of this is not in the complaint -- and that's part

13  of the problem right now.

14       And the argument is that there is somebody on this

15  platform who is not disclosed as the person bidding and they are

16  putting in these shill bids that is driving up the price of

17  vehicles and they have no intention to actually purchase them.

18       So when you are competing with this undisclosed

19  bidder, who actually knows what the floor price is and you

20  don't -- you are in an unfair competition, because they have

21  inside information that is going to make sure they don't lose

22  out on the sale and they don't actually even have to consummate

23  it.

24       So on occasion, you will be the person duped into

25  paying more than you need to, because you are bidding against

1    this proxy bidder.  I think that's how it goes, according to the

2    complaint.

3         **MR. JURATA:**  So the problem with that scenario, Your

4    Honor, is that there is no action under Federal anti-trust law

5    for unfair competition.

6         The notion of unfair competition, it does not make a

7    anti-trust violation.  In order for there to be an anti-trust

8    violation, there has to be a harm to competition.

9         And this is where -- and, of course, the complaint

10   tries to side step that by saying it's a per se violation.  At

11   which point, you wouldn't have to actually show harm to

12   competition.

13        But in the scenario where you do -- again, we have to

14   go back to what the basic conspiracy is here.  It's an online

15   platform.

16        An online platform with many, many used car sellers

17   and many, many used car buyers.  The conspiracy here is between

18   a single seller and a single buyer.

19        The conspiracy here does not allege -- does not extend

20   to any of the other -- any of the other sales transactions that

21   are happening on the platform.

22        Which means that if a customer believes that the bids

23   on a certain vehicle are not worth the price of the car, they

24   are going to do exactly what they did in the 906 transactions

25   involving Mr. Malchak attached to the complaint, they are not

 1  going to outbid, because they do not value the car.

 2          So the actual evidence of transactions which are

 3  attached to the complaint actually demonstrate the opposite.

 4  It's not that people are paying higher for vehicles.  It's that

 5  the vehicles are not being sold.

 6          Why might that be?  Well, if it's a competitive

 7  marketplace, because there are other buyers and sellers on the

 8  platform that are selling competitively priced vehicles,

 9  economics teaches us that people are not going to overpay for a

10  car from Sun Auto, if they believe that there is a similar car

11  at a better price from a auction that does not have shill

12  bidding on it.

13          So unless the plaintiffs can demonstrate that every

14  buyer -- I mean, every seller on the platform -- so of the

15  thousands of companies that use this platform, the thousands of

16  used car dealerships, they would have to show a horizontal

17  conspiracy across all of them in order for there not to be

18  competitively priced cars on the platform.

19          So, again, the plaintiffs submit Exhibits A, B and C

20  as proof of their conspiracy.  All Exhibits A, B and C show is

21  that Mr. Malchak was willing to make a price of what he was

22  willing to pay.

23          It was less than Sun Auto -- in most circumstances, it

24  was less than what Sun Auto was willing to accept.  And in some

25  circumstances, the car was purchased because either Mr. Malchak

1  exceeded the floor price, at which point there was an automatic

2  sale or Sun Auto decided to accept the counteroffer.

3        So -- so, again, Your Honor, while there is a

4  generalized vague theory of harm that maybe people paid more,

5  the actual factual -- the actual detailed factual allegations in

6  the complaint show that there were no sales at all to -- to

7  plaintiffs in this situation.

8        And so therefore, it -- therefore, there is no

9  anti-trust -- there is no anti-trust standing.

10        So for each of those three scenarios, Your Honor, the

11  lack of facts to allege the fact that the -- the lack of facts

12  that are adequate to infer an agreement under the very high

13  standard the Supreme Court set in Twombly; the fact that there

14  has been no demonstration of any unreasonable restraint of

15  trade, because this is pled as a per se conspiracy; and because

16  of the fact that the plaintiffs have actually not been harmed by

17  the alleged conspiracy that they are -- that the -- the alleged

18  fact that they provided any detail for, each of those three

19  independent reasons, the anti-trust claim just does -- you know,

20  cannot -- cannot survive a motion to dismiss.

21        Unless -- unless, Your Honor has any questions about

22  anti-trust, I'll move to civil RICO.  Your Honor, thank you.

23        The civil RICO claim is an attempt to shoehorn the

24  alleged conduct into a statute that it was designed to address

25  ongoing criminal conducted criminal conduct, Your Honor.

1          And the allegation or the assertion that the facts

2   alleged in the complaint refer to a -- a criminal racketeering

3   enterprise, it just is not credible.

4          You know, the vast majority of created attempts to

5   plead civil RICO claims are dismissed at the threshold.  And I

6   respectfully -- well, would submit that this is one of them.

7          Your Honor, RICO has long been recognized as the tool

8   of the overzealous plaintiffs.  Courts in the Second Circuit

9   take very close looks at the allegations, given how -- given the

10  fact that wire communications are so prevalent in business, that

11  civil RICO claims require scrutiny up front.

12         And, you know, that's why courts flush out frivolous

13  RICO claims at a early stages of litigation.

14         And as you noted, Your Honor, an entity can't engage

15  in a RICO conspiracy with itself and that is -- that is one of

16  the reasons why the RICO claim cannot survive -- cannot survive

17  a Rule 12(b)(6) motion.

18         Again -- again, there has been a failure to allege a

19  nexus between what otherwise is legitimate business activity and

20  the alleged racketeering activity.

21         There is --

22         **THE COURT:**  Would you --

23         **MR. JURATA:**  -- failure to.

24         **THE COURT:**  -- would you agree with me that bid rig --

25  bid rigging could be the subject of a RICO claim?

1          **MR. JURATA:**  If bid rigging is -- so, Your Honor, my

2   understanding of bid rigging is when you have horizontal

3   competitors who are deciding which one of them is going to

4   submit a low bid in order to win a contract.

5          Again, a horizontal conspiracy, in that scenario, if

6   it meets all the other criteria of a RICO claim, which is more

7   than just the fact that wireless communications -- wireless

8   communications are used, you would need to show a -- you would

9   need to show that -- you know, in other words, Your Honor,

10   merely satisfying the racketeering activity element does not

11   make a RICO claim.

12          You must demonstrate all of the other things that that

13   statute requires, one of them being demonstrating that there is

14   a nexus between -- between an enterprise, which in this case is

15   alleged to be ACV, and the alleged racketeering activity.

16          And -- and that -- and that -- just in arguing, Your

17   Honor, that supposedly high level management personnel are

18   involved, does not -- does not convert a legitimate business

19   entity into a -- into a criminal enterprise.

20          So the three flaws of the RICO claim, again, are the

21   failure to -- the failure to plead the alleged racketeering with

22   the particularity, which is required under Rule 9(b); the lack

23   of a nexus between a legitimate business activity and alleged

24   racketeering activity; and, again, a failure to allege how the

25   alleged scheme harmed plaintiffs.

1          Can, Your Honor -- I can start with the nexus point,

2   but I think it might be more logical to start with the -- with

3   the alleged racketeering activity, because I think it sets up

4   the discussion on the -- on the nexus point, if that's -- that

5   is okay with you.

6          **THE COURT:**  Well, let me -- let me ask you about my

7   last question.

8          You said, you know, it has to be criminal activity.  I

9   think it has to be illegal activity, but bid rigging is probably

10  not in every case a crime.

11         It's a form of fraud.  And there is a reason why we

12  have a criminal RICO statute and its civil counterpart.

13         So you -- you kind of caught my attention when you

14  were like and there's got to be a crime, and there's got to be a

15  crime.  I'm not so sure I agree with that.

16         **MR. JURATA:**  Yeah.  So -- so, Your Honor, you are --

17  you are correct.  I did not mean to mislead you.

18         It's illegal activity is the proper -- is the proper

19  standard there.  And I -- and I apologize if I did anything to

20  suggest otherwise.

21         The point, though, that I was making about bid

22  rigging -- and, again, what is pled in this complaint is not bid

23  rigging.

24         **THE COURT:**  I understand.

25         **MR. JURATA:**  I'm not quite sure what is pled in this

1    complaint, but it is certainly not bid rigging.

2         But, Your Honor, if you -- the point I was trying to

3    make is that bid rigging might meet the racketeering element of

4    the statute, if pled properly, but that does not make a RICO

5    violation, because there are other things that have to -- to be

6    established.

7         And some of those other things that have to be

8    established is what is the problem here with the second amended

9    complaint.

10        Most notably, other than -- other than the fact that

11   the allegations are incredibly vague and generalized and

12   conclusory for what is assessed on a Rule 9(b) legal standard,

13   but you also have a situation in that there is no nexus.

14        And maybe I will turn to that, Your Honor.  There just

15   simply is no nexus between ACV, as the alleged enterprise, and

16   the predicate acts which make up the civil RICO claim.

17        And so when you turn to paragraph 94 and thereafter in

18   the complaint, where it talks about what the predicate acts are,

19   it is very clear, again, that we are talking about alleged shill

20   bidding involving Mr. Malchak on Sun Auto vehicles.

21        And that is -- that is the alleged illegal activity

22   that the enterprise is supposedly -- has a nexus with.  And, you

23   know, the Second Circuit has said in the First Capital Asset

24   Management case that there -- you know, there has to be this

25   nexus between what is alleged to be the enterprise and what is

1    alleged to be the racketeering activity.

2           And if a complaint -- and a complaint does not state a

3    RICO claim merely by alleging that there is racketeering

4    activity and then denominating a legal entity as the enterprise.

5           Instead, what plaintiffs are required to do is to

6    provide proof of the specified relationship between the

7    racketeering acts and the RICO enterprise.

8           And not surprisingly here, Your Honor, since this

9    started off as an anti-trust claim, the alleged facts behind the

10   RICO claim is this alleged conspiracy, again, that -- that we

11   have been speaking about in which paragraph 29 of the complaint

12   makes clear is a conspiracy that involves the passing of the

13   floor price allegedly from Mr. Malchak to Mr. -- to Sun Auto.

14          And nowhere in paragraph 29 of the complaint does

15   it -- does it say that ACV is involved in any way, face -- or

16   any fashion in facilitating the transfer of the -- of the floor

17   price.

18          In fact, the only -- the only fair inference coming

19   from paragraph 29 is is that if the floor price is being passed,

20   it's being passed directly from an employee at Sun Auto to

21   Mr. Malchak.  Conspiciously absent there is ACV.

22          Why is that important?  Because ACV is the alleged

23   enterprise.  Again, the wrongful conduct here that's being

24   alleged is the fact that Mr. Malchak knows the floor price.

25          ACV is not used in the complaint.  ACV is not used in

1  any way, shape or form in transferring the floor price to

2  Mr. Malchak in the alleged activities regarding ACV that are

3  contained in the complaint.

4       And you referred to some of them earlier, Your Honor,

5  with the supposed app or the fact that management from ACV is

6  alleged to have bid on vehicles.

7       None of those allegations go to the very specific

8  common scheme in which Mr. Malchak is supposedly bidding on

9  vehicles that he has the floor price.

10      None of those generalized allegations go to that.  And

11  so absent there being a connection, as you already noted, Your

12  Honor, high level management positions are not enough.

13      The DePenguin (phonetic) case is very clear that a

14  high ranking position does not in and of itself create an

15  adequate nexus.

16      And, therefore, the lack of a nexus between the

17  alleged scheme and ACV is fatal -- it's fatal to the RICO claim.

18      The other problem with the RICO claim, Your Honor, is

19  similar to what we talked about with anti-trust standing and

20  that is that the plaintiffs have to demonstrate that they have

21  been harmed by this alleged racketeering activity, which has

22  been -- which is what is supposed to be pled with particularity.

23      And we've already talked about that the only

24  allegations that are pled with particularity are transactions

25  which resulted in either Mr. Malchak purchasing the car or there

 1  not being a sale.

 2          And in that situation, Your Honor, the plaintiffs

 3  cannot -- the plaintiffs cannot demonstrate that they have been

 4  harmed.

 5          Their conclusory allegation in paragraph -- I think it

 6  was paragraph -- forgive me for one moment, Your Honor, I want

 7  to make sure I'm giving you the right paragraph now.

 8          I can't find it.  But, Your Honor, you referred to a

 9  very general paragraph earlier in which -- in which plaintiffs

10  have a very conclusory allegation that bidders -- and, notice,

11  it says bidders -- not even plaintiffs -- bidders paid more than

12  they otherwise would have, because of this alleged scheme.

13          But the point being is that that is very -- that is so

14  vague, it doesn't satisfy 9(b).

15          And then, again, if you get to what there actually is

16  detail about, those are all transactions that plaintiff didn't

17  purchase.

18          And so there is no way -- if you look at the

19  allegations that are pled with any particularity, it's clear

20  that in none of those 906 transactions were plaintiffs injured,

21  because they did not purchase the car and they don't have a

22  right to purchase the car below the floor price, so there is no

23  way in which they could be injured.

24          Unless you have any further questions, I can move to

25  the State law claims, Your Honor.

1          **THE COURT:**  I'm going to reserve on the State law

2     claims, because if the Court does not have Federal question

3     jurisdiction, we are not going to be getting to the State court

4     claims.

5          And I want to hear more about that.  We'll have

6     supplemental argument in the course of this same proceeding when

7     we get there.

8          But I first want to hear about the anti-trust claims

9     and the RICO claims, so I'm going to turn to plaintiffs at this

10    point.

11         **MR. YANKELUNAS:**  Thank you, Judge.  If I could, Your

12    Honor, I can make the point that with regard to the 906

13    transactions, what happened there is that when Mr. Malchak was

14    the high bidder below the floor -- floor price -- you have to

15    have a bidder above the floor price to have an automatic sale,

16    but he's below the floor price and he's the high bidder.

17         And so the seller offers him the option to buy and he

18    doesn't buy.  He doesn't buy in 94 percent of those

19    transactions.

20         We submitted that, Judge, for a specific reason which

21    is circumstantial facts supporting an implied agreement.  And it

22    also showed that Mr. Malchak never intended to buy the cars.  He

23    was bidding because he was shill bidding.

24         Now, we've alleged in our complaint that ACV had to

25    know about that.  It had -- they had the option to terminate his

1   account and did not terminate the account.

2          The letter -- they let it continue presumably because

3   they were part of it and aware of it.

4          Also, we alleged -- and, specifically, that an

5   employee brought this to the attention of management.  And then

6   as you point out, they just said mind your own business,

7   basically.

8          So, yes.  I agree with my opponent.  We haven't

9   alleged a direct agreement, but we have alleged an implied

10  agreement, based on these circumstantial facts.

11         There is -- and one thing that I haven't heard from my

12  opponent yet in any great detail, there was a pervasive practice

13  at ACV involving high level management, including their own

14  participation.

15         People are warned not to bid, because you can -- you

16  could be injured because of shill bidding.  The president of the

17  company was a participant.

18         The practice involved at least half of the sellers on

19  the online platform.

20         **THE COURT:**  So --

21         **MR. YANKELUNAS:**  I know that --

22         **THE COURT:**  -- let me stop you there, because we need

23  to stick with what the second amended complaint actually says.

24         So I -- I am -- I -- with this kind of motion accept

25  the well pleaded factual allegations as true.  Bidwell and

1    Twombly actually say this isn't a heightened pleading standard.

2              It's got to be plausible.  It's got to kind of kick

3    the can across the line, but I'm not assessing credibility or

4    doing a deep dive on whether the facts make absolute sense.

5              So taking your facts as true, I agree there is a

6    problem.  There is also a problem in the way the claims are pled

7    because your opposing counsel is right with regard to your

8    anti-trust case, you hang your hat on a horizontal price fixing.

9    And it looks like, at best, vertical price fixing.

10             So if it is vertical price fixing of the some form

11   then you need to have a product market and you need to have a

12   geographic market.  You need to have harm to the plaintiffs.

13   You have to have harm to competition.  And I'm not seeing that

14   in the complaint right now.

15             So kind of just getting to those fundamentals, where

16   am I going to find that in the complaint.

17             **MR. YANKELUNAS:**  First, Judge, can I refer to the

18   Gelborning (phonetic) decision, which I briefed.  I think it's

19   important because that's subsequent to the Supreme Court case

20   that my opponents are speaking about.

21             It's a 2015 Second Circuit case, where the Court makes

22   the point that any agreement which results or any conspiracy

23   which results in prices that don't reflect -- reflect ordinary

24   market conditions is per se illegal.

25             Now, bid rigging, for sure, is per se illegal.  I

1  could -- I would like to cite a case showing that shill bidding

2  is per se illegal, but I don't know why it wouldn't be.

3        I know there is earlier cases where the courts have

4  said -- and I've cited them -- it doesn't matter whether it's

5  vertical or horizontal, so long as it's really a per se case.

6        Now, with regard to --

7        **THE COURT:**  So, so here's my pushback on that.  I

8  agree, that any time you are talking about prices that is in the

9  heartland of anti-trust law and that is something that is very

10  concerning to me.

11        The fact that there has never been a shill bidding

12  case that has declared it a per se violation to anti-trust laws

13  is also concerning to me, because the most recent anti-trust

14  juris prudence from the Supreme Court is we are creating no per

15  se categories.

16        So don't come up with novel per se categories most of

17  this stuff is rule of reason.

18        And there is a recent case from the Supreme Court that

19  says vertical price restraints, price fixing, is rule of reason.

20        So I'm asking you, tell me how this is -- is

21  horizontal.  How is this between competitors?  Who is agreeing

22  across, on the same level of the market.

23        **MR. YANKELUNAS:**  Judge, I don't think I can say that.

24        **THE COURT:**  Okay.

25        **MR. YANKELUNAS:**  I think what I can say, though --

1    there is -- there is I've cited the case in my brief.  I don't

2    have the cite in front of me now, Judge.

3           But one of the abbreviated versions of the rule of

4    reason is what's referred to as the quick -- I think it's the

5    quick look --

6           **THE COURT:**  Yes.

7           **MR. YANKELUNAS:**  -- approach.  And that's where, as I

8    understand it, Judge -- I think this is correct -- where the

9    impact on the market is so easily ascertainable that can satisfy

10   the rule of reason.

11          And that's -- and I know -- know we're coming back to

12   the same problem, Judge.  I agree, if I had a Second Circuit

13   case law on shill bidding, I would have cited it, but I don't

14   know what else this could be, other than an adverse impact on

15   the market.

16          When you have got people -- and, again, the claim is

17   not limited by any means to the 906 transactions in those

18   exhibits.

19          **THE COURT:**  Well --

20          **MR. YANKELUNAS:**  We don't know --

21          **THE COURT:**  -- let me -- let me talk to that.  And --

22   because I've given careful thought to your claims.

23          And I agree that we're in -- we're talking about price

24   and we're talking about if there is shill bidding going on that

25   would be concerning, but this is what I'm hearing from opposing

1    counsel and it has some traction.

2           What Mr. Malchak is doing is not purchasing the

3    vehicles, so these -- these other plaintiffs aren't purchasing

4    it either.

5           The other consumers aren't purchasing it.  He's got

6    kind of an insider's game, so he is not accepting prices on his

7    vehicles that he doesn't want to accept.

8           And I -- I don't think it would be too hard to explain

9    how that's not good for the market, but tell me how your clients

10   are injured in that respect.

11          If he is not consummating the purchase and the

12   purchase isn't going through for anyone, how are they bidding

13   more on his cars?

14          **MR. YANKELUNAS:**  Judge, it may be simply my unartful

15   drafting on my part and that's probably what it is, but I we're

16   not we're not connecting on this point, Judge, let me try again.

17          **THE COURT:**  Okay.

18          **MR. YANKELUNAS:**  If you would allow, the specific

19   reasons for submitting those exhibits was to show not that these

20   are the transactions at issue by any means, because there is

21   probably thousands of transactions at issue.

22          The only reason I and the -- and the specific reason I

23   submitted that, Judge, is to show that it confirms that Malchak

24   was bidding without the intention of buying.

25          And also it confirms that ACV had to know about it,

 1  had the option to terminate his account and didn't do it because

 2  they knew about it and agreed to it.

 3          **THE COURT:**  Okay.  Well, let me stop you there.  And

 4  all that's pled.

 5          What is not pled is that Sun Auto -- you -- you say

 6  it's the largest customer, but you don't talk about the

 7  percentage of transactions this involves.

 8          And you don't explain why, if somebody's on this

 9  website, they can't just go somewhere else.  Why are they at

10  this website?  Why is it important to be doing here and if --

11          **MR. YANKELUNAS:**  This is --

12          **THE COURT:**  -- the biggest customer is conspiring with

13  the platform operator.

14          So that 90 percent of the transactions on the platform

15  are driving up the price and are tainted, that would be one

16  thing, but those kind of allegations are not in the second

17  amended complaint.

18          **MR. YANKELUNAS:**  This is the -- of course they can go

19  wherever they want to bid on the cars.

20          And I -- this was the argument that the defendants

21  make about my position on having any economic sense.

22          The argument, as I understand it, all -- all the buyer

23  has to do is go someplace else to get a more competitive price.

24          The problem with that is they don't know who is shill

25  bidding and who is not.  They don't know that the price is

1  affected -- the prices that they are going to get on the ACV

2  platform are affected by shill bidding and they don't know if

3  ACV Corporation shill platform will be affected by shill

4  bidding.

5        They just don't know that it's still objectively

6  unfair for shill bidding to happen.  So that bidders, like the

7  plaintiffs, are being enticed into thinking there is competition

8  and enticed in a bidding war, where they otherwise wouldn't and

9  that's -- that's the damage --

10        **THE COURT:**  So --

11        **MR. YANKELUNAS:**  That --

12        **THE COURT:**  -- I've got that and that sounds like an

13  unfair business practices State law claim.

14        So it's not like that the Court is saying there is

15  nothing wrong, but if you want to shoehorn it into anti-trust or

16  RICO, there are requirements.

17        And if I start with the premise that this looks to me

18  like a vertical price restraint -- because I'm not hearing about

19  any agreement between competitors.

20        And if -- if we accept the premise that the U.S.

21  Supreme Court -- I -- I hope nobody is listening, but never

22  mind -- what the Second Circuit says, the U.S. Supreme Court

23  says vertical restraints are analyzed under the rule of reason,

24  I need to be able to look at that complaint and say, okay.  Here

25  it is.

1          So that's the problem.  It's not that there isn't a

2   cause of action.  It's just it needs to be a Federal question.

3          **MR. YANKELUNAS:**  But, Your Honor, if I could -- I

4   don't think the Gelborning case could be read in the way that my

5   opponents and Your Honor is presenting this.

6          Because the -- and I read the Gelborning case -- and

7   the reason I cite it is because I think it is saying

8   irrespective of vertical or horizontal, if you have -- and you

9   start -- you start with the market and you start with the price.

10          And if you have got a conspiracy and it's

11   wrongdoing -- and I know it has to be wrongdoing -- if you start

12   with an agreement or conspiracy that has the effect of changing

13   the price in a way that it no longer affects the market, that's

14   a per se wrong per se violation.

15          I think that's -- I think I think that's correct,

16   Judge.  I agree on -- I mean, this is not an agreement among

17   competitors.

18          I -- I'm not sure the London case or the Sierra

19   Santara (phonetic) case -- I don't have their cites in front of

20   me, Judge, are limited to horizontal.

21          But I know we've got a problem with we've got -- I've

22   alleged activity that results in a price that doesn't reflect

23   the market.

24          And I think that's fundamentally a per se violation.

25   I think that also -- I mean, we -- we come -- we come back to

1  the quick look review, which I don't think you even had to do if

2  you have got a per se violation.  In fact, I'm sure of that.

3        But even under the quick look review, if you've got an

4  impact -- an impact on the market that's easily entertainable --

5  ascertainable and obvious like this would be, I think you get

6  past the problem we're talking about.

7        **THE COURT:**  Okay.  So tell me how the consumer's

8  paying a higher price because of this.

9        **MR. YANKELUNAS:**  The consumer is being led -- well,

10  think of think of the people bidding on a painting at

11  Christie's.

12        There's a fake bidder.  Somebody wants the -- wants

13  the painting and that person bids 50,000.  The fake bidder bids

14  60,000 and the next bid is 65,000, it's really the same -- the

15  same scenario here.

16        We've got a bidder who likes the car, bids a price,

17  doesn't get it because he hasn't met the floor price or what he

18  hasn't met is the proxy bid.

19        Really, that's the -- that's the correct term -- he

20  hasn't -- he hasn't met the proxy bid of whether it's Malchak or

21  somebody else.

22        And because of that, he's not the successful bidder

23  because he had to keep bidding up.

24        **THE COURT:**  All right.

25        **MR. YANKELUNAS:**  He's got to surpass the fake bid.

1   He's bidding more than he otherwise would.  That's really as

2   simple as that.

3        And when he is the successful bidder, he's paying more

4   than he would.  But without the shill bid, that's -- and that no

5   longer affects the market.

6        That no longer -- that no longer reflects on market

7   price and that's an anti-trust violation, I believe, Judge.

8        And there is an anti-trust injury which -- which is

9   also -- which we've alleged in paragraph 60 and 61 of the

10  complaint -- that's the economic crux of the injury is the

11  excessive price that the plaintiffs and the punitive class

12  members are paying.

13       **THE COURT:**  Okay.  You want to say anything more about

14  the anti-trust claim or do you want to move on to RICO?

15       **MR. YANKELUNAS:**  Unless, Your Honor has any questions,

16  I'll just go on to RICO now.

17       **THE COURT:**  Okay.

18       **MR. YANKELUNAS:**  And I think ACV -- we allege ACV is

19  the enterprise.  ACV owns the Internet website, owns the -- the

20  platform which is used to make the wire -- the engage in wire

21  fraud.  It's the economic instrument.

22       It's a separate -- it's separate from the actors --

23  the individual RICO defendants.  We don't name ACV as a -- in

24  our RICO count.

25       We name the -- we name the individual managers who

1    we've named.  We've also named Todd Caputo, who was a former

2    owner of Sun Auto.

3         I think the Dornberger case is a key and is really

4    important in our setting, Judge, Dorn -- and it ties into the

5    allegation the complaint and it's definitely there, Judge in

6    detail that there was a pervasive companywide practice ongoing

7    for months or actually years.

8         It involved actual participation of high level

9    management.  Not just knowledge, but participation and it's an

10   important distinction.

11        In Dornberger the Court said it's not necessary to go

12   beyond proving or pleading that kind of a companywide practice

13   in order to tie the individual corporate defendants -- RICO

14   defendants into the -- into the -- a scheme.

15        And we've done -- we've alleged that in your -- in our

16   RICO count and I think Dornberger supports our position.

17        **THE COURT:**  What about my point that you can't -- you

18   know, you have the RICO enterprise as ACV and you have the RICO

19   defendants, with the exception of Mr. Caputo, as the enterprise

20   defendants' employees.

21        And the Second Circuit says you can't -- those can't

22   be the same thing.  It has to be a distinct entity, because the

23   corporation always works through its employees and officers.

24        So what about that concern?

25        **MR. YANKELUNAS:**  Judge, I'm missing your point.  I was

1    thinking about -- can you run that by me one more time.

2            **THE COURT:**  Sure.

3            **MR. YANKELUNAS:**  I'm sorry.

4            **THE COURT:**  You -- in your plaintiff's RICO statement,

5    you tell me that ACV is a corporation, which is the RICO

6    enterprise, as that term is defined in the statute.

7            And then you tell the Court that defendants Neiman

8    Chamoun and Magnuszewski are employed by ACV.  Chamoun is the

9    CEO.  Neiman is the chief customer success officer and

10   Magnuszewski is chief technology officer and those are defined

11   in -- on paragraph two, as the RICO defendants, with the

12   exception of Mr. Caputo.

13           And so I read from you -- I read to you from the

14   Second Circuit that you can't have the RICO entity and its

15   operating officers as distinct, because they are one in the

16   same.

17           And I can read it to you again, but that's what almost

18   every circuit has found and I haven't found anything that says

19   differently.

20           So employees, acting in the course of their employment

21   and on behalf of the corporation, they do not form an enterprise

22   distinct from the corporation.

23           So you can't -- that can't be the -- the people who

24   are acting in violation of RICO, if it's one in the same.

25           **MR. YANKELUNAS:**  I guess my response to that, Judge,

1    would be the Capital 7 Funding case.  That's a 2020 Eastern

2    District of New York case, where the Court found -- that held

3    the people like Caputo -- I'm sorry, people like Neiman and

4    Chamoun responsible under RICO under vicarious liability.

5            **THE COURT:**  And that's a District court case?

6            **MR. YANKELUNAS:**  I'm sorry, Judge.

7            **THE COURT:**  That's a District court case?

8            **MR. YANKELUNAS:**  It's a -- this is -- this is a 2020

9    Eastern District of New York case.

10           **THE COURT:**  Yes, but how would that trump the Second

11   Circuit?

12           **MR. YANKELUNAS:**  I don't think it would, Judge.

13           **THE COURT:**  Okay.

14           **MR. YANKELUNAS:**  Although I'm not still not really --

15   I'm not agreeing with what I'm hearing, but I'm not going to

16   challenge you, Judge, if you read the decision and that's what

17   it says.

18           As I understand what you are saying, Judge, is that --

19   and that would leave me with wondering how we would ever have a

20   RICO claim involving a corporate -- a corporate party and

21   individual managers.

22           Because we've got -- I think what I'm hearing, Judge,

23   is that you can't have a RICO claim if the corporation and the

24   individual defendants are in the case, but how else could you

25   ever have a RICO claim with a corporate defendant being

1    involved?

2         Because we've got a corporate defendant.  It's the

3    economic instrument being used to prosecute this wire fraud.

4    You've got individuals who are associated with it, who manage

5    the company.  And by virtue of their management of the company

6    are tied -- are tied to the fraud.

7         And if that doesn't support a RICO claim then how

8    could you ever have a RICO -- a RICO claim, when you have a

9    corporate defendant as the enterprise?

10        **THE COURT:**  Because you could have the corporate

11   defendant working with another party.

12        So it's -- for example, my dairy farmers case is a

13   good example of there could be a claim.  It just might not be

14   alleged the way it should be.

15        So the first iteration of the complaint was DFA, Dairy

16   Farmers of America is conspiring with DMS, Dairy Marketing

17   Services.  And they are getting together and depriving the dairy

18   farmers of the fair price for their milk.

19        The problem with that is a corporation cannot conspire

20   with a wholly owned subsidiary, because they are one in the

21   same.

22        So I want you to address my concern that there is case

23   law that talks about employees acting in the scope of their

24   employment on behalf of the RICO enterprise.

25        They are the RICO enterprise.  That's how the RICO

 1  enterprise works.  And you've defined them as RICO dependents --

 2  defendants, separate and apart from the corporation.

 3      **MR. YANKELUNAS:**  I did that, Judge, because I know

 4  that.  And maybe I'm now -- I'm hearing maybe I'm wrong.

 5      But I -- it's my understanding that the RICO

 6  enterprise has to be separate from the RICO defendants who I

 7  have named.

 8      They -- they used the RICO enterprise as a means by

 9  which to engage in their conspiracy.  The RICO enterprise itself

10  is a corporate entity, who is -- who is the vehicle for the

11  fraud.  I don't think it's the -- it's the -- the participant in

12  the fraud.

13      **THE COURT:**  Okay.  So -- so this is Riverwoods

14  Chappaqua Corp versus Marine Midland Bank, 30 F.3d 339, 1994

15  case.

16      And I just did a quick search before we came out on

17  the record and it looks like all the circuits are in agreement.

18      And I'll just read the head note to you and I'm just

19  asking if you can distinguish this case.

20      Employees of corporation associating together to

21  commit pattern of predicate acts in course of their employment

22  and on behalf of corporation does not result in formation of

23  enterprise distinct from corporation for the purpose of civil

24  enforcement claim under RICO, in light of the fact that

25  corporation can function only through its employees and agents,

1  so that any act of corporation could be viewed as act of such

2  enterprise.

3        And the conclusion was that these cannot be distinct

4  from the corporation -- the corporate enterprise itself.

5  Evidence did not establish that the alleged association of fact

6  enterprise consisting of bank corporation and its officers was

7  distinct from corporation for the purposes of showing

8  corporation's participation in the affairs of enterprise, as

9  required to maintain civil enforcement claim under RICO.

10        **MR. YANKELUNAS:**  Okay.  Judge, I think what's

11  different about this case and also I think makes it unusual is

12  that we've got Neiman -- Joe Neiman, who not only was in this

13  area that you're finding fault with -- which I'm hearing -- you

14  know, using this position of corporate manager to engage in

15  wrongdoing, but he also engaged in wrongdoing in his own

16  personal capacity.

17        And maybe that means he would be the one RICO

18  defendant to still be in the case.  I'm not sure.  And also,

19  Magnuszewski helped him, according to our allegations, and

20  that's in the complaint, with creating this personal app, so he

21  can engage in wrongdoing.

22        He's not -- so Neiman isn't just accused of doing a

23  wrongdoing in a corporation sense as a president.  He's also

24  engaged in a wrongdoing in his own personal capacity and I think

25  that has to be dealt with somehow in this case.

 1          **THE COURT:**  Well, let me ask you about opposing

 2    counsel's other point, which was -- okay.  Even assuming that

 3    you have the right defendants, there is no allegation that ACV

 4    is the party that is disclosing the floor bid to Mr. Malchak.

 5          That doesn't seem -- there is just -- there is just no

 6    allegation in the complaint that that's how it's happening.

 7          **MR. YANKELUNAS:**  Judge, right.  Paragraph 20, you read

 8    this earlier -- on paragraph 25, we do allege that by agreement

 9    between Sun Auto, ACV and Malchak, they are engaging in shill

10    bidding.

11          I don't have -- at this point -- and I'm going to need

12    discovery to get it, I'm sure.  At this point I don't have

13    specific information as to an agreement between Sun Auto and

14    ACV.

15          I'm -- I think it can be inferred and has to be

16    inferred based on the facts we've alleged in the complaint.

17          **THE COURT:**  Right.  Right.  But you have carefully

18    pled it.  And as appropriately so, because it's based on

19    information and belief, but you are not alleging that ACV is the

20    one who disclosed it.

21          So it says in paragraph 25:  Upon information and

22    belief, by prior agreement with ACV and Sun Auto, the Sun Auto

23    floor price price of the vehicle being offered for sale by Sun

24    Auto using ACV online platform was disclosed to Malchak.

25          And with knowledge of that information, Malchak

1    presented an phantom proxy bid at a price below the floor --
2    floor price for the purposes of causing competing bids to
3    increase the shill up, with no intention of purchasing the motor
4    vehicle being offered for sale by Sun Auto.
5         So there is an agreement of some sort between ACV and
6    Sun Auto, but why isn't it Sun Auto that's disclosing it to
7    Malchak?
8         **MR. YANKELUNAS:**  Again, Judge, I don't think without
9    discovery I'm really able to get that particular -- I mean, I'm
10   going to have to get discovery to get that information.
11        I know that something wrong is happening here.  I
12   think it's pretty clear something wrong is happening here.
13        It hasn't been denied.  I think that I pled sufficient
14   circumstantial facts to imply both the agreement and the scheme
15   and a conspiracy.
16        And I am going to need discovery to get more of the
17   detail that we're talking about.  I wish I had it now.  If I had
18   it, I would have pled it.
19        But I know that -- I think the way paragraph 25 reads,
20   you can't exclude the possibility -- possibility that it came
21   from ACV.
22        I don't know exactly how it happened yet, but it
23   happened.  I mean, we -- we know -- I -- we know that --
24        **THE COURT:**  So sometimes the answer to that is before
25   you allege RICO, you do your discovery and then you bring a RICO

1    claim, because that does have a rigorous standard of pleading.

2         And that's why they have to have a separate RICO

3    statement and then you make the RICO claim, because by that time

4    you have the evidence that you need to make the allegations

5    particularized, which they need to be.

6         **MR. YANKELUNAS:**  I think -- I think I had enough on my

7    plate, Judge, to conclude that based on the evidence of the

8    wrongdoing and the documents that I've seen, the allegations

9    with regard to pervasive conduct and wire fraud, the case law

10   telling me that that bid rigging is always a per se violation,

11   and it's -- it's an improper conduct, I had enough where I

12   needed to plead the RICO claim.

13        I'd like to be able to plead more facts.  I'm going

14   to -- I am going to need more discovery to -- to flesh this out

15   and it's going to be a long --

16        **THE COURT:**  You think this --

17        **MR. YANKELUNAS:**  -- a long process.

18        **THE COURT:**  Do you think -- do you think this is bid

19   rigging?

20        **MR. YANKELUNAS:**  No.  No.  I mean, I think the harm --

21   I think it's similar in that it's improper, but a different kind

22   of harm to the market.

23        I mean, it's a different -- I mean, it's -- I agree

24   with my opponent.  Bid rigging is typically horizontal among

25   among competitors.

1          This is -- I don't know if this -- this is -- it's an

2    unusual situation because we've got Malchak and Sun Auto really

3    being on the same level.

4          And I don't know that I can really say that ACV is on

5    a different level, because they are part of the same structure.

6    They are -- they are part of the -- these group of people --

7    this group, which is selling.

8          And then Malchak is in league with Sun Auto and

9    affecting how this -- these transactions will happen.  And it's

10   people like the punitive class members and the lead plaintiffs

11   in our case that have no idea this was going on.

12         They would have no way of knowing it's going on and

13   they are hurt because they are bidding more than they otherwise

14   would, because they are being enticed into bidding more than

15   they otherwise would by the shill bidding.

16         **THE COURT:**  Anything else that you want to say before

17   I give opposing counsel the last word?

18         **MR. YANKELUNAS:**  No, Judge, thank you.

19         **THE COURT:**  Thank you.

20         **MR. JURATA:**  Thank you, Your Honor.  This is -- this

21   is Jay Jurata again.  Just a couple points is I believe -- I

22   believe that the statement was made that the reason why it would

23   be proper to infer an agreement here is because Sun Auto

24   provides Malchak the option to buy and Mr. Malchak doesn't

25   exercise on that.

1          And I think that that statement needs to be contrasted

2    with what is actually alleged in the complaint.  And if you take

3    a look at paragraph 20 of the complaint, it's very clear, again,

4    that if a bid comes in below the floor price, the seller has the

5    option to accept the highest bid.

6          Nowhere does it say that the seller has to accept the

7    highest bid.  And if you go to paragraph 30 of the second

8    amended complaint and 31, you -- it's very interesting what

9    is -- what is actually being pleaded in these two paragraphs.

10          So in paragraph 30 it states that -- it says:  The

11   reason why this court should conclude that this is shill bidding

12   is because Mr. Malchak was bidding with no intent to purchase.

13          And then -- and I'm sorry, Your Honor, I meant to say

14   31 and 32.  Paragraph 31 again reiterates that if Sun Auto

15   receives a bid that is below the floor price, that the seller

16   has the option to accept the highest bid.

17          Again, nowhere does it say that the seller must do the

18   bid.

19          **THE COURT:**  Does it have to say that?

20          **MR. JURATA:**  And --

21          **THE COURT:**  Does it have to say must?

22          **MR. JURATA:**  No, Your Honor.  I can answer that by

23   pointing at paragraph 32, because here's where it's important.

24          The allegation in paragraph 32 says that on many

25   occasions during the class period Malchak was the high bidder on

1 Sun Auto vehicles, which did not automatically sell on the ACV

2 auction platform.

3        So that means it came below the floor price and

4 Malchak declined the offer to purchase the Sun Auto vehicle.

5        What's critical here, Your Honor, is nowhere in the

6 complaint does it say that Sun Auto gave Mr. Malchak the ability

7 to purchase below the floor price, except for those couple

8 transactions in exhibit -- in Exhibits A through C, where --

9 where it says counter accepted.

10        Which means that there was a counteroffer below the

11 floor price.  So the important point here is we can't infer an

12 agreement from the mere fact that Mr. Malchak did not purchase

13 vehicles that he bid on which were below the floor price.

14        There needs to be something -- there needs to be some

15 factual allegation that to -- to be comfortable that Sun Auto

16 actually gave Mr. Malchak the option to purchase and Mr. Malchak

17 declined and there is none of that.

18        Your Honor, so -- so you -- in -- and it would be

19 wrong to infer an agreement from the fact that Mr. Malchak

20 didn't purchase, because it hasn't been established that he was

21 even given the option to purchase beyond that, Your Honor.

22        **THE COURT:**  Well, he had the option to purchase.  He

23 wasn't compelled to purchase.

24        **MR. JURATA:**  No, no, Your Honor.  He doesn't have the

25 option to purchase.  The only the entity with the option is the

1   seller.

2         **THE COURT:**  Right.

3         **MR. JURATA:**  The seller has to --

4         **THE COURT:**  So that's what it means.  He has the

5   opportunity if the seller gives him and -- and --

6         **MR. JURATA:**  That's --

7         **THE COURT:**  -- he doesn't consummate it.  And you are

8   telling me he doesn't consummate it, because the seller pulled

9   away and we have to have that fact.

10        **MR. JURATA:**  No, Your Honor.  What I'm telling you is

11  that there is no allegation that the seller gave him the option.

12        There is the sole option here.  Again, the seller is

13  saying I'm going to sell a car for one and my floor price is one

14  thousand dollars.

15        And let's say the bidding for that car was five

16  hundred dollars.  If the seller doesn't like that five hundred

17  dollars, the seller can walk away and say I will try to auction

18  that car another time.

19        Now, of course, the seller has the option to say I

20  will take that five hundred dollars.  And there are important

21  facts outside of the pleading here, Your Honor, as to what

22  happens in that circumstances.

23        But putting that aside -- actually, no.  You can see

24  that because you see that on Exhibit C -- the Exhibit C allows

25  me to say this.

1    Exhibit C says for certain transactions counter

2 accepted.  What that means is that the seller accepted the high

3 bid.  And in that situation, the car is automatically sold.

4    The only time there is an option that happens is when

5 it goes back and forth, if there is a counter made above that

6 high -- above that high bid, that's still below the floor price.

7    And if there is no meeting of the minds, you end up

8 with no sale, which is -- which is -- which are the transactions

9 under Exhibit A, which are the ones that state -- please bear

10 with me, Your Honor -- the ones that state counter original

11 declined.

12    So, again, what's important here is -- is that

13 Mr. Malchak does not have the option to purchase any vehicle

14 below the floor price, unless the seller gives him that option.

15    And what is missing from the second amended complaint

16 is any allegation indicating that the seller was willing to

17 accept the price below the floor bid.

18    And, again, this is why the Supreme Court says you

19 have to be very careful in finding an agreement, because there

20 is another equally rationale explanation as to what happened

21 here, which is that Mr. Malchak bid the highest he was willing

22 to pay and that was below the price of what Sun Auto was willing

23 to accept.

24    Except for the few transactions in Exhibit B and

25 Exhibit C, which show that Sun Auto accepted that below -- that

1  below floor price.

2         But moving beyond that, Your Honor, to the allegation

3  of pervasiveness that it -- again, you know, despite the fact

4  that the -- the complaint is very clear that the scheme involved

5  sales involving Sun Auto vehicles that Mr. Malchak bid on and in

6  response to that, it was said that you can infer an agreement

7  here some way, because this was a -- a pervasive practice or

8  maybe there -- that there could be a demonstrating of market

9  harm, because there was a pervasive practice, there is a couple

10 of problems with that argument, Your Honor.

11        First, it's totally conclusory.  The improper

12 affidavits that are before you both say that shill bidding was

13 pervasive, yet they do not mention a single other dealership,

14 other than Sun Auto that engages in shill bidding that makes

15 the -- that makes the allegation that it was pervasive or

16 happening on 50 percent of the platform completely conclusory.

17        There is no basis to infer to -- there is no basis to

18 test that allegation at all.

19        And, in fact, the -- the affidavits which -- which

20 attempt to inject new facts into the second amended complaint

21 actually do the opposite, because they do not support that there

22 is a pervasive practice, because they do not provide any

23 identity on who allegedly -- which dealers are allegedly dealing

24 with the shill bidding.

25        Moving to unreasonable restraint of trade, whether

1  there is a harm in the market, Your Honor, I respectfully -- I

2  respectfully disagree regarding the Guilding decision.

3        It actually does not support plaintiff's case, because

4  footnote 13 of that decision addresses the very -- addresses the

5  actual Leegin decision.

6        **THE COURT:**  No, it says --

7        **MR. JURATA:**  And that foot --

8        **THE COURT:**  It makes that clear.  That's clear.  It

9  says:  Although previous cases apply the per se rule to price

10 fixing agreements, generally, the Supreme Court has clarified

11 that the rule of reason, not a per se rule of unlawfulness, is

12 the appropriate standard to judge vertical price restraints.

13        This has no bearing on this case, in which the

14 appellates allege a horizontal price fixing conspiracy.

15        And, in fact, the second look approach in Apple or the

16 quick look approach, I should say, in Apple applies only if you

17 have one horizontal element.

18        **MR. JURATA:**  Yes.  It's Professor Aregan (phonetic)

19 teaches us, Your Honor, in his leading treatise on anti-trust

20 law.

21        And what is interesting here is that there was a

22 reference earlier to Christie's and shill bidding happening on

23 Christie's.

24        And I think that's important to put into concept --

25 put into context when thinking about these claims.

1           Auctions have been around for hundreds of years.

2    Allegations have been around that there has been shill bidding

3    on certain auctions for hundreds of years, yet there is not a

4    single case in the Second Circuit or otherwise that has found

5    that to be a per se violation of the anti-trust law.

6           Something susceptible, I believe, for a quick look or

7    even something unlawful under a full blown rule of reason

8    analysis.

9           This is simply not the type of case which would

10   warrant taking a shortcut from the incredibly important step of

11   determining whether or not there was harm in a relevant

12   anti-trust market.

13          And, Your Honor, I would go so far as to say that

14   amending would be futile on this point.  Because as made clear

15   in the opposition, that if there was a market -- a relevant

16   market, which would be identified, it was identified in the

17   opposition as the ACV platform, which Your Honor is a single

18   branded market.

19          It reads the market definition market power step out

20   of the Sherman Act.  It says that any -- anyone has a monopoly

21   over its own product.  So Safeway would have a monopoly over

22   anything sold in the Safeway store.

23          A movie theater would have a monopoly over the

24   concession that are sold in the movie -- during the movie.  That

25   eBay would have a monopoly over anything sold on its platform.

1          Single brand markets are disfavored under the

2     anti-trust laws because again it reads -- it reads the whole

3     market definition market power step out of the -- out of the

4     Sherman Act.

5          So -- so I would respectfully request that an

6     amendment would be futile on that point.

7          Moving to RICO, the -- the Dornberger case actually

8     does -- actually supports the defendants' position on on the

9     nexus point.

10          And, you know, Dornberger goes through -- and I'm

11     sorry, not the nexus, but the particularity point.  Dornberger

12     does say that -- that a plaintiff still has to allege facts

13     giving rise to a strong inference of fraudulent intent on the

14     part of each defendant.  That's at page 528 of the decision.

15          But also, look at the factual context of what happened

16     in Dornberger versus here.  Dornberger involved a case in which

17     there was a criminal arrest for the alleged conduct in

18     Switzerland.

19          There was a government investigation in Switzerland on

20     the conduct.  There was a government investigation on London on

21     the conduct.

22          Throughout the complaint, even though there was not

23     specifics regarding each RICO defendant, the complaint

24     contained -- you know, in addition to the -- in addition to the

25     criminal arrest and the Government investigation, the complaint

1    had a thorough description of the decades long scheme, including

2    set forth the roles that each of the defendants played.

3          And plaintiff had been extremely precise, it says, on

4    page 529, in describing the role played for the many individual

5    defendants.

6          And there, unlike here, the role that they were

7    playing actually went to the underlying predicate act, which is

8    not the case here, as we've already talked about, because

9    generalized conduct by certain ACV employees that is unrelated

10   to the Malchak scheme, does not -- does not provide the basis in

11   order to find a -- a RICO -- a RICO violation.

12         And, Your Honor, I would just like to close on one

13   point.  Numerous times today, we've heard -- we've heard, Your

14   Honor, this is why discovery is needed here.

15         And I would respectfully -- respectfully say that that

16   is not what the law allows one to do in a -- in a anti-trust or

17   a civil RICO claim, in which there are treble damages, massive

18   discovery and attorneys fees.

19         And the Supreme Court describes in detail in Twombly

20   how it has to be more than something which is a mere possibility

21   for that and there is similar authority on the RICO cases.

22         So saying that discovery is needed is putting the cart

23   before the horse here.  The -- when the Supreme Court has said

24   this is exactly what we do not do in these types of cases.

25         So that's all I have, Your Honor, unless you have any

1    questions.

2         **THE COURT:**  I don't have any questions.  At this

3    point, the Court is going to grant the motion to dismiss with

4    leave to amend.

5         It's going to grant the motion to dismiss with regard

6    to the anti-trust claim, because this is a vertical price

7    restraint, at best, and that's judged by the rule of reason.

8         This is not a quick look case, because it doesn't have

9    a horizontal component to it.

10        There is no case law that has been cited to the Court

11   where shill bidding has been identified as a per se restraint.

12        There is no allegation of a product market.  There is

13   no allegation of a geographic market.  There is no allegation of

14   market power, in this case.

15        I'm not dismissing on the basis that the Court cannot

16   reasonably infer an agreement, but there is nothing that would

17   allow the Court to determine a plausible rule of reason offense,

18   and the second amended complaint, which is pled as -- solely as

19   a per se price fixing restraint, subject to a per se analysis.

20        With regard to the RICO claim, I'm going to dismiss on

21   the basis of the insufficiency of the RICO statement.

22        The RICO statement identifies the RICO enterprise as

23   ACV.  It identifies defendants Neiman, Chamoun and Magnuszewski

24   as the RICO defendants, along with Mr. Caputo.

25        But the allegations are simply that defendants Neiman,

1    Chamoun and Magnuszewski are employed by ACV.  Chamoun is the

2    CEO.  Neiman is the chief customer success officer and

3    Magnuszewski is the chief technology officer.

4           With regard to Mr. Caputo, it's only described as an

5    investor in ACV and former owner of Sun Auto, ACV's largest

6    customer for 2015 to 2019.  Defendant Caputo is associated with

7    ACV.

8           There has to be a distinction between the RICO

9    enterprise and the RICO defendants.  And the Court again cites

10   the Riverwoods case.

11          So RICO, Section 1962(c) provides as follows:  It

12   shall be unlawful for any person employed by or associated with

13   any enterprise engaged in or the activities of which affect

14   interstate or foreign commerce to conduct or participate

15   directly or indirectly in the conduct of such enterprises affair

16   through a pattern of racketeering activity or collection of

17   unlawful debt.

18          Under this section, the RICO person must conduct the

19   affairs of the RICO enterprise through a pattern of racketeering

20   activity.

21          We have determined that the person and the enterprise

22   referred to must be distinct.

23          The RICO statute clearly envisions separate entities.

24   We have made clear that by virtue of the distinctives

25   requirement, a corporate entity may not be both the RICO person

1   and the RICO enterprise under Section 1962(c).

2          This does not foreclose the possibility of a corporate

3   entity being held liable as a defendant under Section 1962(c),

4   where it associates with others to form an enterprise that is

5   sufficiently distinct from itself.

6          In this regard from its -- in this regard, we have

7   noted that a Section 1962(c) claim may be sustained, where there

8   is only a partial overlap between the RICO person and the RICO

9   enterprise.

10          Nevertheless, by alleging a RICO enterprise that

11   consists merely of a corporate defendant associated with its own

12   employee or agents carrying on the regular affairs that the

13   defendant, the distinctiveness requirement may not be

14   circumvented.

15          Because a corporation can only function through its

16   employees and agents, an action of the corporation can be viewed

17   as an act of such an enterprise.

18          And the enterprise is in reality no more than the

19   defendant itself.

20          Thus, when where employees of a corporation associate

21   together to commit a pattern of predicate acts in the course of

22   their employment, on the behalf of the corporation, the

23   employees in association with the corporation do not form an

24   enterprise distinct from the corporation.

25          At least as framed in the RICO statement, that is what

1   is alleged.

2        I -- I think there is persuasive traction in opposing

3   counsel's argument that they have to establish that these

4   individuals were engaged in the predicate acts.

5        It can't be somebody apart from the RICO defendants,

6   Mr. Malchak, who was responsible for that.

7        I -- I am going to grant leave to amend.  I can't

8   conclude at this point in time that amendment would be futile.

9        I do understand that in an anti-trust case, there is

10  an abundance of law that says that the evidence is likely to be

11  in the hands of the alleged co-conspirators.

12        There is also an abundance of case law that -- that a

13  product market and a geographic market are fact dependent --

14  dependent criteria.

15        And that often, the Court does not dismiss on a motion

16  to dismiss simply because the product market and the geographic

17  market aren't defined with a great deal of specificity.

18        But in this case, and looking the second amended

19  complaint, there is no allegation of a product market and the

20  Court's not going to infer one from the class action

21  allegations.

22        And there is also no allegation of a geographic market

23  and on that basis, the claim cannot withstand a motion to

24  dismiss.

25        Let me turn to plaintiffs and ask how much time you

 1  want to file an amended complaint and then I'm going to talk to

 2  the defendants about that.

 3       **MR. YANKELUNAS:**  Judge, I want to make sure I'm clear

 4  on this.  I know you are denying -- you are granting with leave

 5  to amend with regard to the anti-trust.

 6       Is that the same ruling with regard to RICO?

 7       **THE COURT:**  Yes, but I would caution you to look at

 8  the RICO case law carefully, because it does need to be pled

 9  with particularity and that's why you have the RICO statement.

10       And sometimes it's just a very difficult pleading

11  hurtle at the pleading stage.  So I'm not forcing you to do it,

12  but that is something that the Court is going to be looking for

13  since this is the third iteration of the complaint.

14       **MR. YANKELUNAS:**  All right.

15       **THE COURT:**  The reason why I'm not -- I'm not going to

16  analyze the State law claims is that the Court does not have

17  subject matter jurisdiction.  Because of Federal question, these

18  claims belong in State court.

19       **MR. YANKELUNAS:**  Right.  Would 60 days be permissible,

20  Judge?

21       **THE COURT:**  Let me ask how the defendants feel about

22  that.

23       **MR. JURATA:**  Your Honor, we obviously are happy with

24  anything that you deal -- that you feel is proper here.

25       I will note that, again, we're in a situation where

 1   the exact arguments for which you are ordering dismissal were

 2   raised in defendants' first motion to dismiss and which was done

 3   back during the summer.

 4          I -- and so plaintiffs have had -- have had

 5   approximately nine months to -- to evaluate these deficiencies.

 6   I think providing 60 days is -- is very generous to that --

 7          **THE COURT:**  Well, here's the difference is that you

 8   did raise these arguments.  They did amend the complaint, but

 9   the Court did not rule on them.

10          And, typically, I would not do a ruling on the record,

11   but I -- I feel comfortable in finding that these are not

12   plausible claims of relief at this point in time.

13          And I did not to further delay the proceedings when I

14   could pick out two things that I thought were kind of case

15   dispositive.

16          With regard to both of these Federal claims, if I

17   grant 60 days, it will not be extended thereafter.  That's

18   plenty of time and it's plenty of time to analyze these claims

19   that fit with the facts of the case or it is this really more of

20   an unfair trade practice -- practices or fraud claim or

21   something else.

22          But if it's going to be 60 days, it will not be longer

23   than that.  I can't fault them for not taking you at your word

24   in the motion to dismiss, because you advanced a number of

25   arguments.

1          Some of which, I would have not granted dismissal on

2     in that motion.

3          **MR. JURATA:**  Understood.  Your Honor, 60 days is

4     obviously acceptable to defense.

5          **THE COURT:**  Okay.

6          That work for plaintiffs as well?

7          **MR. YANKELUNAS:**  Yes, Judge.

8          **THE COURT:**  All right.  Anything further in this

9     matter?

10          **MR. YANKELUNAS:**  Not today, Your Honor.

11          **MR. JURATA:**  Not here, Your Honor.

12          **MR. YANKELUNAS:**  I guess we're we've got the sanctions

13     motion pending before the Court and I guess the 18th is the

14     deadline for any supplemental submissions, if there are going to

15     be any.

16          That's kind of where we are right now.

17          **THE COURT:**  If that's what the minute entry says, I

18     don't have it in my head.

19          **MR. YANKELUNAS:**  Yeah.

20          **THE COURT:**  But I could look it up, but that's

21     something --

22          **MR. YANKELUNAS:**  It was -- it was 14 days from the day

23     after the hearing, which was June -- which was January hearing

24     was January 3, so we start counting on January 4.

25          **THE COURT:**  Okay.

1          **MR. YANKELUNAS:**  Okay.

2          **THE COURT:**  That sounds good.

3          **MR. YANKELUNAS:**  All right.  Thank you, Your Honor.

4          **THE COURT:**  Thank you.

5          **MR. JURATA:**  Thank you.

6          **THE COURT:**  You're free to leave.

7

8                    (Proceedings concluded at 2:49 p.m.)

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2       "I certify that the foregoing is a correct transcript, to the

3          best of my ability, from the record of proceedings in the

4                          above-entitled matter."

5

6

7       _s/ Bonnie S. Weber___                    __February 4, 2022___
            Signature                                  Date

8

9       BONNIE S. WEBER

10      Official Court Reporter
        United States District Court
11      Western District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25