UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERRY GRADL MOTORS, INC. and LIFETIME MOTOR CARS, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACV AUCTIONS, INC., SUN CHEVROLET, INC., WHOLESALE CARS ONLINE.COM, L.L.C. d/b/a SUN AUTO WAREHOUSE, WHOLESALE CARS ONLINE.COM, L.L.C. d/b/a SUN AUTO WAREHOUSE OF CORTLAND, and BRIAN M. MALCHAK,<br><br>Defendants. | Case No. 1:21-cv-00409 |

**OPINION AND ORDER DENYING DEFENDANT ACV AUCTIONS INC.'S MOTION FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL**
(Doc. 67)

Plaintiffs Jerry Gradl Motors, Inc. and Lifetime Motor Cars, Inc. bring this action, individually and on behalf of all others similarly situated, against Defendants ACV Auctions, Inc. ("ACV"); Sun Chevrolet, Inc., Wholesale Cars Online.com, L.L.C. d/b/a Sun Auto Warehouse, Wholesale Cars Online.com, L.L.C. d/b/a Sun Auto Warehouse of Cortland (together, "Sun Auto"); and Brian M. Malchak (collectively, "Defendants"). Plaintiffs contend that Defendants used the ACV online car auction platform to engage in "shill bidding[,]" a practice by which prices for automobiles were artificially inflated to the detriment of consumers. (Doc. 84 at 1, ¶ 1.)

Plaintiffs are represented by Steven M. Cohen, Esq. and Edward P. Yankelunas, Esq. Defendant ACV is represented by John A. Jurata, Jr., Esq., Jonathan Direnfeld, Esq., Michael L. McCabe, Esq., and Myriah Valentina Jaworski, Esq. Defendant Sun Auto is

represented by Myriah Valentina Jaworski, Esq. and Timothy W. Hoover, Esq. Defendant Brian M. Malchak is represented by Jon P. Devendorf, Esq. and Myriah Valentina Jaworski, Esq.

## I. The Pending Motion for Sanctions Against Plaintiffs' Counsel.

On September 10, 2021, Defendant ACV filed the pending motion for sanctions against Plaintiffs' counsel, alleging improper in-person solicitation of prospective class members in violation of New York Rule of Professional Conduct 7.3. (Doc. 67.) Specifically, ACV asserts that on July 22, 2021, Nathan McMurray, a former attorney at HoganWillig, PLLC ("HoganWillig"), the law firm representing Plaintiffs, contacted the Certified Auto Brokers ("CAB") dealership in Grand Island, New York in person "under false pretenses, and, once in the door, tried to coerce that business to join this lawsuit." (Doc. 67-1 at 5.)

Defendant ACV contends this court is authorized to sanction unethical conduct pursuant to its supervisory authority regarding attorney professional responsibility and that it may restrict pre-certification communications with class members. It requests an order restricting Plaintiffs' counsel from contacting prospective class members; requiring Plaintiffs' counsel to "disclose whether they have engaged in any other in-person or other solicitations of prospective plaintiffs, and, if so, provide the specifics of those solicitations[;]" and requiring Plaintiffs to pay attorney's fees incurred in relation to the investigation of and briefing this issue. (Doc. 67 at 1.)

On September 29, 2021, Plaintiffs opposed ACV's motion for sanctions and requested an award of attorney's fees for the costs incurred in responding to ACV's motion. On October 6, 2021, ACV filed a reply. A hearing was held on October 14, 2021, during which the court determined that an evidentiary hearing was required. The evidentiary hearing was held on January 3, 2022. On January 18, 2022, after the court's submission deadline for supplemental briefing expired, the court took the pending motion under advisement.

## II. Factual Findings.

Based on the preponderance of the evidence, the court makes the following findings of fact:

1. Plaintiffs are represented by HoganWillig. From July 2021 until approximately November of 2021, Nathan McMurray, Esq. was employed by HoganWillig and was working on this lawsuit. In that capacity, he met with witnesses and others to obtain information in support of Plaintiffs' claims.

2. Attorney McMurray is licensed to practice law in the State of New York and is familiar with New York's Rules of Professional Conduct. He formerly served as Town Supervisor for the Town of Grand Island, New York.

3. Christopher Taylor is a co-owner of CAB, located on River Road, Grand Island, New York. CAB sells used cars both online and on its premises. It typically has approximately 150 used vehicles on its lot. Timothy Renzoni is a salesperson employed by CAB.

4. Prior to July 2021, Attorney McMurray, in his capacity as Grand Island's Town Supervisor, was acquainted with Mr. Taylor through a number of professional interactions. For example, Mr. Taylor invited Attorney McMurray to participate in a ribbon cutting ceremony at CAB in 2016 to celebrate an expansion of its facilities. Attorney McMurray was one of several representatives of local government present. In addition, Attorney McMurray and Mr. Taylor worked on a war memorial together which was spearheaded by Mr. Taylor in honor of one of his relatives.

5. Attorney McMurray and Mr. Taylor offer divergent accounts of their other professional interactions. Attorney McMurray testified that Mr. Taylor was a frequent advocate regarding Grand Island town issues, appeared before him on numerous occasions, and was a vocal opponent of a trail which Attorney McMurray supported, and which transformed a parkway in front of Mr. Taylor's home into a public bike path. In his affidavit dated September 27, 2021, Attorney McMurray avers that Mr. Taylor, whose residence abuts the trail, on one occasion yelled at him that he was "ruining his dream home." (Doc. 73-1 at 2, ¶ 6) (internal quotation marks omitted). Mr. Taylor, in contrast, testified that he supported the trail although he concedes that many of his neighbors did not. He does not recall an altercation with Attorney McMurray and believes Attorney McMurray may have him confused with another individual. He denies being active in local politics.

3

6. On July 22, 2021 at approximately 7:00 p.m. in the evening, Attorney McMurray stopped at CAB which he passed to and from work. He met with Mr. Renzoni and discussed his interest in purchasing a pick-up truck for a project he was doing with his brother in Niagara County. The parties offer divergent accounts of the conversation and also offer divergent accounts of how Mr. Taylor became involved in the Renzoni-McMurray conversation. Although Attorney McMurray may have asked whether Mr. Taylor was at the dealership, the court finds that Mr. Taylor was not summoned by either Attorney McMurray or Mr. Renzoni but instead happened to walk into the dealership at approximately 7:00 p.m., saw Attorney McMurray and Mr. Renzoni talking in Mr. Renzoni's office, and stopped by, as is his custom, to greet Attorney McMurray as a potential customer.

7. After discussing the pick-up truck for approximately five to ten minutes, Attorney McMurray initiated a conversation about a lawsuit he was working on at HoganWillig. He asked Mr. Taylor questions about Joseph Neiman, who is a former Defendant in this lawsuit and a principal of Defendant ACV.[1] Mr. Taylor testified that he was one of the first dealers to sign up with Mr. Neiman and they started their businesses around the same date, but has had no contact with him in the interim.

8. Attorney McMurray and Mr. Taylor discussed, among other things, Mr. Neiman's alleged aggressive sales tactics, ACV's alleged use of shill bidding, and ACV's alleged provision of lavish gifts to auto dealers.

9. Attorney McMurray advised Mr. Taylor that he was representing a client in a lawsuit against Mr. Neiman's company and, if the lawsuit was successful, there would be a substantial amount of money to be made. He stated something to the effect that if Mr. Taylor joined in the lawsuit, it stood to benefit him.

10. The conversation between Mr. Taylor and Attorney McMurray about the lawsuit lasted approximately ten to fifteen minutes. It ended with a discussion of the pick-up truck although Attorney McMurray did not ask to see used trucks on the lot.

11. Mr. Renzoni was present for the conversation between Attorney McMurray and Mr. Taylor. He felt it was "improper" because it appeared more important to Attorney McMurray to have "face time" with Mr. Taylor to discuss the lawsuit

---

[1] While this motion was pending, Plaintiffs filed a Third Amended Complaint which removed Mr. Neiman from this lawsuit. (Doc. 84.)

than to buy a truck. In his affidavit, he avers that: "[i]t is very unusual for a customer to bring up . . . competing dealerships or lawsuits, and it felt like [Attorney] McMurray was doing something that was not appropriate or right." (Doc. 67-3 at 3, ¶ 17.)

12. Mr. Renzoni credibly testified that he did not recall an offer by Attorney McMurray to represent Mr. Taylor or CAB in a lawsuit. In his affidavit, which he acknowledged reflected a more accurate recollection of the encounter, he stated that Attorney McMurray "stated that it would be very good for Mr. Taylor if CAB became involved in the lawsuit [Attorney] McMurray was handling, and stated that Mr. Taylor would gain financially if he joined the lawsuit." *Id.* at ¶ 15.

13. Attorney McMurray did not affirmatively offer to represent Mr. Taylor or CAB in a lawsuit. Mr. Taylor's testimony and affidavit to the contrary is an overstatement of what took place.

14. Although both Mr. Taylor and Mr. Renzoni in their affidavits claim Attorney McMurray stated he had already spoken to other dealerships about joining the lawsuit, no details were provided and HoganWillig does, in fact, represent other dealerships.

15. It is undisputed that Attorney McMurray did not discuss attorney's fees or a fee structure, did not discuss the terms and conditions of any legal representation, and did not present a retainer agreement or make any other effort to represent Mr. Taylor or CAB.

16. Toward the end of the July 22, 2021 encounter, Attorney McMurray proposed that he meet with Mr. Taylor at HoganWillig to discuss the matter further. Mr. Taylor provided his contact information to Attorney McMurray on Mr. Renzoni's business card. Although Mr. Taylor initially denied providing Attorney McMurray with his contact information (in part, because he does not use business cards), the court finds that he did so.

17. Mr. Taylor did not express his discomfort with the encounter at the time although in his affidavit he avers that he was "physically shaking by the end of the conversation with Mr. McMurray." (Doc. 67-2 at 3, ¶ 26.) Mr. Taylor acknowledged it is typical for him to react in this manner to an uncomfortable situation and he demonstrated to the court that his hand was shaking during his testimony.

18. Although the court found both Attorney McMurray and Mr. Taylor to be generally credible, the court finds Mr. Taylor's declaration filed in support of ACV's motion could reasonably be interpreted to create a false impression that he met Attorney McMurray for the first time on July 22, 2021 by stating: "[w]hen I walked in [to Mr. Renzoni's office at the CAB dealership], I saw Nate McMurray, who I know now to an attorney with Hogan[]Willig, speaking with one of CAB's sales people, Tim Renzoni." (Doc. 67-2 at 2, ¶ 4.) The Affidavit contains no mention of a pre-existing relationship or even acquaintance. In addition, it does not mention that Mr. Taylor wrote his name and cell phone number on Mr. Renzoni's business card and gave it to Attorney McMurray to facilitate further communication. As Mr. Taylor was not solely responsible for selecting the information that would be contained in his affidavit, and as he credibly testified that he does not know why his prior relationship with Attorney McMurray was not mentioned, the court finds no intent to deceive on his part.

19. On balance, the court finds that, prior to July 22, 2021, Attorney McMurray and Mr. Taylor had several encounters and that, at least from Attorney McMurray's perspective, there had been a "falling out" between them over a public trail and Attorney McMurray wanted to mend the relationship.

20. Attorney McMurray purchased a new pick-up truck on the day after the July 22, 2021 encounter. He did not respond to Mr. Renzoni's texts and calls regarding whether he was still interested in a pick-up truck.

21. On an unspecified date, Mr. Taylor received a call on his cell phone which he did not recognize. He investigated the number and determined it was from HoganWillig. No voicemail was left, and Mr. Taylor did not return the call. The court finds that while Mr. Taylor's affidavit attributes this call to Attorney McMurray, this is merely a reasonable inference on Mr. Taylor's part.

22. Mr. Taylor subsequently instructed one of his employees to contact Defendant ACV and advise it of the July 22, 2021 encounter. He agreed to talk with ACV's counsel and sign an affidavit regarding his interaction with Attorney McMurray. Mr. Taylor and Mr. Renzoni have not been compensated for their involvement in this lawsuit and both testified at the court's hearing pursuant to subpoenas.

23. The court finds that Attorney McMurray initiated the July 22, 2021 encounter with a mixed motive. He sought to repair his relationship with Mr. Taylor which he perceived to be broken and he was genuinely interested in purchasing a pick-up truck. When he saw Mr. Taylor at CAB, he sought to obtain information from him

6

that might prove helpful to his client's lawsuit. He further sought to encourage CAB to participate in the lawsuit by stating it might prove lucrative if successful and by inviting Mr. Taylor to discuss the matter further.

**III.     Conclusions of Law and Analysis.**

**A.     Whether Sanctions are Appropriate Based on an Ethical Violation.**

"The federal courts [may] enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar." *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir. 1988) (citing *In re Snyder*, 472 U.S. 634, 645 n.6 (1985)). The Western District of New York's Local Rules state that "[a]ttorneys practicing in this [c]ourt shall faithfully adhere to the New York Rules of Professional Conduct." L.R. Civ. P. 83.3(a). The New York Rules of Professional Conduct prohibit in-person solicitation where the recipient is not a "close friend, relative, former client or existing client[.]" N.Y.R. Prof. Conduct 7.3(a)(1). Solicitation is defined in Rule 7.3(b) as:

> any advertisement initiated by or on behalf of a lawyer or law firm that is directed to, or targeted at, a specific recipient or group of recipients, or their family members or legal representatives, *the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain*. It does not include a proposal or other writing prepared and delivered in response to a specific request.

(emphasis supplied). According to an American Bar Association ("ABA") Formal Opinion, the ABA's similar rule applies to collective actions, including class actions, in which the goal is to secure representation of a putative class member. *See* ABA Formal Op. 07-445 (2007). The ABA rule contains an exception for solicitation of a person with "a family, close personal, or prior business or professional relationship with the lawyer or law firm[.]" ABA Model R. Prof. Conduct 7.3(b)(2). The parties agree that New York's version of Rule 7.3 does not contain an exception for a prior professional relationship. (Doc. 74 at 5.)

The Supreme Court has observed that "[t]he solicitation of business by a lawyer through direct, in-person communication with the prospective client has long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client." *Ohralik v. Ohio State*

7

*Bar Ass'n*, 436 U.S. 447, 455 (1978); *see also Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 476 (1988) (explaining the importance of an attorney's mode of communication when assessing solicitation).

In this case, Attorney McMurray had several motives when he initiated in-person contact with a potential client, including encouraging CAB's participation in a putative class action lawsuit. Attorney McMurray did not provide Mr. Taylor or Mr. Renzoni with a copy of his business card and did not discuss a retainer agreement or attorney's fees while at CAB. Instead, he gathered information. The court finds that obtaining information useful to this lawsuit was Mr. McMurray's primary purpose. *See Pagan v. C.I. Lobster Corp.*, 2021 WL 3009656, at *3 (S.D.N.Y. July 16, 2021) (finding that attorney contacting potential plaintiffs about a lawsuit shortly after they received text messages from a named plaintiff that referenced "get[ting] this money" did not constitute improper solicitation where attorney stated under oath that he made contact "for the purpose of gathering information and interviewing witnesses") (internal quotation marks omitted) (alteration in original). Although a close question, the court does not find that Attorney McMurray violated applicable ethical standards because his primary purpose was not Mr. Taylor's retention of HoganWillig as his counsel for purposes of pecuniary gain. The court finds the evidence that Attorney McMurray engaged in other in-person direct solicitations also insufficient.

### B. Whether the Court Should Ban Future Communications with Potential Class Members.

As a prophylactic measure, ACV requests a restriction on Plaintiffs' ability to communicate with potential class members before any class has been certified. "[C]ommunications with putative class members prior to certification may . . . implicate ethical rules[,]" *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 569 (D. Conn. 2011), and courts may impose limitations on this type of communication. "[A] court's authority to control . . . communications [between counsel and class members] can apply even before an attorney-client relationship is created with a potential class member." *Scott v. Chipotle Mexican Grill, Inc.*, 2014 WL 4852063, at *2 (S.D.N.Y. Sept. 29, 2014).

The court must, however, tread lightly so as to strike an appropriate balance between ethical concerns and the right to communicate with potential class members.

In *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981), the Supreme Court recognized the "potential problems" that can arise out of communications with potential class members and that this "potential for abuse" provides district courts "the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Id.* at 100-01. Noting this discretion is "bounded" and "not unlimited," the Supreme Court cautioned that any "order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* (footnote omitted). In other words, a court "must not interfere with *any* party's ability to communicate freely with putative class members, unless there is a specific reason to believe that such interference is necessary." *Austen*, 831 F. Supp. 2d at 567. Any restrictions on communications must reflect whether "potential problems" that arise specifically in class or collective actions require such restrictions. *Gulf Oil*, 452 U.S. at 101.

> As this court has previously explained:
>
> [e]xamples of abusive conduct by parties to a class action in communicating with prospective class members that may be subject to judicial remedies include providing false, misleading or intimidating information, or other misconduct such as concealing material information or conducting communications with a represented party.

*Gordon v. Kaleida Health*, 737 F. Supp. 2d 91, 96-97 (W.D.N.Y. 2010) (internal quotation marks and citations omitted). Correspondingly, "[w]hen . . . district courts have imposed significant pre-certification communications—for example, requiring prior court approval of all communications with putative class members—they have done so because the parties engaged in serious abuses such as 'giv[ing] false, misleading, or intimidating information, concealing material information, or attempting to influence the decision about whether to seek exclusion from a class.'" *Austen*, 831 F. Supp. 2d at 568 (citations omitted); *see also Brown v. Mustang Sally's Spirits and Grill, Inc.*, 2012 WL 4764585, at

9

\*5 (W.D.N.Y. Oct. 5, 2012) (concluding the court was "precluded from any significant restraint on the parties' communications with potential class members because this record [did] not support a finding of actual abuse.").

ACV has not established an ethical violation, a clear record of abuse, or the potential for specific problems. Although it relies heavily on *Shibetti v. Z Rest., Diner and Lounge, Inc.*, 2021 WL 1738315, at \*6-7 (E.D.N.Y. May 3, 2021), that case is inapposite. There, the court found that phone calls to certain individuals requesting that they "give [counsel] a call back" if they had "any interest in joining this lawsuit" constituted a "[d]irect solicitation by telephone[.]" *Id.* The court acknowledged that while there are legitimate reasons to contact potential plaintiffs, including to obtain information regarding the merits of a case, telephone calls soliciting them to join a lawsuit does not constitute a permissible reason. *Id.* at \*7. As a result, the district court awarded a monetary sanction against the plaintiffs' counsel. *Id.* at \*10. In contrast, Attorney McMurray sought relevant information regarding the Defendants in this lawsuit and mentioned the potential benefits for those who joined the lawsuit. He did not directly ask Mr. Taylor or CAB to join the lawsuit or offer to represent them. While Attorney McMurray may have hoped for further communications with Mr. Taylor, when they did not transpire, he ceased contacting him.

"Plaintiffs have a right to seek information from putative class members[,]" including evidence in support of their claims. *Gordon*, 737 F. Supp. 2d at 102 (citing *Gulf Oil*, 452 U.S. at 101). The Supreme Court has condemned orders that "made it more difficult for respondents, as the class representatives, to obtain information about the merits of the case from the persons they sought to represent." *Gulf Oil*, 452 U.S. at 101. The "mere possibility of abuses" does not justify sanctions in the form of a communications ban that could "interfere[] with the formation of a class or the prosecution of a class action[.]" *Id.* at 104.

Where appropriate, courts may consider "less burdensome remedies" such as "an order requiring parties to file copies of nonprivileged communications to class members with the court[.]" *Gulf Oil*, 452 U.S. at 104 n.20. Even this restriction is not justified by

10

the record before the court. Attorney McMurray is no longer employed by HoganWillig or involved in this lawsuit. A single instance of in-person communication supported by a mixed motive does not warrant court intervention.

### C. Whether to Award Attorney's Fees and Costs.

Plaintiffs request an "award of attorney's fees and the costs incurred to Plaintiffs' counsel in responding to ACV's motion[.]" (Doc. 73 at 8.) Defendant ACV also requests "attorney's fees incurred in uncovering [Attorney] McMurray's unethical conduct[.]" (Doc. 74 at 14.) Because there is no clear record of unethical conduct before the court, and, conversely, because the motion for sanctions was not frivolous and presented a close question, an award of attorney's fees, for either party, is not warranted. *Cf. Shibetti*, 2021 WL 1738315, at *9-10 ("reserv[ing] judgment on whether to reduce plaintiffs' fee awards" in the future based on the finding of an unethical solicitation by plaintiffs' counsel and refusing to award defense counsel fees for their work on the pending motions where they were "not without blame").

## CONCLUSION

For the foregoing reasons, Defendant ACV's motion for sanctions against Plaintiffs' counsel (Doc. 67) is DENIED. The court also DENIES Plaintiffs' request for an award of attorney's fees.

SO ORDERED.

Dated this 30th day of March, 2022.

Christina Reiss, District Judge
United States District Court